# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**　　　**2. PLEASE TYPE OR PRINT**　　　**3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| Kareem Bellamy,<br><br>　　　　Plaintiff,<br><br>City of New York, John J. Gillen and Michael F. Solomeno,<br><br>　　　　Defendants. | Eastern Dist. of New York | Ann M. Donnelly |

| District Court or Agency | Judge |
|---|---|
| Date the Order or Judgment Appealed from was Entered on the Docket:<br>May 18, 2017 | District Court Docket No.:<br>12-cv-1025 |
| Date the Notice of Appeal was Filed:<br>June 14, 2017 (amended) | Is this a Cross Appeal?<br>☐ Yes　✓ No |

**Attorney(s) for Appellant(s):**
✓ Plaintiff
☐ Defendant

| Counsel's Name: | Address: | Telephone No.: | Fax No.: | E-mail: |
|---|---|---|---|---|
| Thomas Hoffman, Esq. | 37 Elaine Terr.<br>Yonkers, NY 10701 | 917-589-6156 | | thoff93452@aol.com |
| Joel B. Rudin, Esq. | 600 5th Ave, 10 Fl.<br>New York, NY 10020 | 212-752-7600 | | jbrudin@rudinlaw.com |

**Attorney(s) for Appellee(s):**
☐ Plaintiff
✓ Defendant

| Counsel's Name: | Address: | Telephone No.: | Fax No.: | E-mail: |
|---|---|---|---|---|
| Matthew Modafferi<br>N.Y.C. Law Dept. | 100 Church St<br>New York, NY 10007 | 212-356-2331 | 212-788-9776 | mmodaffe@law.nyc.gov |

| Has Transcript Been Prepared?<br><br>No | Approx. Number of Transcript Pages:<br><br>N/A | Number of Exhibits Appended to Transcript:<br><br>N/A | Has this matter been before this Circuit previously? ☐ Yes ✓ No<br><br>If Yes, provide the following:<br><br>Case Name:<br><br>2d Cir. Docket No.:　　　Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

*ADDENDUM "A"*: COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

*ADDENDUM "B"*: COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| ☐ U.S. a party　　☐ Diversity<br>✓ Federal question　　☐ Other (specify):<br>　(U.S. not a party) | ✓ Final Decision　　☐ Order Certified by District Judge (i.e., Fed. R. Civ. P. 54(b))<br>☐ Interlocutory Decision Appealable As of Right　　☐ Other (specify): |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

**FORM C** (Rev. October 2016)

**PART B:  DISTRICT  COURT DISPOSITION    (Check as many as apply)**

1. Stage of Proceedings

- [✓] Pre-trial
- [ ] During trial
- [ ] After trial

2. Type of Judgment/Order Appealed

- [ ] Default judgment
- [ ] Dismissal/FRCP 12(b)(1) lack of subject matter juris.
- [ ] Dismissal/FRCP 12(b)(6) failure to state a claim
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) other dismissal

- [ ] Dismissal/other jurisdiction
- [ ] Dismissal/merit
- [ ] Judgment / Decision of the Court
- [✓] Summary judgment
- [ ] Declaratory judgment
- [ ] Jury verdict
- [ ] Judgment NOV
- [ ] Directed verdict
- [ ] Other (specify):

3.  Relief

- [✓] Damages:
  - [ ] Sought: $ _____
  - [ ] Granted: $ _____
  - [ ] Denied: $ _____

- [ ] Injunctions:
  - [ ] Preliminary
  - [ ] Permanent
  - [ ] Denied

**PART C:  NATURE OF SUIT   (Check as many as apply)**

1. Federal Statutes

- [ ] Antitrust
- [ ] Bankruptcy
- [ ] Banks/Banking
- [✓] Civil Rights
- [ ] Commerce
- [ ] Energy
- [ ] Commodities
- [ ] Other (specify): _____

- [ ] Communications
- [ ] Consumer Protection
- [ ] Copyright ☐ Patent
- [ ] Trademark
- [ ] Election
- [ ] Soc. Security
- [ ] Environmental

- [ ] Freedom of Information Act
- [ ] Immigration
- [ ] Labor
- [ ] OSHA
- [ ] Securities
- [ ] Tax

2.  Torts

- [ ] Admiralty/ Maritime
- [ ] Assault / Defamation
- [ ] FELA
- [ ] Products Liability
- [✓] Other (Specify): Supplemental State law tort claims

3.  Contracts

- [ ] Admiralty/ Maritime
- [ ] Arbitration
- [ ] Commercial
- [ ] Employment
- [ ] Insurance
- [ ] Negotiable Instruments
- [ ] Other Specify

4.  Prisoner Petitions

- [ ] Civil Rights
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Parole
- [ ] Vacate Sentence
- [ ] Other

5.  Other

- [ ] Hague Int'l Child Custody Conv.
- [ ] Forfeiture/Penalty
- [ ] Real Property
- [ ] Treaty (specify): _____
- [ ] Other (specify): _____

6.  General

- [ ] Arbitration
- [ ] Attorney Disqualification
- [ ] Class Action
- [ ] Counsel Fees
- [ ] Shareholder Derivative
- [ ] Transfer

7.  Will appeal raise constitutional issue(s)?

- [✓] Yes
- [ ] No

Will appeal raise a matter of first impression?

- [ ] Yes
- [✓] No

1. Is any matter relative to this appeal still pending below? [ ] Yes, specify: _____ [✓] No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A)   Arises from substantially the same case or controversy as this appeal?   [ ] Yes   [✓] No

   (B)   Involves an issue that is substantially similar or related to an issue in this appeal?   [ ] Yes   [✓] No

If yes, state whether ☐ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|
| | | | |

Name of Appellant:

| Date: June 27, 2017 | Signature of Counsel of Record:  s/Joel B. Rudin |
|---|---|

## NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.

2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.

3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

      **PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

**FORM C**  (Rev. December 2016)

## ADDENDUM "A"

### 1. The Nature of the Action

This is a civil rights action, pursuant to 42 U.S.C. § 1983, brought in the United States District Court for the Eastern District of New York, seeking monetary damages from individual police officers and the City of New York for plaintiff's wrongful conviction and fourteen years of imprisonment, caused by officers' *Brady* violations and evidence fabrication, as well as unconstitutional policies and practices of the Queens District Attorney's Office.

Plaintiff-Appellant Kareem Bellamy was convicted at trial in Queens County in 1995 of depraved indifference murder and criminal possession of a weapon based on an inculpatory statement fabricated by police and by the testimonies of three fact witnesses: an eyewitness who admittedly could not identify plaintiff in a lineup but was pressured to falsely identify him in court; a second witness who fabricated a threat by plaintiff in exchange for substantial financial assistance, which was not disclosed; and a third witness, who glimpsed a man of plaintiff's height and build at the crime scene but could not identify plaintiff, despite being pressured to do so.

In 2008, a State hearing court vacated plaintiff's conviction based on newly-discovered evidence that a longtime suspect had confessed that he

1

and fellow gang member committed the murder. Police had failed to investigate an earlier reported confession by these same two gang members one week after the murder. In 2010, the hearing court affirmed its decision, which was affirmed by the Appellate Division and led to the dismissal of all charges in 2011.

In 2012, Mr. Bellamy brought this civil rights suit to vindicate his constitutional rights and to expose the misconduct that was a substantial cause of his wrongful conviction. Plaintiff filed claims against New York City Police Detectives John Gillen and Michael Solomeno for malicious prosecution and violation of his right to a fair trial through evidence fabrication and withholding of *Brady* material. Plaintiff also brought claims against the City of New York for the policy of the Queens District Attorney's Office of deliberate indifference to *Brady* violations, especially the non-disclosure of witness benefits, and to summation and other misconduct, which caused Plaintiff to be denied his constitutional right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## 2. The Result Below

On April 15, 2016, the District Court (Donnelly, J.) stayed discovery on Plaintiff's municipal liability claims, notwithstanding the parties' prior,

2

negotiated stipulation that such discovery might proceed, and allowed Defendants to move for summary judgment. On May 17, 2017, the District Court granted summary judgment for Defendants on all of Plaintiff's federal claims as well as his state-law malicious prosecution claim. In doing so, the District Court ignored most record evidence of police and prosecutorial misconduct and drew critical factual inferences *against* plaintiff. The District Court found that plaintiff's claims of municipal liability failed as a matter of law, reasoning, contrary to this Circuit's precedent, *see, e.g., Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998) and *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), that the Queens District Attorney acts on behalf of the State, and not the municipality, when he adopts a policy, custom, or practice of deliberate indifference to constitutional violations of *Brady* disclosure requirements as well as the right to a fair trial. The District Court further held that, in Mr. Bellamy's case, the Queens District Attorney's Office did not violate *Brady* or commit constitutionally significant summation misconduct.

3. **The Notice of Appeal and a Current Copy of the Lower Court Docket Sheet Are Attached.**

4. **A Copy of the District Court's Memorandum and Order Dismissing The Action is Attached.**

5. **A Copy of the Minutes of the April 15, 2016 Hearing at Which the District Court Stayed *Monell* Discovery is Attached.**

3

Case 17-1859, Document 15, 06/27/2017, 2067418, Page6 of 128

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

KAREEM BELLAMY,

                            Plaintiff,

    -against-

City of New York,
John J. Gillen,
Michael F. Solomeno,
Vincent Pepe, Robert Schruell, Supervising
Officers at the NYPD 101st Precinct,

                        Defendants.

-------------------------------------------------------------x

           12 Civ. 1025 (AMD)(PK)

           **AMENDED
           NOTICE OF APPEAL**

      NOTICE IS HEREBY GIVEN, that KAREEM BELLAMY, plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit each and every part of the judgment entered in this action on May 18, 2017 granting defendants' motion for summary judgment in its entirety.

Dated:
      New York, New York
      June 14, 2017

                        Thomas Hoffman
                        Attorney for Plaintiff
                        Law Offices of Thomas Hoffman, P.C.
                        37 Elaine Terrace
                        Yonkers, NY 10701
                        thoff93452@aol.com
                        212-581-1180
                        917 589 6156

APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:12−cv−01025−AMD−PK

Bellamy v. City of New York et al
Assigned to: Judge Ann M Donnelly
Referred to: Magistrate Judge Peggy Kuo
Cause: 42:1983 Civil Rights Act

Date Filed: 03/01/2012
Date Terminated: 05/18/2017
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Kareem Bellamy**      represented by    **Thomas Hoffman**
Law Offices of Thomas Hoffman, P.C.
5 Columbus Circle/1790 Broadway
6th Floor
New York, NY 10019
212−581−1180
Fax: 212−581−8002
Email: thoff93452@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of New York**      represented by    **Andrew Patrick Wenzel**
Devitt & Spellman
50 Route 111
Smithtown, NY 11787
631−724−8833
Fax: 631−724−8010
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Modafferi**
New York City Law Department
100 Church Street
New York, NY 10007
212−356−2331
Fax: 212−788−9776
Email: mmodaffe@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Virginia Jackson Nimick**
New York City Law Department
100 Church Street
New York, NY 10007
212−356−2663
Fax: 212−356−3509
Email: vnimick@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Moe**
New York City Law Department
100 Church Street
New York, NY 10007
212−356−3549
Fax: 212−788−9776
*TERMINATED: 10/03/2014*

*ATTORNEY TO BE NOTICED*

**Elizabeth M. Daitz**
New York City Law Department
100 Church St Rm 3−183
New York, NY 10007
212−356−2412
Fax: (212)788−9776
Email: edaitz@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**John J. Gillen**                                    represented by  **Andrew Patrick Wenzel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Modafferi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Virginia Jackson Nimick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Moe**
(See above for address)
*TERMINATED: 10/03/2014*
*ATTORNEY TO BE NOTICED*

**Elizabeth M. Daitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael F. Solomeno**                              represented by  **Andrew Patrick Wenzel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Modafferi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Virginia Jackson Nimick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Moe**
(See above for address)
*TERMINATED: 10/03/2014*
*ATTORNEY TO BE NOTICED*

**Elizabeth M. Daitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe 1**
*TERMINATED: 12/07/2016*

**Defendant**

**John Doe 2**
*Supervising Officers at the NYPD 101st*
*Precinct*
*TERMINATED: 12/07/2016*

**Defendant**

**Vincent NMI Pepe**
*TERMINATED: 08/18/2015*

**Defendant**

**Robert Schruhl**
*TERMINATED: 08/18/2015*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/01/2012 | 1 | COMPLAINT against All Defendants Disclosure Statement on Civil Cover Sheet completed −no,, filed by Kareem Bellamy. (Attachments: # 1 Civil Cover Sheet) (Bowens, Priscilla) (Additional attachment(s) added on 3/5/2012: # 2 addendum) (Bowens, Priscilla). (Entered: 03/05/2012) |
| 03/01/2012 | | Summons Issued as to All Defendants. (Bowens, Priscilla) (Entered: 03/05/2012) |
| 03/01/2012 | | FILING FEE: $ 350, receipt number 4653040594 (Bowens, Priscilla) (Entered: 03/05/2012) |
| 03/21/2012 | 2 | MOTION for Extension of Time to File Answer by City of New York. (Wenzel, Andrew) (Entered: 03/21/2012) |
| 03/23/2012 | | ORDER granting 2 Motion for Extension of Time to Answer. City of New York answer due 5/22/2012. Ordered by Magistrate Judge Viktor V. Pohorelsky on 3/23/2012. (Newton, Joan) (Entered: 03/23/2012) |
| 03/26/2012 | | SCHEDULING ORDER: An initial conference will be held in this case on **June 5, 2012 at 10:00 a.m.** before Viktor V. Pohorelsky, United States Magistrate Judge in Courtroom 13A of the United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York. All parties are directed to make the disclosures required by Rules 26(a)(1) of the Federal Rules of Civil Procedure no later than ***five days before*** the conference. **All counsel are required to attend, and plaintiffs counsel is directed to ensure that all counsel are aware of their obligation to appear.** Any requests for adjournment must be made in writing on notice to opposing parties, and must disclose whether or not all parties consent. No request for adjournment will be considered unless made at least forty−eight (48) hours before the scheduled conference. Ordered by Magistrate Judge Viktor V. Pohorelsky on 3/26/2012. (Newton, Joan) (Entered: 03/26/2012) |
| 03/29/2012 | 3 | SUMMONS Returned Executed by Kareem Bellamy. City of New York served on 3/2/2012, answer due 5/22/2012. (Hoffman, Thomas) (Entered: 03/29/2012) |
| 03/29/2012 | 4 | SUMMONS Returned Executed by Kareem Bellamy. John J. Gillen served on 3/20/2012, answer due 4/10/2012. (Hoffman, Thomas) Modified on 3/29/2012 to correct the filer. (Brucella, Michelle). (Entered: 03/29/2012) |
| 03/29/2012 | 5 | SUMMONS Returned Executed by Kareem Bellamy. Michael F. Solomeno served on 3/10/2012, answer due 4/2/2012. (Hoffman, Thomas) (Entered: 03/29/2012) |
| 05/21/2012 | 6 | Letter *Pre−motion conference letter* by City of New York, John J. Gillen, Michael F. Solomeno (Wenzel, Andrew) (Entered: 05/21/2012) |
| 05/22/2012 | | SCHEDULING ORDER: The Court has scheduled a pre−motion conference in the above−titled action for Friday, July 6, 2012 at 11:00 a.m. in Courtroom 6H North before the Honorable William F. Kuntz, II. Ordered by Judge William F. Kuntz, II on 5/22/2012. (Crockett, Daniel) (Entered: 05/22/2012) |

| 05/22/2012 | 7 | MOTION to Stay *discovery* by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 05/22/2012) |
|---|---|---|
| 05/22/2012 | 8 | MOTION to Adjourn Conference *on July 6th* by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 05/22/2012) |
| 05/22/2012 | 9 | ORDER granting 7 Motion to Stay Discovery. So Ordered by Judge William F. Kuntz, II on 05/22/2012. (Kuntz, William) (Entered: 05/22/2012) |
| 05/22/2012 | 10 | ORDER granting 8 Motion to Adjourn Conference is hereby granted. The Conference will be held at Noon on July 18, 2012. So Ordered by Judge William F. Kuntz, II on 5/22/2012. (Kuntz, William) (Entered: 05/22/2012) |
| 05/24/2012 | 11 | Letter MOTION for Reconsideration re 9 Order on Motion to Stay by Kareem Bellamy. (Hoffman, Thomas) (Entered: 05/24/2012) |
| 05/24/2012 | | ORDER denying plaintiff's request for this court to vacate the stay of discovery or, alternatively, advance the July 19, 2012 pre−motion conference date. As the plaintiff is responding to two separate letter motions, permission is granted nunc pro tunc to enlarge the page limit to six (6) pages the pre−motion letter submission: So Ordered by Judge William F. Kuntz, II on 5/24/2012. (Kuntz, William) (Entered: 05/24/2012) |
| 05/25/2012 | | ORDER finding as moot 11 Motion for Reconsideration. Ordered by Judge William F. Kuntz, II on 5/25/2012. (Crockett, Daniel) (Entered: 05/25/2012) |
| 05/29/2012 | 12 | Letter by Kareem Bellamy (Hoffman, Thomas) (Entered: 05/29/2012) |
| 05/30/2012 | | ORDER −− In light of the stay of discovery, the 6/5/12 conference is adjourned sine die. All counsel are to report to Room 1207S immediately following the pre−motion conference with the district judge for a brief status conference with the magistrate judge. Ordered by Magistrate Judge Viktor V. Pohorelsky on 5/30/2012. (Newton, Joan) (Entered: 05/30/2012) |
| 07/18/2012 | | Minute Entry for proceedings held before Judge William F. Kuntz, II: Pre Motion Conference held on 7/18/2012. Appearances: Thomas Hoffman, Esq., and Marvin Artis, Esq., appeared on behalf of the Plaintiff. Andrew Wenzel, Esq., appeared on behalf of the Defendants. The Court granted the Defendant's request to make its motion to dismiss. The Court ordered the following briefing schedule: The Defendant shall serve its motion on or before Friday, August 31, 2012 by 5:00 P.M.; Plaintiff shall serve its response on or before Friday, October 5, 2012 by 5:00 P.M.; the Defendant shall serve its reply on Friday, November 9, 2012 by 5:00 P.M. Once the motion is fully briefed, the original moving party shall be responsible for immediately filing all motion papers on ECF no later than 5:00 P.M. on Friday, November 9, 2012. The moving party shall mail a complete hard copied set of the fully briefed motion to chambers addressed to Andrew Jackson. The stay is to remain in place with respect to all discovery. (Court Reporter Ronald Tolkin.) (Jackson, Andrew) (Entered: 07/19/2012) |
| 08/22/2012 | 13 | First MOTION for Leave to File Excess Pages by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 08/22/2012) |
| 08/22/2012 | 14 | ORDER granting 13 Motion for Leave to File Excess Pages. This Court will allow an additional 15 pages to be filed with respect to this Memorandum of Law on this motion. So Ordered. (Kuntz, William) (Entered: 08/22/2012) |
| 08/31/2012 | 15 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 08/31/2012) |
| 08/31/2012 | 16 | MEMORANDUM in Support re 15 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 08/31/2012) |
| 08/31/2012 | 17 | AFFIDAVIT/DECLARATION in Support re 15 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Wenzel, Andrew) (Entered: 08/31/2012) |

| | | |
|---|---|---|
| 09/04/2012 | | ORDER dismissing 15 Motion to Dismiss for Failure to State a Claim. The moving party is directed to file its motion to dismiss only once the motion is fully briefed, no later than 5 P.M. on November 9, 2012, in accordance with the briefing schedule established at the July 18, 2012 pre−motion conference and Rule III(G)(2) of Judge Kuntz's Individual Motion Practices. Ordered by Judge William F. Kuntz, II on 9/4/2012. (Crockett, Daniel) (Entered: 09/04/2012) |
| 10/01/2012 | 18 | First MOTION for Leave to File Excess Pages by Kareem Bellamy. (Hoffman, Thomas) (Entered: 10/01/2012) |
| 10/01/2012 | | ORDER granting 18 Motion for Leave to File Excess Pages. An additional twenty five (25) pages may be filed. So Ordered. (Kuntz, William) (Entered: 10/01/2012) |
| 11/05/2012 | 19 | First MOTION for Extension of Time to File Response/Reply *due to weather related issues* by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 11/05/2012) |
| 11/07/2012 | | ORDER granting 19 Motion for Extension of Time to File Response/Reply. Ordered by Judge William F. Kuntz, II on 11/7/2012. (Crockett, Daniel) (Entered: 11/07/2012) |
| 11/20/2012 | 20 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 21 | DECLARATION re 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 22 | MEMORANDUM in Support re 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 23 | DECLARATION *IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT* by Kareem Bellamy (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 24 | MEMORANDUM in Opposition re 23 Declaration, filed by Kareem Bellamy. (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 25 | REPLY to Response to Motion re 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 26 | DECLARATION re 25 Reply to Response to Motion by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 1) (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/20/2012 | 27 | MEMORANDUM in Support re 26 Declaration filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 11/20/2012) |
| 11/21/2012 | 28 | Letter MOTION for Leave to File *Sur Reply and for Oral Argument* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 11/21/2012) |
| 11/21/2012 | | ORDER granting in part and denying in part 28 Motion for Leave to File a Two Page Sur−Reply is granted. Motion for oral argument is denied without prejudice. The Court, pursuant to its previously stated practice, will order oral argument if the Court determines oral argument would be of assistance in this action.. So Ordered. (Kuntz, William) (Entered: 11/21/2012) |
| 12/03/2012 | 29 | MOTION for Leave to File Excess Pages *Sur−Reply* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 12/03/2012) |
| 12/03/2012 | | ORDER granting 29 Motion for Leave to File Excess Pages. The Reply shall not exceed three (3) pages. So Ordered. (Kuntz, William) (Entered: 12/03/2012) |
| 12/04/2012 | 30 | REPLY to Response to Motion re 15 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Sur−Reply* filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 12/04/2012) |

| | | |
|---|---|---|
| 12/14/2012 | 31 | MOTION to Amend/Correct/Supplement by Kareem Bellamy. (Hoffman, Thomas) (Entered: 12/14/2012) |
| 12/14/2012 | | ORDER granting 31 Motion to Amend/Correct/Supplement. The City of New York will also be allowed to supplement its submission by an additional two (2) pages, as requested. So Ordered by Judge William F. Kuntz, II on 12/14/2012. (Kuntz, William) (Entered: 12/14/2012) |
| 12/20/2012 | 32 | Supplemental MOTION to Amend/Correct/Supplement 26 Declaration, 23 Declaration, 30 Reply to Response to Motion, 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 22 Memorandum in Support, 21 Declaration, 27 Memorandum in Support, 25 Reply to Response to Motion, 24 Memorandum in Opposition by Kareem Bellamy. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Hoffman, Thomas) (Entered: 12/20/2012) |
| 01/03/2013 | 33 | REPLY in Opposition re 32 Supplemental MOTION to Amend/Correct/Supplement 26 Declaration, 23 Declaration, 30 Reply to Response to Motion, 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 22 Memorandum in Support, 21 Declaration, 27 Memorandum in filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 01/03/2013) |
| 01/17/2013 | | ORDER granting 32 Motion to Amend/Correct/Supplement. So Ordered by Judge William F. Kuntz, II on 1/17/2013. (Kuntz, William) (Entered: 01/17/2013) |
| 01/28/2013 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on July 18, 2012, before Judge Kuntz. Court Reporter/Transcriber Ronald E. Tolkin, Official Court Reporter, Telephone number 718−613−2647. Email address: ronald_tolkin@nyed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/18/2013. Redacted Transcript Deadline set for 2/28/2013. Release of Transcript Restriction set for 4/29/2013. (Tolkin, Ronald) (Entered: 01/28/2013) |
| 04/24/2013 | 35 | Second MOTION for Reconsideration re 9 Order on Motion to Stay *Discovery* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 04/24/2013) |
| 04/30/2013 | | ORDER denying 35 Motion for Reconsideration. So Ordered. Ordered by Judge William F. Kuntz, II on 4/30/2013. (Kuntz, William) (Entered: 04/30/2013) |
| 05/23/2013 | 36 | Letter by Kareem Bellamy (Hoffman, Thomas) (Entered: 05/23/2013) |
| 05/29/2013 | 37 | Letter *in response to plaintiff's letter filed May 23, 2013* by City of New York, John J. Gillen, Michael F. Solomeno (Wenzel, Andrew) (Entered: 05/29/2013) |
| 06/11/2013 | 38 | Letter *regarding in banc review of Poventud v. City* by City of New York, John J. Gillen, Michael F. Solomeno (Wenzel, Andrew) (Entered: 06/11/2013) |
| 06/12/2013 | 39 | Letter by Kareem Bellamy (Hoffman, Thomas) (Entered: 06/12/2013) |
| 10/24/2013 | 40 | Letter by Kareem Bellamy (Hoffman, Thomas) (Entered: 10/24/2013) |
| 01/22/2014 | 41 | Third MOTION for Reconsideration re 9 Order on Motion to Stay by Kareem Bellamy. (Hoffman, Thomas) (Entered: 01/22/2014) |
| 01/24/2014 | 42 | Letter *regarding intervening case law* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit A) (Wenzel, Andrew) (Entered: 01/24/2014) |
| 02/10/2014 | | ORDER denying 41 Motion for Reconsideration. So Ordered by Judge William F. Kuntz, II on 2/10/2014. (Kuntz, William) (Entered: 02/10/2014) |
| 02/10/2014 | | ORDER denying 20 Motion to Dismiss for Failure to State a Claim. The Motion is dismissed without prejudice. So Ordered by Judge William F. Kuntz, II on 2/10/2014. (Kuntz, William) (Entered: 02/10/2014) |
| 02/10/2014 | | ORDER. The parties may resume discovery. So Ordered by Judge William F. Kuntz, II on 2/10/2014. (Kuntz, William) (Entered: 02/10/2014) |
| 02/12/2014 | 43 | Letter *Reschedule Initial Conference* by Kareem Bellamy (Hoffman, Thomas) (Entered: 02/12/2014) |

| | | |
|---|---|---|
| 02/19/2014 | | SCHEDULING ORDER: Initial Conference set for 3/20/2014 10:00 AM in Courtroom 13A South before Magistrate Judge Viktor V. Pohorelsky. All parties are directed to make the disclosures required by Rules 26(a)(1) of the Federal Rules of Civil Procedure no later than ***five days before*** the conference. **All counsel are required to attend, and plaintiff's counsel is directed to ensure that all counsel are aware of their obligation to appear.**. Ordered by Magistrate Judge Viktor V. Pohorelsky on 2/19/2014. (Newton, Joan) (Entered: 02/19/2014) |
| 02/24/2014 | 44 | ANSWER to 1 Complaint, by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 02/24/2014) |
| 03/21/2014 | 45 | MINUTE ENTRY for Status Conference held on 3/20/14 before Magistrate Judge Viktor V. Pohorelsky: The next conference will be held on June 20, 2014 at 10:00 a.m. The defendants' motion to bifurcate discovery shall be made as follows: a. Letter motion to be filed by April 10, 2014; b. Opposition by letter to be filed by April 17, 2014; c. No replies d. Argument will be scheduled by the court if deemed necessary. 3. The parties shall commence discovery and may serve requests for discovery addressed to all claims and defenses now pleaded. Should the defendants make a motion to bifurcate as contemplated above, the parties will not be required to respond to discovery requests insofar as they concern the plaintiffs Monell claims until the motion is decided. (Newton, Joan) (Entered: 03/21/2014) |
| 04/10/2014 | 46 | Letter MOTION to Bifurcate *Monell Discovery* by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A) (Daitz, Elizabeth) (Entered: 04/10/2014) |
| 04/17/2014 | 47 | RESPONSE in Opposition re 46 Letter MOTION to Bifurcate *Monell Discovery* filed by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit) (Hoffman, Thomas) (Entered: 04/17/2014) |
| 04/18/2014 | 48 | Letter dated 4/17/14 from Thomas Hoffman to Judge Pohorelsky, enclosing a CD labeled "Kareem Bellamy − The System: Anything You Say." (Brucella, Michelle) (Entered: 04/21/2014) |
| 04/24/2014 | 49 | Proposed MOTION for Protective Order by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 04/24/2014) |
| 04/28/2014 | | ORDER Setting Hearing on Motion 46 Letter MOTION to Bifurcate Monell Discovery: Motion Hearing set for 5/7/2014 11:00 AM in Courtroom 13A South before Magistrate Judge Viktor V. Pohorelsky. Ordered by Magistrate Judge Viktor V. Pohorelsky on 4/28/2014. (Pohorelsky, Viktor) (Entered: 04/28/2014) |
| 04/29/2014 | 50 | ORDER granting 49 Motion for Protective Order. *See modifications on page 2. Ordered by Magistrate Judge Viktor V. Pohorelsky on 4/28/2014. (Newton, Joan) (Entered: 04/29/2014) |
| 04/30/2014 | 51 | MOTION to Adjourn Conference *to a different time on May 7th.* by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 04/30/2014) |
| 05/01/2014 | | ORDER granting 51 Motion to Adjourn Conference. The 5/7/14 hearing on the defendants' 46 Letter MOTION to Bifurcate Monell Discovery is rescheduled for 12:00 p.m. Ordered by Magistrate Judge Viktor V. Pohorelsky on 5/1/2014. (Toritto, Jim) (Entered: 05/01/2014) |
| 05/08/2014 | 52 | MINUTE ORDER for Motion Hearing held on 5/7/14 before Magistrate Judge Viktor V. Pohorelsky: For reasons stated on the record, the defendants' motion to bifurcate discovery 46 is granted. Discovery concerning the plaintiff's Monell claim shall be postponed until a motion for summary judgment is decided on the question whether any of the plaintiff's federal constitutional rights were violated by the actions of the district attorney's office. As previously scheduled, the next conference will be held on June 20, 2014 at 10:00 a.m. (Newton, Joan) (Entered: 05/08/2014) |
| 05/22/2014 | 53 | MOTION to Unseal Document *s related to criminal history of non−parties* by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 05/22/2014) |
| 05/23/2014 | | ORDER denying without prejudice 53 Motion to Unseal arrest histories of non−party witness. Any renewed application shall include a proposed order that identifies by |

| | | |
|---|---|---|
| | | name the witnesses whose records are subject to the order, as well as a provision that subjects the records to the "attorney's eyes−only" provision of the Protective Order entered by the court on April 28, 2014. Ordered by Magistrate Judge Viktor V. Pohorelsky on 5/23/2014. (Toritto, Jim) (Entered: 05/23/2014) |
| 05/27/2014 | 54 | Second MOTION to Unseal Document *arrest history of non−parties* by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Proposed Order Unsealing Order, # 2 Appendix Addendum w/ Redacted Names) (Wenzel, Andrew) (Entered: 05/27/2014) |
| 06/09/2014 | 56 | Letter by Kareem Bellamy, STIPULATION by Kareem Bellamy (Attachments: # 1 Quick Peek Agreement) (Hoffman, Thomas) (Entered: 06/09/2014) |
| 06/10/2014 | 57 | STIPULATION AND ORDER re 56 Quick−Peek Agreement. Ordered by Magistrate Judge Viktor V. Pohorelsky on 6/10/2014. (Toritto, Jim) (Entered: 06/11/2014) |
| 06/11/2014 | | ORDER granting 54 / 55 Motion to Unseal arrest records of non−party witnesses. Ordered by Magistrate Judge Viktor V. Pohorelsky on 6/11/2014. (Toritto, Jim) (Entered: 06/11/2014) |
| 06/20/2014 | 58 | MINUTE ENTRY for proceedings held before Magistrate Judge Viktor V. Pohorelsky: Status/Scheduling Conference held on 6/20/2014. Discussion held concerning disputed items of discovery. No rulings were nmade and the parties agreed to engage in further disucssion in an effort to resolve as many of the disputed items as possible. The following deadlines concerning discovery on non−Monell claims were set. The next conference will be held on September 3, 2014 at 11:00 a.m. See annexed conference calendar for details. (Newton, Joan) (Entered: 06/23/2014) |
| 07/11/2014 | 59 | NOTICE of Appearance by Alison G. Moe on behalf of City of New York, John J. Gillen, Michael F. Solomeno (aty to be noticed) (Moe, Alison) (Entered: 07/11/2014) |
| 07/18/2014 | 60 | MOTION to Amend/Correct/Supplement 1 Complaint, by Kareem Bellamy. (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 07/18/2014) |
| 07/21/2014 | 61 | Consent MOTION for Extension of Time to File *Motion to Compel* by City of New York, John J. Gillen, Michael F. Solomeno. (Moe, Alison) (Entered: 07/21/2014) |
| 07/21/2014 | | ORDER granting 61 motion for an extension of time until 8/15/14 to file motions to compel. Any opposition is due by 8/22/15 and no replies shall be filed. Ordered by Magistrate Judge Viktor V. Pohorelsky on 7/21/2014. (Toritto, Jim) (Entered: 07/21/2014) |
| 07/23/2014 | 62 | Letter *in opposition to plaintiff's request to amend the complaint* by City of New York, John J. Gillen, Michael F. Solomeno (Moe, Alison) (Entered: 07/23/2014) |
| 08/04/2014 | 63 | Letter MOTION for Discovery by Kareem Bellamy. (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 08/04/2014) |
| 08/05/2014 | | Set Deadlines: Any opposition to the plaintiff's 63 motion for discovery should be filed by August 11, 2014. Ordered by Magistrate Judge Viktor V. Pohorelsky on August 5, 2014. (Carlson, Cody) (Entered: 08/05/2014) |
| 08/11/2014 | 64 | REPLY in Opposition re 63 Letter MOTION for Discovery filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 08/11/2014) |
| 08/12/2014 | 65 | Letter *requesting permission to reply* by Kareem Bellamy (Hoffman, Thomas) Modified on 8/13/2014 (Toritto, Jim). (Entered: 08/12/2014) |
| 08/13/2014 | | ORDER granting the plaintiff's 65 motion for leave to file a reply. The reply shall be filed by the close of business on 8/15/14. Ordered by Magistrate Judge Viktor V. Pohorelsky on 8/13/2014. (Toritto, Jim) (Entered: 08/13/2014) |
| 08/15/2014 | 66 | MOTION for Leave to Electronically File Document under Seal by Kareem Bellamy. (Hoffman, Thomas) (Entered: 08/15/2014) |
| 08/15/2014 | 67 | REPLY in Support re 63 Letter MOTION for Discovery filed by Kareem Bellamy. (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 08/15/2014) |

| 08/15/2014 | 68 | Letter MOTION to Compel *disclosure of written communications with private investigators* by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, part 1, # 7 Exhibit F, part 2, # 8 Exhibit G) (Moe, Alison) (Entered: 08/15/2014) |
|---|---|---|
| 08/18/2014 | | ORDER granting 66 Motion for Leave to Electronically File Document under Seal Counsel is directed to file the original document under seal as a separate entry. Instructions on filing sealed documents on ECF are located at www.nyed.uscourts.gov... Ordered by Magistrate Judge Viktor V. Pohorelsky on 8/18/2014. (Toritto, Jim) (Entered: 08/18/2014) |
| 08/18/2014 | 69 | REPLY in Support re 63 Letter MOTION for Discovery *and to seal certain exhibits* filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 08/18/2014) |
| 08/22/2014 | 70 | RESPONSE in Opposition re 68 Letter MOTION to Compel *disclosure of written communications with private investigators* filed by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit) (Hoffman, Thomas) (Entered: 08/22/2014) |
| 08/25/2014 | 71 | Letter *Correcting a Mistake* by Kareem Bellamy (Hoffman, Thomas) (Entered: 08/25/2014) |
| 09/03/2014 | 72 | MINUTE ENTRY for Status Conference/Motion Hearing held on 9/3/14 before Magistrate Judge Viktor V. Pohorelsky: The next conference will be held on December 3, 2014 at 11:00 a.m. See annexed conference calendar for detailed scheduling and rulings. (Newton, Joan) (Entered: 09/04/2014) |
| 09/04/2014 | | ORDER denying 60 Motion to Amend/Correct/Supplement. The Plaintiff has failed to comply with the requirements of this Court regarding requests to amend complaints. The plaintiff is directed to seek a pre−motion conference to determine whether or not amendment to the complaint will be allowed. So Ordered by Judge William F. Kuntz, II on 9/4/2014. (Kuntz, William) (Entered: 09/04/2014) |
| 09/05/2014 | 73 | MOTION for pre motion conference *to allow amendment to Complaint* by Kareem Bellamy. (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 09/05/2014) |
| 09/08/2014 | | ORDER granting 73 Motion for Pre−Motion Conference. The Pre−Motion Conference is scheduled for October 15, 2014 at 12:30 p.m. in Courtroom 6H North. So ordered by Judge William F. Kuntz, II on 9/8/2014. (Riley, Cliff) (Entered: 09/08/2014) |
| 09/16/2014 | 74 | ORDER granting in part and denying in part 63 Motion for Discovery. Ordered by Magistrate Judge Viktor V. Pohorelsky on 9/16/2014. (Newton, Joan) (Entered: 09/16/2014) |
| 09/26/2014 | 75 | MOTION to Compel by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit) (Hoffman, Thomas) (Entered: 09/26/2014) |
| 09/26/2014 | 76 | EXHIBIT by Kareem Bellamy. Related document: 75 MOTION to Compel filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 09/26/2014) |
| 10/02/2014 | 77 | First MOTION for Extension of Time to File Response/Reply as to 75 MOTION to Compel by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 10/02/2014) |
| 10/02/2014 | | ORDER granting 77 Motion for Extension of Time to File Response to 75 MOTION to Compel. Response due by 10/10/2014. Ordered by Magistrate Judge Viktor V. Pohorelsky on 10/2/2014. (Toritto, Jim) (Entered: 10/02/2014) |
| 10/10/2014 | 78 | REPLY in Opposition re 75 MOTION to Compel filed by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Wenzel, Andrew) (Entered: 10/10/2014) |
| 10/13/2014 | 79 | Letter MOTION for Leave to File *Reply to ECF 78* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 10/13/2014) |
| 10/15/2014 | | ORDER granting 79 Plaintiff's Motion for Leave to File three−page reply to Defendant's October 10, 2014 Opposition 78 by October 21, 2014.. Ordered by Magistrate Judge Viktor V. Pohorelsky on 10/15/2014. (Buckman, Elliot) (Entered: |

| | | |
|---|---|---|
| | | 10/15/2014) |
| 10/15/2014 | | Minute Entry for proceedings held before Judge William F. Kuntz, II: Pre Motion Conference held on 10/15/2014. Appearances: Thomas Hoffman, Esq., appeared on behalf of the Plaintiff. Andrew Wenzel, Esq., appeared on behalf of the Defendants. The City is directed to turnover an official certificate of death for Seargent Vincent Pepe to Plaintiff's counsel by October 17, 2014. The Plaintiff's application to serve and file a First Amended Complaint was granted. The Court ordered the following briefing schedule: 1) Plaintiff shall serve the First Amended Complaint on or before Friday, October 31, 2014; 2) Defendants shall serve their opposition brief to the First Amended Complaint on or before Friday, November 14, 2014; and 3) Plaintiff shall serve the reply on or before Friday, November 21, 2014. Plaintiff shall be responsible for filing all briefing papers on ECF by 5:00 p.m. on November 21, 2014. In addition, Plaintiff shall send a courtesy copy of all motion papers to the Court, via overnight mail, addressed to Mr. Andrew Jackson. (Court Reporter Richard Barry.) (Jackson, Andrew) (Entered: 10/20/2014) |
| 10/20/2014 | 80 | Letter *for permission to file 5 page reply* by Kareem Bellamy (Hoffman, Thomas) Modified on 10/21/2014 (Toritto, Jim). (Entered: 10/20/2014) |
| 10/21/2014 | | ORDER granting 80 motion for leave to file a 5−page reply. Ordered by Magistrate Judge Viktor V. Pohorelsky on 10/21/2014. (Toritto, Jim) (Entered: 10/21/2014) |
| 10/21/2014 | 81 | REPLY in Support re 75 MOTION to Compel filed by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (Hoffman, Thomas) (Entered: 10/21/2014) |
| 10/31/2014 | 82 | AMENDED COMPLAINT against Vincent NMI Pepe, Robert Schruhl, filed by Kareem Bellamy. (Attachments: # 1 Exhibit Addendum) (Hoffman, Thomas) (Entered: 10/31/2014) |
| 11/19/2014 | 83 | MOTION for Extension of Time to File Answer by Kareem Bellamy. (Hoffman, Thomas) (Entered: 11/19/2014) |
| 11/19/2014 | | ORDER granting 83 Motion for Extension of Time to Answer Kareem Bellamy answer due 12/4/2014; City of New York answer due 12/12/2014. So Ordered by Judge William F. Kuntz, II on 11/19/2014. (Kuntz, William) (Entered: 11/19/2014) |
| 12/03/2014 | 84 | MINUTE ORDER for Status/Motion Hearing held on 12/3/14 before Magistrate Judge Viktor V. Pohorelsky: granting 68 Motion to Compel; reserving ruling on 75 Motion to Compel. The next conference will be held on February 26, 2015 at 10:00 a.m. See annexed conference calendar for detailed scheduling and rulings. (Newton, Joan) (Entered: 12/04/2014) |
| 12/10/2014 | 85 | First MOTION for Extension of Time to File Response/Reply as to 82 Amended Complaint by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 12/10/2014) |
| 12/10/2014 | | ORDER granting 85 Motion for Extension of Time to File Response/Reply. So Ordered by Judge William F. Kuntz, II on 12/10/2014. (Kuntz, William) (Entered: 12/10/2014) |
| 12/19/2014 | 86 | Motion to Dismiss for Failure to State a Claim *in amended complaint* by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 12/19/2014) |
| 12/19/2014 | 87 | MEMORANDUM in Support re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 12/19/2014) |
| 12/19/2014 | 88 | AFFIDAVIT/DECLARATION in Opposition re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint submitted by plaintiff Kareem Bellamy* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 12/19/2014) |
| 12/19/2014 | 89 | MEMORANDUM in Opposition re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint submitted by plaintiff Kareem Bellamy* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 12/19/2014) |

| 12/19/2014 | 90 | AFFIDAVIT/DECLARATION in Opposition re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint submitted by Plaintiff Kareem Bellamy* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Wenzel, Andrew) (Entered: 12/19/2014) |
|---|---|---|
| 12/19/2014 | 91 | REPLY in Support re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint submitted by defedants* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Wenzel, Andrew) (Entered: 12/19/2014) |
| 12/23/2014 | 92 | REPLY in Opposition re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint Letter Motion for Leave to File Sur Reply* filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 12/23/2014) |
| 02/20/2015 | | RESET CONFERENCE: Due to a conflict in the court's calendar, the 2/26/15 status conference has been rescheduled to Tuesday, March 3, 2015 at 11:00 a.m. Plaintiff's counsel shall insure that all adversaries are aware of the new date and time. Ordered by Magistrate Judge Viktor V. Pohorelsky on 2/20/15. (Newton, Joan) (Entered: 02/20/2015) |
| 02/27/2015 | 93 | NOTICE of Appearance by Virginia Jackson Nimick on behalf of City of New York, John J. Gillen, Michael F. Solomeno (aty to be noticed) (Nimick, Virginia) (Entered: 02/27/2015) |
| 02/27/2015 | 94 | Consent MOTION to Adjourn Conference by City of New York, John J. Gillen, Michael F. Solomeno. (Nimick, Virginia) (Entered: 02/27/2015) |
| 03/02/2015 | | ORDER granting 94 Motion to Adjourn Conference. The 3/3/15 Status Conference is adjourned to April 9, 2015 at 12:00 p.m. Ordered by Magistrate Judge Viktor V. Pohorelsky on 3/2/2015. (Toritto, Jim) (Entered: 03/02/2015) |
| 04/07/2015 | 95 | Second MOTION to Compel *to Fix Dates for Compliance* by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (Hoffman, Thomas) (Entered: 04/07/2015) |
| 04/09/2015 | 96 | MINUTE ORDER for Status/Motion Hearing held on 4/9/15 before Magistrate Judge Viktor V. Pohorelsky: deferring ruling on 75 Motion to Compel; deferring ruling on 95 Motion to Compel. See annexed conference calendar for details (Newton, Joan) (Entered: 04/10/2015) |
| 04/22/2015 | 97 | Proposed Scheduling Order *regarding discovery* by Kareem Bellamy (Hoffman, Thomas) (Entered: 04/22/2015) |
| 04/28/2015 | | ORDER finding as moot 95 Motion to Compel. In view of the Agreement reached by the parties with respect to outstanding discovery, as reflected in the letter 97 filed in the record of the court, a ruling by the court on the motion is unnecessary. The schedule set forth in the letter 97 is hereby so ordered. In accordance with the schedule, any further submissions concerning the documents produced by the defendants for in camera review are to be filed by April 29, 2015. The next conference will be held on July 1, 2015 at 11:00 a.m. Ordered by Magistrate Judge Viktor V. Pohorelsky on 4/28/2015. (Pohorelsky, Viktor) (Entered: 04/28/2015) |
| 04/28/2015 | 98 | Letter *Re: Plaintiff's Position Regarding In−camera Review* by Kareem Bellamy (Hoffman, Thomas) (Entered: 04/28/2015) |
| 05/08/2015 | 99 | First MOTION to Amend/Correct/Supplement 50 Order on Motion for Protective Order by Kareem Bellamy. (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 05/08/2015) |
| 05/08/2015 | | SET DEADLINE: Any response to the plaintiff's 99 MOTION to Amend the 50 Protective Order is due by May 13, 2015. Ordered by Magistrate Judge Viktor V. Pohorelsky on 5/8/2015. (Toritto, Jim) (Entered: 05/08/2015) |
| 05/13/2015 | 100 | RESPONSE to Motion re 99 First MOTION to Amend/Correct/Supplement 50 Order on Motion for Protective Order filed by City of New York, John J. Gillen, Michael F. Solomeno. (Nimick, Virginia) (Entered: 05/13/2015) |
| 05/13/2015 | 101 | RESPONSE to Motion re 99 First MOTION to Amend/Correct/Supplement 50 Order on Motion for Protective Order filed by Kareem Bellamy. (Hoffman, Thomas) |

| | | |
|---|---|---|
| | | (Entered: 05/13/2015) |
| 05/14/2015 | 102 | ORDER granting in part 99 Motion to Amend the 50 Protective Order. Ordered by Magistrate Judge Viktor V. Pohorelsky on 5/14/2015. (Toritto, Jim) (Entered: 05/14/2015) |
| 05/22/2015 | 103 | MEMORANDUM ORDER granting in part and denying in part 75 Motion to Compel. Ordered by Magistrate Judge Viktor V. Pohorelsky on 5/22/2015. (Pohorelsky, Viktor) (Entered: 05/22/2015) |
| 06/03/2015 | 104 | Letter submitted by City of New York Virginia J. Nimick. Enclosures will be filed under seal. (Newton, Joan) (Entered: 06/03/2015) |
| 06/25/2015 | 106 | MOTION for Sanctions by Kareem Bellamy. (Attachments: # 1 Certification by Thomas Hoffman, # 2 Exhibit A − May 4, May 5 email, # 3 Exhibit B − May 6 email, # 4 Exhibit C −Email to reschedule EBT, # 5 Exhibit D − May 27 email, # 6 Exhibit E − Simmon's report, # 7 Exhibit F − Gillen's original report, # 8 Exhibit G − Gillen's second report, # 9 Exhibit H − Solomeno's DD5, # 10 Exhibit I − Sanchez line up sheet, # 11 Exhibit J − Gillen's handwrittennotes, # 12 Exhibit K − Gillen's second handwritten notes, # 13 Exhibit L − Cox transcript) (Hoffman, Thomas) (Entered: 06/25/2015) |
| 06/26/2015 | | SET DEADLINE: Any response to the plaintiff's 106 motion for sanctions is due by July 2. 2015. Ordered by Magistrate Judge Viktor V. Pohorelsky on 6/26/2015. (Toritto, Jim) (Entered: 06/26/2015) |
| 07/01/2015 | 108 | MINUTE ENTRY for Status Conference held on 7/1/15 before Magistrate Judge Viktor V. Pohorelsky: The court will hear argument on the plaintiff's motion 106 for sanctions on July 17, 2015 at 4:00 p.m. See annexed conference calendar for detailed scheduling and rulings. (Newton, Joan) (Entered: 07/07/2015) |
| 07/02/2015 | 107 | RESPONSE in Opposition re 106 MOTION for Sanctions filed by City of New York, John J. Gillen, Michael F. Solomeno. (Nimick, Virginia) (Entered: 07/02/2015) |
| 07/17/2015 | 109 | MINUTE ORDER for Motion Hearing held on 7/17/15 before Magistrate Judge Viktor V. Pohorelsky: taking under advisement 106 Motion for Sanctions. Thenext conference will be held on September 3, 2015 at 10:00 a.m. (Newton, Joan) (Entered: 07/21/2015) |
| 08/18/2015 | 110 | STIPULATION re 86 Motion to Dismiss for Failure to State a Claim *in amended complaint*, 88 Affidavit in Opposition to Motion, 87 Memorandum in Support, 92 Reply in Opposition, 91 Reply in Support, 90 Affidavit in Opposition to Motion, 89 Memorandum in Opposition by Kareem Bellamy (Attachments: # 1 Exhibit Cover Ltr to Magistrate) (Hoffman, Thomas) (Entered: 08/18/2015) |
| 08/18/2015 | 111 | Letter *to Judge Kuntz* by Kareem Bellamy (Hoffman, Thomas) (Entered: 08/18/2015) |
| 08/18/2015 | 112 | STIPULATION AND ORDER withdrawing 86 Motion to Dismiss, 106 Motion for Sanctions, and 82 First Amended Complaint. Ordered by Magistrate Judge Viktor V. Pohorelsky on 8/18/2015. (Toritto, Jim) (Entered: 08/18/2015) |
| 08/20/2015 | 113 | TRANSCRIPT of Proceedings held on July 1, 2015, before Judge Pohorelsky. Court Transcriber: TypeWrite Word Processing Service, Telephone number 718−966−1401. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request − Transcript" located under "Other Filings − Other Documents". Redaction Request due 9/10/2015. Redacted Transcript Deadline set for 9/21/2015. Release of Transcript Restriction set for 11/18/2015. (Rocco, Christine) (Entered: 08/20/2015) |
| 09/02/2015 | 114 | Joint MOTION to Adjourn Conference by City of New York, John J. Gillen, Michael F. Solomeno. (Nimick, Virginia) (Entered: 09/02/2015) |
| 09/03/2015 | | ORDER denying 114 Motion to Adjourn Conference. The 9/3/15 in−person conference has been rescheduled to September 9, 2015 at 10:00 a.m. Ordered by Magistrate Judge Viktor V. Pohorelsky on 9/3/2015. (Newton, Joan) (Entered: 09/03/2015) |

| 09/09/2015 | 115 | MINUTE ENTRY for Status Conference held on 9/9/15 before Magistrate Judge Viktor V. Pohorelsky: The next conference will be held on **November 19, 2015 at 11:00 a.m.** See annexed conference calendar for detailed scheduling and rulings. (Main Document 115 replaced on 9/9/2015) Modified on 9/9/2015 (Newton, Joan). (Entered: 09/09/2015) |
|---|---|---|
| 09/21/2015 | 116 | DECISION AND ORDER re in camera review of documents for which "core" work product protection has been asserted. See Decision and Order for rulings. Ordered by Magistrate Judge Viktor V. Pohorelsky on 9/21/2015. (Pohorelsky, Viktor) (Entered: 09/21/2015) |
| 09/23/2015 | 117 | ORDER re 116 Order vacating, in part, the Order dated September 21, 2015 with respect to the disclosure of the document bearing Bates Number PrivilEmail08358. See Order for details. Ordered by Magistrate Judge Viktor V. Pohorelsky on 9/23/2015. (Pohorelsky, Viktor) (Entered: 09/23/2015) |
| 09/25/2015 | 118 | Letter dated 9/10/2015 to Judge Pohorelsky from Thomas Hoffman, Esq. submitting materials for in−camera review. (Lee, Tiffeny) (Entered: 09/25/2015) |
| 10/02/2015 | 120 | NOTICE of Appearance by Matthew J. Modafferi on behalf of City of New York, John J. Gillen, Michael F. Solomeno (aty to be noticed) (Modafferi, Matthew) (Entered: 10/02/2015) |
| 10/18/2015 | | Case Reassigned to Magistrate Judge Peggy Kuo. Magistrate Judge Viktor V. Pohorelsky no longer assigned to the case.Please continue to follow the individual practices of Magistrate Judge Pohorelsky, located on our website, where applicable until further notice.Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Mahoney, Brenna) (Entered: 10/18/2015) |
| 11/05/2015 | | Case Reassigned to Judge Ann M Donnelly. Judge William F. Kuntz, II no longer assigned to the case.Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Mahoney, Brenna) (Entered: 11/05/2015) |
| 11/16/2015 | | Status Conference set for 11/19/2015 at 11:00 AM in Courtroom 322 North before Magistrate Judge Peggy Kuo. (Riquelme, Claudia) (Entered: 11/16/2015) |
| 11/19/2015 | | Minute Entry for proceedings held before Magistrate Judge Peggy Kuo. Status Conference held on 11/19/15. Attorney Thomas Hoffman appeared on behalf of plaintiff; Jonathan Hiles, a law student working at the firm of Thomas Hoffman, was also present. Attorney Matthew J. Modafferi appeared on behalf of defendants. Plaintiff's counsel is to provide to defense counsel a new copy of the August 31, 2015 letter that plaintiff states outlines plaintiff's outstanding discovery demands. The following deadlines have been established: by 12/2/15, defense counsel is to reach out to the Queens District Attorney's Office to determine the accessibility of the attorney personnel files referred to in item 7 of the August 14, 2015 stipulation, and file a status report on those files. Defendants are to respond to plaintiff's non−Monell interrogatories and document production by 12/4/15. Defendants are to respond to plaintiff's Monell interrogatories and document production by 1/8/2016. All Monell deposition witnesses are to be identified by 12/11/2015, and those depositions are to be completed by 2/26/2016. The deposition of non−party witness Terrell Lee is to be held by 1/29/2016. The next Status Conference is scheduled for February 16, 2016 at 11:00 am in Courtroom 322 North before Magistrate Judge Peggy Kuo. (Tape # 11:00−12:27) (Feldman, Shira) Modified on 12/5/2015 to correct date of filing and add tape information) (Riquelme, Claudia). (Entered: 11/23/2015) |
| 12/02/2015 | 121 | STATUS REPORT *concerning Monell discovery requests* by City of New York, John J. Gillen, Michael F. Solomeno (Modafferi, Matthew) (Entered: 12/02/2015) |
| 12/17/2015 | 122 | Letter MOTION for Protective Order *concerning Monell depositions* by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 12/17/2015) |
| 12/21/2015 | 123 | First MOTION for Leave to File Excess Pages by Kareem Bellamy. (Hoffman, Thomas) (Entered: 12/21/2015) |

| | | |
|---|---|---|
| 12/22/2015 | | ORDER granting 123 Motion for Leave to File Excess Pages. Counsel is encouraged to submit only as many pages as necessary to make plaintiff's points succinctly and effectively. Ordered by Magistrate Judge Peggy Kuo on 12/22/2015. (Feldman, Shira) (Entered: 12/22/2015) |
| 12/24/2015 | 124 | Consent MOTION for Extension of Time to Complete Discovery / *to complete the deposition of non−party witness Terrell Lee* by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 12/24/2015) |
| 12/24/2015 | 125 | RESPONSE in Opposition re 122 Letter MOTION for Protective Order *concerning Monell depositions* filed by Kareem Bellamy. (Attachments: # 1 Exhibit Addendum) (Hoffman, Thomas) (Entered: 12/24/2015) |
| 12/29/2015 | | ORDER granting 124 Motion for Extension of Time to Complete Discovery. The deposition of non−party witness Terrell Lee is to be completed by **February 26, 2016**. Ordered by Magistrate Judge Peggy Kuo on 12/29/2015. (Feldman, Shira) (Entered: 12/29/2015) |
| 12/30/2015 | 126 | REPLY in Support re 122 Letter MOTION for Protective Order *concerning Monell depositions* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 12/30/2015) |
| 01/04/2016 | 127 | Letter *Re: Law Student Intern Appearance* by Kareem Bellamy (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 01/04/2016) |
| 01/04/2016 | 128 | Letter *amending footnote 3 from Defendants' December 30, 2015 reply* by City of New York, John J. Gillen, Michael F. Solomeno (Modafferi, Matthew) (Entered: 01/04/2016) |
| 01/04/2016 | 129 | First MOTION to Strike *Defendants' Reply* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 01/04/2016) |
| 01/05/2016 | 130 | ORDER re 127 Letter filed by Kareem Bellamy. The undersigned consents to the appearance of law student Jonathan Hiles as reflected in the attached signed appearance form. Ordered by Judge Ann M Donnelly on 1/5/2016. (Sise, Ellen) (Greene, Donna). (Entered: 01/05/2016) |
| 01/06/2016 | 131 | RESPONSE to Motion re 129 First MOTION to Strike *Defendants' Reply* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 01/06/2016) |
| 01/06/2016 | 132 | STATUS REPORT by City of New York, John J. Gillen, Michael F. Solomeno (Modafferi, Matthew) (Entered: 01/06/2016) |
| 01/11/2016 | 133 | TRANSCRIPT of Proceedings held on April 9, 2015, before Judge POHORELSKY. Court Reporter/Transcriber Transcriptions Plus II, Inc.. Email address: laferrara44@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request − Transcript" located under "Other Filings − Other Documents". Redaction Request due 2/1/2016. Redacted Transcript Deadline set for 2/11/2016. Release of Transcript Restriction set for 4/11/2016. (Hong, Loan) (Entered: 01/11/2016) |
| 01/11/2016 | 134 | TRANSCRIPT of Proceedings held on November 19, 2015, before Judge Kuo. Court Reporter/Transcriber Transcriptions Plus II, Inc.. Email address: laferrara44@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request − Transcript" located under "Other Filings − Other Documents". Redaction Request due 2/1/2016. Redacted Transcript Deadline set for 2/11/2016. Release of Transcript Restriction set for 4/11/2016. (Hong, Loan) (Entered: 01/11/2016) |
| 01/13/2016 | 135 | Letter *to defer Judge Blumenfeld deposition* by Kareem Bellamy (Hoffman, Thomas) (Entered: 01/13/2016) |

| 02/11/2016 | 136 | Letter *advising the Court of discovery issues in advance of the February 16, 2016 conference* by City of New York, John J. Gillen, Michael F. Solomeno (Modafferi, Matthew) (Entered: 02/11/2016) |
|---|---|---|
| 02/15/2016 | 137 | Letter *in response to City letter dated Feb. 11, 2016* by Kareem Bellamy (Hoffman, Thomas) (Entered: 02/15/2016) |
| 02/18/2016 | 138 | Minute Entry for proceedings held before Magistrate Judge Peggy Kuo. Status Conference held on 2/16/2016. Attorney **Thomas Hoffman** appeared on behalf of plaintiff. Attorney **Matthew J. Modafferi** appeared on behalf of defendants. Jonathan Hiles, a law student working at the firm of Thomas Hoffman, was also present. Argument was heard on 122 Motion for Protective Order. Motion denied. Details of the Court's ruling are annexed at 138 . The Court allows the depositions of the witnesses listed on 125 −Exhibit 1 to go forward, except that the number of witnesses is limited to 10. Since plaintiff's counsel has withdrawn Judge Blumenfeld and Robert Masters from the list at this time, plaintiff's counsel must take one more witness off the list. Plaintiff is advised to attempt to limit the number of witnesses further as depositions proceed. Plaintiff is also directed to provide information to defendants' counsel in advance regarding the scope of the proposed deposition testimony, cases the witness may be asked about, and documents that may be used in the deposition. Plaintiff's oral request to exceed the page limit by filing a twelve (12) page motion to compel discovery is granted. The deadline for filing that motion is **February 19, 2016**. Defendants are also granted leave to file a twelve (12) page response by **March 4, 2016**. Plaintiff's Motion to Strike Defendants' Reply 129 is denied. The next status conference will be held on **March 14, 2016 at 3:00 p.m.**, in Courtroom 322 North, before Magistrate Judge Peggy Kuo. (Tape #11:24−12:08.) (Feldman, Shira) (Entered: 02/18/2016) |
| 02/19/2016 | 139 | First MOTION to Compel *Monell production* by Kareem Bellamy. (Attachments: # 1 Exhibit A−Def's responses to interrogatories & document requests, # 2 Exhibit B−Pltf's second Monell document request, # 3 Exhibit C−Def's WPP production, # 4 Exhibit D−discovery re: Chinese wall, # 5 Exhibit E − discovery re: failure to discipline, # 6 Exhibit F − discovery re:internal communications about discipline, etc, # 7 Exhibit G− discovery re: similar claims and lawsuits, etc.) (Hoffman, Thomas) (Entered: 02/19/2016) |
| 03/03/2016 | 140 | MOTION for Protective Order / *Objection to the Magistrate's February 18, 2016 Order*, MOTION to Bifurcate by City of New York. (Modafferi, Matthew) (Entered: 03/03/2016) |
| 03/03/2016 | 141 | AFFIDAVIT/DECLARATION in Support re 140 MOTION for Protective Order / *Objection to the Magistrate's February 18, 2016 Order* MOTION to Bifurcate filed by City of New York. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Modafferi, Matthew) (Entered: 03/03/2016) |
| 03/03/2016 | 142 | MEMORANDUM in Support re 140 MOTION for Protective Order / *Objection to the Magistrate's February 18, 2016 Order* MOTION to Bifurcate filed by City of New York. (Modafferi, Matthew) (Entered: 03/03/2016) |
| 03/04/2016 | 143 | RESPONSE in Opposition re 139 First MOTION to Compel *Monell production* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Modafferi, Matthew) (Entered: 03/04/2016) |
| 03/08/2016 | 144 | First MOTION to Seal Document 139 First MOTION to Compel *Monell production* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 03/08/2016) |
| 03/09/2016 | | ORDER granting 144 Motion to Seal Document. 139 Exhibit "C" will be sealed. Ordered by Magistrate Judge Peggy Kuo on 3/9/2016. (Feldman, Shira) (Entered: 03/09/2016) |
| 03/09/2016 | 145 | TRANSCRIPT of Proceedings held on February 16, 2016, before Judge Kuo. Court Transcriber: Transcriptions Plus II, Inc.. Email address: laferrara44@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request − Transcript" located under "Other Filings − Other Documents". Redaction Request due 3/30/2016. Redacted Transcript Deadline set for 4/11/2016. Release of Transcript Restriction set for 6/7/2016. (Rocco, Christine) (Entered: 03/09/2016) |

| | | |
|---|---|---|
| 03/10/2016 | 146 | MOTION to Sever *Bifurcate and Summary Judgment Motions* by Kareem Bellamy. (Hoffman, Thomas) (Entered: 03/10/2016) |
| 03/11/2016 | | ORDER denying 146 Motion to Sever. The plaintiff's request to refer the motion to bifurcate is denied. The plaintiff shall respond to the defendants' March 3, 2016 submission on or before March 23, 2016. The Court will treat the defendants' March 3, 2016 submission as a request for a pre−motion conference. If plaintiff wishes, he may include in his filing a response to the defendants' request for summary judgment briefing. A pre−motion conference will occur in Courtroom 4G North at 2 p.m. on April 4, 2016. Ordered by Judge Ann M Donnelly on 3/11/2016. (Sise, Ellen) (Entered: 03/11/2016) |
| 03/11/2016 | | SCHEDULING ORDER: In light of the order denying 146 motion to bifurcate and the pre−motion conference before District Judge Ann M. Donnelly scheduled for April 4, 2016, the status conference before Magistrate Judge Peggy Kuo scheduled for March 14, 2016 is adjourned, *sine die*. Ordered by Magistrate Judge Peggy Kuo on 3/11/2016. (Feldman, Shira) (Entered: 03/11/2016) |
| 03/14/2016 | 147 | First MOTION to Adjourn Conference by Kareem Bellamy. (Hoffman, Thomas) (Entered: 03/14/2016) |
| 03/14/2016 | | ORDER granting 147 Motion to Adjourn Conference. The Pre−motion conference will take place at 12:30 p.m. on April 15, 2016, in Courtroom 4G North. Ordered by Judge Ann M Donnelly on 3/14/2016. (Sise, Ellen) (Entered: 03/14/2016) |
| 03/23/2016 | 148 | MEMORANDUM in Opposition re 140 MOTION for Protective Order */ Objection to the Magistrate's February 18, 2016 Order* MOTION to Bifurcate *and for Permission to File a Motion for Summary Judgment* filed by Kareem Bellamy. (Attachments: # 1 Exhibit Confidental Documents to be Filed Under Seal, # 2 Exhibit Cox EBT Excerpts, # 3 Exhibit Sanchez EBT Excerpts, # 4 Exhibit Guys Summation Excerpts, # 5 Exhibit Gershman Report) (Hoffman, Thomas) (Entered: 03/23/2016) |
| 03/24/2016 | 149 | First MOTION to Seal *confidential documents* by Kareem Bellamy. (Attachments: # 1 Exhibit) (Hoffman, Thomas) (Entered: 03/24/2016) |
| 03/24/2016 | | ORDER granting 149 Motion to Seal. Ordered by Judge Ann M Donnelly on 3/24/2016. (Sise, Ellen) (Entered: 03/24/2016) |
| 03/30/2016 | 150 | Letter *To Supplement Answer to Motion to Sever and Objection* by Kareem Bellamy (Attachments: # 1 Supplement) (Hoffman, Thomas) (Entered: 03/30/2016) |
| 04/12/2016 | 151 | NOTICE of Change of address by Thomas Hoffman (Hoffman, Thomas) (Entered: 04/12/2016) |
| 04/15/2016 | | Minute Entry for proceedings held before Judge Ann M Donnelly: Pre Motion Conference held on 4/15/2016. Appearances by Thomas Hoffman and Jonathan Hiles, a law student intern, for the plaintiff, and Matthew Modafferi for the defendants. Case called and discussions held. The defendants shall file their motion for summary judgment by May 13, 2016. The response shall be filed by June 3, 2016. The reply, if any, shall be filed by June 27, 2016. If the plaintiff decides to cross−move for summary judgement, he shall file his motion by June 3, 2016. The defendants shall respond by June 27, 2016. The plaintiff shall reply, if any, by July 5, 2016. Discovery is stayed pending the decision on the summary judgment motion. (Court Reporter Gene Rudolph.) (Sise, Ellen) (Entered: 04/15/2016) |
| 05/06/2016 | 152 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/15/16, before Judge Donnelly. Court Reporter/Transcriber Rudolph. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request − Transcript" located under "Other Filings − Other Documents". Redaction Request due 5/27/2016. Redacted Transcript Deadline set for 6/6/2016. Release of Transcript Restriction set for 8/4/2016. (Rudolph, Gene) (Entered: 05/06/2016) |
| 05/10/2016 | 153 | Letter MOTION for Leave to File Excess Pages *(5 additional pages)* by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 05/10/2016) |

| 05/10/2016 | 154 | Letter *noting Plaintiff's consent to the application for excess pages* by City of New York, John J. Gillen, Michael F. Solomeno (Modafferi, Matthew) (Entered: 05/10/2016) |
|---|---|---|
| 05/11/2016 | | ORDER granting 153 Motion for Leave to File Excess Pages. Ordered by Judge Ann M Donnelly on 5/11/2016. (Sise, Ellen) (Entered: 05/11/2016) |
| 05/13/2016 | 155 | MOTION for Summary Judgment by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 05/13/2016) |
| 05/13/2016 | 156 | RULE 56.1 STATEMENT re 155 MOTION for Summary Judgment filed by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 05/13/2016) |
| 05/13/2016 | 157 | AFFIDAVIT/DECLARATION in Support re 155 MOTION for Summary Judgment filed by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO) (Modafferi, Matthew) (Entered: 05/13/2016) |
| 05/13/2016 | 158 | MEMORANDUM in Support re 155 MOTION for Summary Judgment filed by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 05/13/2016) |
| 06/01/2016 | 159 | Letter *Request for Extension of Time to Respond to Motion* by Kareem Bellamy (Hoffman, Thomas) (Entered: 06/01/2016) |
| 06/01/2016 | | ORDER The plaintiff's request for extension of time to respond 159 is granted. The plaintiff's response is due June 24, 2016; the defendants' reply is due July 6, 2016. Ordered by Judge Ann M Donnelly on 6/1/2016. (Sise, Ellen) (Entered: 06/01/2016) |
| 06/21/2016 | 160 | First MOTION for Leave to File Excess Pages by Kareem Bellamy. (Hoffman, Thomas) (Entered: 06/21/2016) |
| 06/21/2016 | | ORDER granting in part and denying in part 160 Motion for Leave to File Excess Pages. Plaintiff may file a brief of up to 35 pages in response to the defendants' motion for summary judgment and in support of his cross motion for partial summary judgment. The defendants' reply and answer is due on or before July 22, 2016, and the plaintiff's reply to his cross−motion, if any, is due by August 5, 2016. Ordered by Judge Ann M Donnelly on 6/21/2016. (Zainulbhai, Yasmin) (Entered: 06/21/2016) |
| 06/24/2016 | 161 | First MOTION for Leave to Electronically File Document under Seal by Kareem Bellamy. (Attachments: # 1 Exhibit Def's Bates Docs 1 of 5, # 2 Exhibit Def's Bates Docs 2 of 5, # 3 Exhibit Def's Bates Docs 3 of 5, # 4 Exhibit Def's Bates Docs 4 of 5, # 5 Exhibit Def's Bates Docs 5 of 5) (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | | ORDER granting 161 Motion for Leave to Electronically File Document under Seal. Counsel is directed to file the original documents under seal as a separate entry. Instructions on filing sealed documents on ECF are located at www.nyed.uscourts.gov. Ordered by Judge Ann M Donnelly on 6/24/2016. (Goeke, Justine) (Entered: 06/24/2016) |
| 06/24/2016 | 162 | First MOTION for Partial Summary Judgment by Kareem Bellamy. Responses due by 7/22/2016 (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | 163 | AFFIDAVIT/DECLARATION in Support re 162 First MOTION for Partial Summary Judgment filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | 164 | AFFIDAVIT/DECLARATION in Support re 162 First MOTION for Partial Summary Judgment *and in Answer to Motion for Summary Judgment* filed by Kareem Bellamy. (Attachments: # 1 Exhibit 9.9.94 Wade Hearing, # 2 Exhibit Trial Trans. 1 of 6, # 3 Exhibit Trial Trans. 2 of 6, # 4 Exhibit Trial Trans. 3 of 6, # 5 Exhibit Trial Trans. 4 of 6, # 6 Exhibit Trial Trans. 6 of 6, # 7 Exhibit Trial Trans. 6 of 6, # 8 Exhibit 440 |

| | | |
|---|---|---|
| | | Trans. 1 of 3, # 9 Exhibit 440 Trans. 2 of 3, # 10 Exhibit 440 Trans. 3 of 3, # 11 Exhibit 2nd 440 Trans. 1 of 2, # 12 Exhibit 2nd 440 Trans. 2 of 2, # 13 Exhibit Renewed 440 Trans. 1 of 2, # 14 Exhibit Renewed 440 Trans. 2 of 2, # 15 Exhibit Antignani EBT, # 16 Exhibit Bellamy EBT, # 17 Exhibit Burgos EBT, # 18 Exhibit Cox EBT, # 19 Exhibit Gillen EBT, # 20 Exhibit Green EBT, # 21 Exhibit Guy EBT, # 22 Exhibit Lila EBT, # 23 Exhibit Mansfield EBT, # 24 Exhibit Sanchez EBT, # 25 Exhibit Solomeno EBT, # 26 Exhibit Wheaton EBT, # 27 Exhibit Walker EBT, # 28 Exhibit Grand Jury, # 29 Exhibit Sentencing Tran., # 30 Exhibit 50H Hearing Tran, # 31 Exhibit P's Bates Stamped Doc, # 32 Exhibit 9.20.94 Wade Hearing, # 33 Exhibit 12.11.15 Not to take EBT, # 34 Exhibit 1.16.08 Hearing Tran) (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | 165 | RULE 56.1 STATEMENT re 155 MOTION for Summary Judgment filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | 166 | MEMORANDUM in Opposition re 155 MOTION for Summary Judgment , 162 First MOTION for Partial Summary Judgment filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | 167 | RULE 56.1 STATEMENT re 155 MOTION for Summary Judgment , 162 First MOTION for Partial Summary Judgment filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/24/2016 | 168 | RULE 56.1 STATEMENT re 155 MOTION for Summary Judgment *Response to Defendant's 56.1 Statement* filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 06/24/2016) |
| 06/28/2016 | 169 | EXHIBIT *S* by Kareem Bellamy. Related document: 155 MOTION for Summary Judgment filed by John J. Gillen, Michael F. Solomeno, City of New York, 162 First MOTION for Partial Summary Judgment filed by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Hoffman, Thomas) (Entered: 06/28/2016) |
| 06/29/2016 | 170 | Letter *enclosing courtesy copies* by Kareem Bellamy (Hoffman, Thomas) (Entered: 06/29/2016) |
| 07/18/2016 | 171 | Consent MOTION for Extension of Time to File Response/Reply , Consent MOTION for Leave to File Excess Pages by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 07/18/2016) |
| 07/19/2016 | | ORDER granting 171 Motion for Extension of Time to File Response/Reply; granting 171 Motion for Leave to File Excess Pages. The defendants' reply and opposition shall be filed by July 27, 2016, and the plaintiff's reply shall be filed on or before August 10, 2016. The defendants may file an opposition that is up to 18 pages. Ordered by Judge Ann M Donnelly on 7/19/2016. (Sise, Ellen) (Entered: 07/19/2016) |
| 07/27/2016 | 172 | REPLY to Response to Motion re 162 First MOTION for Partial Summary Judgment *RESPONSE TO PLAINTIFF'S 56.1 COUNTERSTATEMENT* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12) (Modafferi, Matthew) (Entered: 07/27/2016) |
| 07/27/2016 | 173 | REPLY in Support re 155 MOTION for Summary Judgment , REPLY in Opposition re 162 First MOTION for Partial Summary Judgment filed by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 07/27/2016) |
| 08/05/2016 | 174 | REPLY in Support re 162 First MOTION for Partial Summary Judgment filed by Kareem Bellamy. (Hoffman, Thomas) (Entered: 08/05/2016) |
| 08/05/2016 | 175 | Letter *Request Oral Argument* by Kareem Bellamy (Hoffman, Thomas) (Entered: 08/05/2016) |
| 08/05/2016 | | ORDER re 175 The Court will read the parties' submissions and notify the parties if the Court determines oral argument will assist the Court. Ordered by Judge Ann M Donnelly on 8/5/2016. (Sise, Ellen) (Entered: 08/05/2016) |

| | | |
|---|---|---|
| 08/05/2016 | 176 | Letter *enclosing courtesy copy of Reply* by Kareem Bellamy (Hoffman, Thomas) (Entered: 08/05/2016) |
| 08/09/2016 | 177 | Letter *Notice of Intervening Decision* by Kareem Bellamy (Hoffman, Thomas) (Entered: 08/09/2016) |
| 08/11/2016 | 178 | Letter *in response to plaintiff's letter dated August 9, 2016* by City of New York, John J. Gillen, Michael F. Solomeno (Modafferi, Matthew) (Entered: 08/11/2016) |
| 08/15/2016 | 179 | Letter *Request for Permission to File Sur−Reply* by Kareem Bellamy (Hoffman, Thomas) (Entered: 08/15/2016) |
| 08/15/2016 | | ORDER denying 179 request to file sur−reply. Ordered by Judge Ann M Donnelly on 8/15/2016. (Sise, Ellen) (Entered: 08/15/2016) |
| 09/16/2016 | | SCHEDULING ORDER: Oral argument on the motion for summary judgment will take place at 2:00 pm on October 11, 2016. Ordered by Judge Ann M Donnelly on 9/16/2016. (Sise, Ellen) (Entered: 09/16/2016) |
| 10/11/2016 | | Minute Entry for proceedings held before Judge Ann M Donnelly: Motion Hearing held on 10/11/2016 re 155 Motion for Summary Judgment filed by John J. Gillen, Michael F. Solomeno, City of New York, 162 First Motion for Partial Summary Judgment filed by Kareem Bellamy. Appearances by Thomas Hoffman and Joel Rubin, of Counsel, for the plaintiff and Matthew Modafferi for the defendants. The parties are requested to file the full trial transcript, post−trial hearing transcripts, and deposition transcripts by October 17, 2016. (Court Reporter Lisa Schwam.) (Sise, Ellen) (Entered: 10/11/2016) |
| 10/17/2016 | 180 | Letter *to add exhibit* by Kareem Bellamy (Attachments: # 1 Exhibit Alleged statement given to def. detectives by V. Walker) (Hoffman, Thomas) (Entered: 10/17/2016) |
| 12/05/2016 | | ORDER: The defendants provided the Court with a disc, which purported to be a digital copy of the transcripts submitted in conjunction with the parties' cross−motions for summary judgment. That disc appears to be blank. The defendants are to provide a disc−−that includes text−searchable transcripts of the materials that were provided in hard copy and detailed in the October 14, 2016 letter from Corporation Counsel−−as soon as possible, but no later than December 7, 2016. The defendants are to electronically file the cover letter associated with the delivery of that disc. Ordered by Judge Ann M Donnelly on 12/5/2016. (Goeke, Justine) (Entered: 12/05/2016) |
| 12/05/2016 | 181 | Letter *with CD (containing transcripts)* by City of New York (Modafferi, Matthew) (Entered: 12/05/2016) |
| 12/05/2016 | | ORDER: The parties do not appear to have submitted a complete hard copy of the September 9, 1994 Wade/Huntley Hearing. (Excerpts from the hearing are electronically filed as Plaintiff's Exhibit A at ECF No. 164−1.) The defendants are either to direct the court to the electronic location of the complete transcript of the September 9, 1994 Wade/Huntley hearing or electronically file the same by December 6, 2016. The defendants are to submit a complete courtesy hard copy of the transcript as soon as possible, but no later than December 7, 2016. Ordered by Judge Ann M Donnelly on 12/5/2016. (Goeke, Justine) (Entered: 12/05/2016) |
| 12/05/2016 | 182 | Letter *with Wade/Huntley hearing transcript* by City of New York (Attachments: # 1 Wade/Huntley transcript) (Modafferi, Matthew) (Entered: 12/05/2016) |
| 12/05/2016 | | ORDER: The Defendant's counsel filed a copy of the September 20, 1994 Wade/Huntley hearing transcript in response to my order requesting a complete transcript from the September 9, 1994 hearing. The defendants are directed to file the transcript from the September 9, 1994 hearing as soon as possible, but no later than December 7, 2016. Ordered by Judge Ann M Donnelly on 12/5/2016. (Goeke, Justine) (Entered: 12/05/2016) |
| 12/05/2016 | 183 | Letter *with September 9, 1994 Wade/Huntley hearing minutes* by City of New York (Attachments: # 1 September 9, 1994 Wade/Huntley hearing minutes) (Modafferi, Matthew) (Entered: 12/05/2016) |
| 12/07/2016 | | Order Dismissing Parties: John Doe 1 and John Doe 2 (Supervising Officers at the NYPD 101st Precinct) terminated pursuant to the parties' August 15, 2015 stipulation 112 . Ordered by Judge Ann M Donnelly on 12/7/2016. (Goeke, Justine) (Entered: |

| | | |
|---|---|---|
| | | 12/07/2016) |
| 12/21/2016 | | ORDER TO SHOW CAUSE: The plaintiff filed Exhibit S 169 under seal. However, in view of the decisions of the Second Circuit in United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995)and Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119−120 (2d Cir. 2006), any party seeking to maintain a document under seal is to submit an affidavit by a person with personal knowledge of the facts, i.e. not merely counsel of record, containing the following: (a) identification with particularity the precise information which the party contends should be kept under seal; (b) demonstrating the particular need for sealing the information; and (c) annexing a proposed redacted page together with the unredacted version for the Court's in camera review. See Prescient Acquisition Grp., Inc. v. MJ Pub. Trust, 487 F. Supp. 2d 374, 375 (S.D.N.Y. 2007). The parties' submissions responsive to this order are due by January 13, 2017. Ordered by Judge Ann M Donnelly on 12/21/2016. (Goeke, Justine) (Entered: 12/21/2016) |
| 01/13/2017 | 184 | Letter *Request that Exh S (169) be unsealed* by Kareem Bellamy (Hoffman, Thomas) (Entered: 01/13/2017) |
| 01/13/2017 | | ORDER: At the request of the parties, Exhibit S, filed as document # 169 is hereby unsealed. The Clerk of Court is respectfully directed to unseal document #169. Ordered by Judge Ann M. Donnelly on 1/13/2017. (Greene, Donna) (Entered: 01/13/2017) |
| 02/27/2017 | | STATUS REPORT ORDER: Neither party cites to a transcript of a deposition of witness Andrew Carter; it does not appear that Mr. Carter was deposed in connection with this civil lawsuit. By March 3, 2017, the plaintiff is to file a letter advising the court of Mr. Carter's whereabouts and availability to testify at trial. Separately, in support of the plaintiff's memorandum opposing summary judgment, the plaintiff relies on Mr. Carter's 440 testimony and affidavits. However, a court, in ruling on summary judgment, must only consider admissible evidence. Fed. R. Civ. P. 56; Presbyterian Church of Sudan v. Talisman Energy, Inc. 582 F.3d 244, 264 ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). By March 13, 2017, the plaintiff is to submit a supplemental brief addressing the admissibility of Mr. Carter's prior statements−−including his 440 testimony and affidavits. See United States v. Amato, No. 03−cr−1382−NGG, 2006 WL 1788190, at *1−3 (E.D.N.Y. June 26, 2006); O'Brien v. City of Yonkers, No. 07−cv−3947−KMK−LMS, 2013 WL 1234966, at *7−8 (S.D.N.Y. Mar. 22, 2013). Ordered by Judge Ann M Donnelly on 2/27/2017. (Goeke, Justine) (Entered: 02/27/2017) |
| 03/03/2017 | 185 | Letter *to Judge A. Donnelly re Andrew Carter* by Kareem Bellamy (Attachments: # 1 Public Records Re A. Carter, # 2 6.6.14 email from A. Wenzel) (Hoffman, Thomas) (Entered: 03/03/2017) |
| 03/13/2017 | 186 | MEMORANDUM in Opposition re 155 MOTION for Summary Judgment *Supplemental Memo* filed by Kareem Bellamy. (Attachments: # 1 Exhibit, # 2 Exhibit) (Hoffman, Thomas) (Entered: 03/13/2017) |
| 03/20/2017 | 187 | REPLY in Opposition *to plaintiff's supplemental memorandum of law concerning Andrew Carter's prior testimony* filed by City of New York, John J. Gillen, Michael F. Solomeno. (Modafferi, Matthew) (Entered: 03/20/2017) |
| 05/01/2017 | | ORDER: Counsel for the defendants previously submitted−−digitally and in hard copy−−twenty−two complete transcripts, portions of which were originally filed as exhibits to the parties' summary judgment declarations 181 . By May 9, 2017, the defendants are to electronically file the same. Ordered by Judge Ann M Donnelly on 5/1/2017. (Goeke, Justine) (Entered: 05/01/2017) |
| 05/08/2017 | 188 | Letter *as cover to the 22 transcripts previously provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 1) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 189 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 2) (Modafferi, Matthew) (Entered: 05/08/2017) |

| 05/08/2017 | 190 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 3) (Modafferi, Matthew) (Entered: 05/08/2017) |
|---|---|---|
| 05/08/2017 | 191 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 4) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 192 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 5) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 193 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 6) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 194 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 7, # 2 Exhibit 8, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 11, # 6 Exhibit 12) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 195 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 13, # 2 Exhibit 14, # 3 Exhibit 15) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 196 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 16, # 2 Exhibit 17) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 197 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 18, # 2 Exhibit 19) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 198 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 20, # 2 Exhibit 21) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/08/2017 | 199 | Letter *as cover to the 22 transcripts previosuly provided to the Court in connection with Defendants' motion for summary judgment* by City of New York, John J. Gillen, Michael F. Solomeno (Attachments: # 1 Exhibit 22, # 2 Exhibit 23, # 3 Exhibit 24, # 4 Exhibit 25, # 5 Exhibit 26) (Modafferi, Matthew) (Entered: 05/08/2017) |
| 05/17/2017 | 200 | ORDER granting 155 Motion for Summary Judgment; granting 162 Motion for Partial Summary Judgment: For the reasons set out in the associated memorandum and order, the defendants' motion for summary judgment is granted in its entirety, and the claims against the individual defendants are dismissed. The Monell claims against the City of New York are dismissed as a matter of law. Thus, the action is dismissed in its entirety. Ordered by Judge Ann M Donnelly on 5/17/2017. (Goeke, Justine) (Main Document 200 replaced on 5/17/2017) (Greene, Donna). (Main Document 200 replaced on 5/30/2017) (Greene, Donna). (Entered: 05/17/2017) |
| 05/17/2017 | | ORDER terminating 140 Motion for Protective Order; terminating 140 Motion to Bifurcate. Ordered by Judge Ann M Donnelly on 5/17/2017. (Goeke, Justine) (Entered: 05/17/2017) |
| 05/18/2017 | 201 | CLERK'S JUDGMENT: the Defendants' motion for summary judgment is granted in its entirety; the claims against the individual Defendants are dismissed the Monell claims against the City of New York are dismissed as a matter of law; and the action is dismissed in its entirety. Signed by Janet Hamilton Deputy Clerk on behalf of Douglas |

| | | C. Palmer Clerk of Court on 5/18/2017. (Ramesar, Thameera) (Entered: 05/18/2017) |
|---|---|---|
| 06/13/2017 | 202 | NOTICE OF APPEAL by Kareem Bellamy. Filing fee $ 505, receipt number 0207−9598266. Appeal Record due by 6/16/2017. (Hoffman, Thomas) (Entered: 06/13/2017) |
| 06/13/2017 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 202 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 06/13/2017) |
| 06/14/2017 | 203 | Subsequent NOTICE OF APPEAL as to 201 Clerk's Judgment, 200 Order on Motion for Summary Judgment,,, Order on Motion for Partial Summary Judgment,, by Kareem Bellamy . (Hoffman, Thomas) (Entered: 06/14/2017) |

Case 17-1859, Document 15, 06/27/2017, 2067418, Page29 of 128

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

                                                                  :

**KAREEM BELLAMY,**                             :

                         Plaintiff,         :

                                                          :    **MEMORANDUM DECISION AND**

                                                          :                  **ORDER**

                    - against -                      :

                                                        :    12 Civ. 1025 (AMD) (PK)

**CITY OF NEW YORK, JOHN J. GILLEN, and**   :

**MICHAEL F. SOLOMENO,**                       :

                                                          :

                         Defendants.      :

-------------------------------------------------------------- X

**ANN DONNELLY,** District Judge.

       The plaintiff brought this action on March 1, 2012 against Detectives John Gillen and

Michael Solomeno, as well as the City of New York, for alleged violations of federal and state

law, in connection with his prosecution for the April 9, 1994 murder of James Abbott.

       The plaintiff alleges misconduct on the part of the detectives who investigated the

murder.  Specifically, he asserts that Detectives Gillen and Solomeno fabricated evidence against

him, and coerced an eyewitness into identifying him.  His claims against the City are premised

on the trial prosecutor's summation comments, and on a perceived policy not to disclose

relocation assistance for threatened witnesses.

       The defendants move for summary judgment on all claims; the plaintiff cross-moves.  For

the reasons set out below, the defendants' motion for summary judgment is granted in its

entirety, and the action is dismissed.

1

**OVERVIEW**

James Abbott was stabbed to death on April 9, 1994. A jury found the plaintiff guilty of Murder in the Second Degree, on a theory that he acted with depraved indifference to human life.

At that trial, the critical issue was identification. The jury heard evidence from two witnesses. One witness saw the plaintiff shortly before the murder; this witness also said that the plaintiff had threatened her after the murder. The second witness saw the killing itself. Both of these witnesses identified the plaintiff in separate lineups. The jury also heard that the plaintiff made statements to police. The plaintiff's stepfather testified for the defense, and said that the plaintiff was home at the time of the murder.

The jury acquitted the plaintiff of intentional murder, and convicted him of depraved indifference murder. The plaintiff appealed his conviction to the Appellate Division, Second Department, which affirmed his conviction. The New York Court of Appeals denied the plaintiff's application for leave to appeal. The plaintiff filed a petition for habeas corpus in this district, and the Honorable Charles Sifton denied the petition in a written opinion.

More than ten years after his conviction, the plaintiff persuaded a state court judge to vacate his conviction, pursuant to Criminal Procedure Law Section 440.10, and to grant him a new trial. The path to that decision was a tortured one, and spanned more than three years and two lengthy hearings.

The plaintiff's initial claims at the 440 hearing were that his trial lawyer was ineffective, that one of the eyewitnesses had come forward with new evidence calling into question the reliability of his identification of the plaintiff, and that the prosecutor withheld *Brady* material. The plaintiff called many witnesses who purported to have seen either the crime or its aftermath, but none of them gave evidence that would have warranted setting aside the conviction. The

2

record also revealed that the plaintiff's team of lawyers and investigators, including his current lawyer, Thomas Hoffman, engaged in questionable tactics in their dealings with witnesses. For example, the plaintiff's team told the witnesses—many of whom had testified at the plaintiff's criminal trial—that the plaintiff was innocent, that prosecutors knew he was innocent, that the real killer had been identified and was still at large. Most troubling, the lawyers paid a substantial fee to one of these witnesses—the eyewitness, Andrew Carter—who changed his testimony only after negotiating a payment.

After the close of the evidence, however, the plaintiff's team announced that they had located a new witness, Michael Green, who claimed that Levon "Ishmel" Melvin had confided to Green that he had killed someone—presumably James Abbott—who was having an affair with Melvin's wife. Moreover, Green produced a tape recording, which he said that he had surreptitiously made of Melvin admitting to the murder. There were certainly problems with his testimony at the first hearing; like Carter, the defense team paid Green a significant amount of money, and told him that the plaintiff was innocent. Additionally, his account of how Melvin supposedly confessed to him was not entirely believable. Nevertheless, the recording itself was powerful evidence, and the judge granted the plaintiff's motion to vacate the conviction.

Shortly thereafter, however, Green's story was revealed to be a hoax. After an investigation, Green admitted that Melvin had never confessed to him, and that he paid a friend to play Melvin's role on the tape. Judge Blumenfeld granted the prosecutor's application to reopen the hearing, at which Green admitted that his previous testimony was a lie, that Melvin had never confessed to him, and that he fabricated the entire story. He also claimed that the defense team employed indefensible tactics: that they fed him evidence and played on his sympathies, and that Mr. Hoffman paid him far more than Green admitted at the first hearing,

3

and that after the tape was proved to be false, Mr. Hoffman told him to "disappear." Green also described fabricating a second recording purporting to be a witness who had overheard "the real killers" discussing the murder.

Despite Green's admission that the entire story was fabricated, Judge Blumenfeld adhered to his initial decision granting the plaintiff a new trial. He reasoned that Green could have been telling the truth when he testified that Melvin had confessed to him, and was only lying about the tape. Although the court ordered a new trial, the Queens County District Attorney's Office could not go forward with the case. In the years following the plaintiff's conviction, the New York Court of Appeals sharply restricted the circumstances under which depraved indifference murder, the crime for which the plaintiff was convicted, could be established. As a result, the Office could not retry the plaintiff for the murder of James Abbott.

The Queens County District Attorney's Office dismissed the indictment against the plaintiff in September of 2011. Six months later, the plaintiff—represented by Mr. Hoffman—brought this lawsuit against the detectives who had investigated the murder of James Abbott and the City of New York.

**BACKGROUND**

## I.    Factual History[1]

### A.  Murder Investigation

James Abbott was stabbed to death on Beach Channel Drive at the intersection of Beach 48th Street in Far Rockaway, Queens, at around 9:40 a.m. on April 9, 1994.  (Defendants' 56.1 Statement (ECF No. 156) ("Defs.' 56.1") ¶¶ 4, 9; Plaintiff's 56.1 Counterstatement (ECF No. 165) ("Pl.'s 56.1 Counterstatement") ¶¶ 4, 9.)  The murder site was three blocks from the Edgemere Houses, the public housing complex in which the plaintiff lived, and one or two blocks from the C-Town supermarket at 4909 Beach Channel Drive where Abbott had purchased groceries minutes before he was killed,  (Plaintiff's Additional 56.1 Statement (ECF No. 167) ("Pl.'s Add. 56.1") ¶ 21; Defendants' Responsive 56.1 Statement (ECF No. 172) ("Defs.' Resp. 56.1") ¶ 21), and where the plaintiff bought beer on April 9, 1994.  (Defs.' 56.1 ¶ 18; Pl.'s 56.1 Counterstatement ¶ 18.)

The case was first assigned to Detective Michael Solomeno of the 101st Precinct, and transferred to his colleague, Detective John Gillen, before the plaintiff's arrest, which took place five weeks after the murder.  (Pl.'s Add. 56.1 ¶ 22; Defs.' Resp. 56.1 ¶ 22.)  In the weeks that followed the murder, the detectives continued to investigate.  They went to the C-Town

---

[1] The plaintiff's submissions do not comply with Local Rule 56.1, which requires a summary judgment opponent to "specifically controvert[]" the movant's Rule 56.1 Statement of Material Facts, with citation to admissible record evidence.  Local Rule 56.1(c) & (d).  Instead, the plaintiff includes citations to evidence that does not support the claims being made, and draws strained or unwarranted inferences by combining evidence from different sources.  In many instances, the plaintiff's factual claims seem to be premised on counsel's own theories about the case, rather than the actual evidence.  I give no weight to statements that are not supported by the record.  Narrative and argument in a 56.1 Counterstatement violate the Local Rules, and is of no help to the Court, as it requires the Court to sift through thousands of pages of transcripts and depositions in order to ascertain the factual basis, if any, for the plaintiff's allegations.  *See Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 308–09 (E.D.N.Y. 2013).  While the record in this case is voluminous, and is comprised of thousands of pages of trial testimony, testimony from two lengthy 440.10 hearings, and multiple depositions, I have undertaken a thorough review of the record.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) (The court, in considering the parties' submissions, has broad discretion to "conduct an assiduous review of the record," or to "deem as admitted" facts that are not controverted by the opposing party's statement).

supermarket shortly after the murder, and learned that Abbott had been in the store moments before he was killed. (Pl.'s 56.1 Counterstatement ¶ 16; Pl.'s Add. 56.1 ¶¶ 30–31; Defs.' Resp. 56.1 ¶¶ 30–31.)

They also spoke at least twice to Andrew Carter,[2] who told the police he saw two men attack the victim, and that the shorter man stabbed Abbott repeatedly.[3] (Defs.' 56.1 ¶¶ 6–9; Pl.'s 56.1 Counterstatement ¶¶ 6–9, Defs.' Ex. E (ECF No. 157-5).)

Detectives Gillen and Solomeno interviewed Linda Sanchez, who was working at the C-Town the morning of the murder. (Defs.' 56.1 ¶ 12; Defs.' Ex. G (ECF No. 157-7).) She said that Abbott came to the store at about 9:30 a.m. (Defs.' 56.1 ¶ 13; Defs.' Ex. G.) Two other men also came in, picked up some beer, and got in the same line as Abbott. (Defs.' 56.1 ¶ 14; Defs.' Ex. G.) The two men left the store before Abbott, walked through the C-Town parking lot, turned back to the store, and then continued walking. (Defs.' 56.1 ¶ 15; Defs.' Ex. G.) Abbott also left, heading in the same direction as the two men. (Defs.' 56.1 ¶ 16; Defs.' Ex. G.)

On April 15, 1994, Detective Gillen received a telephone call from someone identifying herself as "Anna Simmons."[4] (Defs.' Ex. I (ECF No. 157-9).) The caller claimed to have overheard two men bragging about stabbing a man on Beach 48th Street. (Defs.' Ex. I.) According to the caller, the men said that they waited for the victim to leave the supermarket, and followed him to the scene of the stabbing; while he was on the telephone, they got out of their car, "snuffed him," and then drove away. (Defs.' Ex. I.) The woman added that the men were members of "the Regulators" gang, and that the victim may have been asked to join, but

---

[2] The parties agree that Carter used a wheelchair, and was a drug user who had served prison time for an armed robbery. (Pl.'s Add. 56.1 ¶ 32; Defs.' Resp. 56.1 ¶ 32.)

[3] A DD5 dated April 9, 1994, indicates that Carter spoke with Detective Lane. (Defs.' Ex. E.) The DD-5 did not include a description of the two men. (Pl.'s Add. 56.1 ¶ 33; Defs.' Resp. 56.1 ¶ 33.)

[4] Detective Gillen prepared a DD5 memorializing the call. (Defs.' Ex. I.) The caller is identified in the DD5 as "FKD," which stands for "female known to the department."

6

refused. (Defs.' Ex. I.) The caller said that she knew both men and gave the following description:

1.   Rodney Harris [male/black] 26-27 [years of age]
     5610 Beach Channel Drive
     Apartment 7g or 7H
     Short possibly 5'2-5'4"
     wears red hoodies

2.   Ishael [sic]
     5449 Almeda Avenue
     [male/black] 27-29 [years of age]
     possibly the head of the Regulators

(Defs.' Ex. I.) Although the caller promised to come to the precinct after she left work at 3:00 p.m., she never arrived. (Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23; Defs.' Ex. I.)

As documented in a DD5, Detectives Solomeno and Gillen, in an effort to interview the caller, visited two locations that the caller had given: a laundromat where she claimed to work, and an apartment at 411 Beach 54th Street, Apartment 2G. (Defs.' 56.1 ¶ 25; Defs.' Ex. K (ECF No. 157-11).) They could not find Simmons or anyone who knew her. (Defs.' 56.1 ¶¶ 25–27; Defs.' Ex. K.) Detective Solomeno showed both Carter and Sanchez, separately, two photographic arrays—one with Levon Melvin's[5] photograph, and the other with Rodney Harris's photograph—but neither Carter nor Sanchez identified either Melvin or Harris.[6] (Defs.' 56.1 ¶¶ 28–29; Solomeno Dep. Tr. 53:22–25, 55:9–60:5.)

On October 20, 1994, ADA David Guy sent a letter to Detective Gillen, requesting the female caller's name, and appended a copy of Detective Gillen's notes from the April 15, 1994

---

[5] The parties agree that "Ishmel" was a nickname for someone named Levon Melvin. (Defs.' 56.1 ¶ 28 n.2.)
[6] On a November 18, 1994 printout of Harris's arrest record, someone wrote the name "Mage Styles," as well as an address. (Pl.'s Add. 56.1 ¶ 54; Defs.' Resp. 56.1 ¶ 54.) Harris and Styles were "wanted" in connection with a shooting on Beach 54th Street and Beach Channel Drive that occurred five months before Abbott's murder. (Pl.'s Add. 56.1 ¶ 55; Defs.' Resp. 56.1 ¶ 55.)

7

conversation. (Pl.'s Ex. S (ECF No. 169-3 at ECF Page Nos. 10–11).) Detective Gillen created

a DD5 in response, dated November 18, 1994, which documented the visit to the apartment and

the laundromat the caller described.[7] (Defs.' Ex. K.) Detective Gillen added the phrases "does

not live here 4/19" and "Photos neg 16 m/w 22 p/w" to his notes.[8] (Pl.'s Ex. S (ECF No. 169 at

ECF Page No. 20).)

It is undisputed that Detective Gillen never looked for or questioned Harris or Melvin.[9]

(Pl.'s Add. 56.1 ¶ 45; Defs.' Resp. 56.1 ¶ 45.)

### B. The Arrest and Lineups

On May 13, 1994, Linda Sanchez called the 101st Precinct Detective Squad and said the

person she saw immediately before the stabbing was now in front of 5132 Beach Channel Drive.

(Defs.' 56.1 ¶ 30; Pl.'s 56.1 Counterstatement ¶ 30; Defs.' Ex. M.) The detectives arrived and

directed the plaintiff to get into the squad car, which he did.[10] (Defs.' 56.1 ¶ 33; Pl.'s 56.1

Counterstatement ¶ 33.)

The plaintiff says that he asked detectives why they picked him up. (Defs.' 56.1 ¶ 38;

Pl.'s 56.1 Counterstatement ¶ 38.) Both sides agree that Detective Gillen told the plaintiff that

they were bringing him back to the precinct stationhouse because he was drinking beer in public,

and he would be fined for disorderly conduct and drinking a beer in the street. (Defs.' 56.1 ¶¶

---

[7] During his deposition, ADA Guy testified that unless he had a separate telephone conversation with Detective Gillen, which he did not recall, he would not have known the April 15, 1994 caller had identified herself as Anna Simmons, until he received the November 18, 1994 DD5. (Guy Dep. Tr. 91:25–92:17.)

[8] The plaintiff says that Detective Gillen made these notes after ADA Guy requested the identity of the female caller. (Pl.'s Ex. S (ECF No. 169 at ECF Page No. 20).) Detective Gillen testified at his deposition that he made this addition to his notes, but did not recall when he did so. (Gillen Dep. Tr. at 82:5–84:1.)

[9] The defendants contend that Detective Gillen did not question Harris or Melvin because the detectives had nothing more than the telephone call from an unverifiable source, which did not give them a basis to make an arrest. (Defs.' Resp. 56.1 ¶ 45.) Moreover, questioning either or both men about a murder would have compromised the investigation, and caused potential suspects to flee. (Defs.' Resp. 56.1 ¶ 45.)

[10] According to the plaintiff, one of the detectives pointed a gun at him. (Pl.'s 56.1 Counterstatement ¶ 33.) The defendants say they asked the plaintiff to get into their car. (Defs.' 56.1 ¶ 33.)

8

35, 36; Pl.'s 56.1 Counterstatement ¶¶ 35, 36.)  At this point, according to the defendants, the plaintiff replied, "This must be a case of mistaken identity—someone probably accused me of murdering someone.  Why would someone accuse me of something I didn't do?"  (Defs.' 56.1 ¶ 37; Defs.' Ex. N (ECF No. 157-14).)  Detective Gillen made a note of the statement in his spiral notebook.  (Defs.' Ex. N.)  Sometime later, Detective Gillen added to the note: "Statement made by def while being asked his pedigree – spontaneous & unsolicited."  (Pl.'s Ex. S (ECF No. 169-2 at ECF Page No. 30); Gillen Dep. Tr. 58:14–59:5.)  The plaintiff denies making this statement.[11]  (Pl.'s 56.1 Counterstatement ¶ 37.)

On May 14, 1994, Detective Gillen conducted a lineup at the 101st Precinct.  (Defs.' 56.1 ¶ 42; Pl.'s 56.1 Counterstatement ¶ 42.)  Both Linda Sanchez and Andrew Carter viewed the lineup.  (Defs.' 56.1 ¶ 46; Pl.'s 56.1 Counterstatement ¶ 46.)  The witnesses were asked three questions: (1) Do you recognize anybody? (2) Whom do you recognize? (3) From where do you recognize that person?  (Defs.' 56.1 ¶ 48; Pl.'s 56.1 Counterstatement ¶ 48.)  A sergeant from a different precinct and Assistant District Attorney Stephen Antignani were in the viewing room when the witnesses looked at the lineup.  (Defs.' 56.1 ¶ 186; Pl.'s 56.1 Counterstatement ¶ 186.[12])

It is undisputed that Sanchez identified the plaintiff.  (Defs.' 56.1 ¶ 49; Pl.'s 56.1 Counterstatement ¶ 49.)  Detective Gillen documented this identification in a DD5 dated May 14, 1994.  (Defs.' Ex. P (ECF No. 157-16).)  Further, Sanchez signed a lineup report memorializing the identification.  (Defs.' Ex. Q (ECF No. 157-17).)  On this form, in response to the question,

---

[11] The plaintiff contends that Detective Gillen fabricated the statement, and argues, without support, that prosecutors would necessarily have introduced the statement in the grand jury.  (Pl.'s 56.1 Counterstatement ¶ 37.)  The plaintiff does not explain why this would be so, nor cite to any evidence that prosecutors regularly present all the evidence that they have gathered to the grand jury.

[12] In support of this fact, the defendants cite ADA Antignani's 440 testimony; ADA Antignani testified that he, Detective Gillen, and "one of Detective Gillen's supervisors, a sergeant who was not from that precinct" were in the lineup room.  (Defs.' Ex. MM, 440 Tr. 1109:3–8.)

"Where do you recognize him/her from," Detective Gillen wrote that Sanchez answered, "From C-town he was with the guy who got stabbed on that Saturday & he is the guy who I called up on with the yellow shirt yesterday and the brown boots." (Defs.' Ex. Q.)

When Carter first viewed the lineup, he said that the person who stabbed the victim was either the person seated in position one, or the person in position two.[13] (Defs.' 56.1 ¶ 51; Defs.' Ex. R (ECF No. 157-18).) The signed lineup form reflects this identification: in response to the question "Do you recognize anyone?" Carter answered, "Either 1 or 2 I'm not sure." (Defs.' 56.1 ¶ 52; Pl.'s 56.1 Counterstatement ¶ 52; Defs.' Ex. S (ECF No. 157-19).)

After the lineup, ADA Antignani joined Detective Gillen and Carter in another room. (Antignani Dep. Tr. 94:15–96:22.) When Detective Gillen left, Carter told ADA Antignani that he knew that the stabber was the person in position number one, but that the hair was different. (Antignani Dep. Tr. 94:15–96:22.) Detective Gillen prepared a DD5 that summarized Carter's statements:

> The line up was viewed by Andrew Carter and he stated that it was either position #1 or #2 that stabbed the victim at the c/o B.48 Street and Beach Channel Drive. He stated that it was more likely it was number one but could not be absolutely sure it was him. He stated that he was 99% sure but could not say for sure. Carter stated that it appeared that number one was the guy but it seemed as if he had cut his hair as he didn't have any braids.

(Defs.' Ex. R.)

---

[13] The plaintiff maintains that Carter "initially indicated that the perpetrator was number two, a filler." (Pl.'s 56.1 ¶ 51.) The plaintiff's citations to the record evidence do not support this proposition. At trial, Carter repeatedly testified that he initially indicated that the person who stabbed the victim was in "either one or two." (*See* Trial Tr. 880:11–883:22.) When Carter was asked, "Did you then pick out either one or two from that lineup at that time," Carter answered, "Two." (*See* Trial Tr. 882:25–883:3.) This testimony, however, does not support the plaintiff's argument that Carter first identified the person in position two, and then—after a "private conversation with Gillen outside of the lineup room" identified the person in position one. The plaintiff also cites the testimony of ADA Guy, who stated that Carter said, "One or two, I'm not sure." (Guy Dep. Tr. at 52:24–53:2.) Finally, the plaintiff testified at his deposition that during the lineup, he was able to hear voices from the other side of the door, and he "heard a guy say number two." (Bellamy Dep. Tr. at 158:23–159:21.)

ADA Antignani memorialized his exchange with Carter in a memorandum dated June 30, 1994. (Defs.' Ex. U (ECF No. 157-21).) ADA Antignani said that Carter initially said that both the plaintiff, in position one, and a filler, in position two, "resembled" the stabber. (Defs.' Ex. U.) In a second conversation immediately after the lineup, Carter explained that his statement in the lineup room "reflected only that there was a resemblance between the persons holding numbers one and two in the lineup, and that the stabber on the date of the incident had a different style haircut than he did on the date of the lineup." (Defs.' Ex. U.)

The plaintiff asserts that Detective Gillen and Carter had a conversation outside the lineup room, during which Detective Gillen directed Carter to identify the person in position one—the plaintiff—and told Carter that "Bellamy was the right person to identify but that he had 'cut his hair' and shortened his braids." (Pl.'s 56.1 Counterstatement ¶ 53.) Detective Gillen denies this accusation.

After the plaintiff was returned to his holding cell, Detective Gillen told him that both witnesses picked him out of the lineup. (Defs.' 56.1 ¶ 58; Pl.'s 56.1 Counterstatement ¶ 58.) According to the plaintiff, he fainted for a moment, and when he woke up, Detective Gillen said, "Once I close the door, I close it for good." (Pl.'s Add. 56.1 ¶ 127.)

The plaintiff told the detectives that he was with a friend, Terrell Lee, at the time of the murder. (Defs.' 56.1 ¶ 39; Pl.'s 56.1 Counterstatement ¶ 39.) On May 15, 1995, ADA Antignani, accompanied by Detective Gillen, took a sworn statement from Terrell Lee. Lee said that while he knew the plaintiff, he was not with him at the time of the murder:

> ADA Antignani: [I]f Kareem told us that he was with you at the time, the morning or April 9th, would he be telling the truth?
>
> Lee: I can't say if he would be telling the truth and I'm not going to try to justify what he's saying, but . . .

11

Antignani:  So, were you with him?

Lee: No, I wasn't.[14]

(Lee Interview, Pl.'s Ex. S (ECF No. 169-1 at ECF Page Nos. 6).)  On May 15, 1994, Detective

Gillen arrested the plaintiff for murder, and signed the criminal court complaint.  (Pl.'s Add. 56.1

¶ 128; Defs.' Resp. 56.1 ¶ 128.)

### C.  The Grand Jury

ADA Antignani presented the case to the Grand Jury on May 19, 1994.  Four witnesses

testified: Police Officer Frank Perez, Linda Sanchez, Andrew Carter, and Detective John Gillen.

Police Officer Frank Perez testified that on Saturday, April 9, 1994, at about 9:45 a.m., he

saw James Abbott lying in a pool of blood on the corner of Beach 48th Street and Beach Channel

Drive.  (Defs.' 56.1 ¶ 63; Pl.'s 56.1 Counterstatement ¶ 63.)

On April 9, 1994, Linda Sanchez was working as a cashier at C-Town.  (Defs.' Ex. X,

Grand Jury Tr. 8:16–9:8.)  At 9:30 a.m., James Abbott, whom she knew as "a quiet customer"

came into the store.  (Grand Jury Tr. 9:9–10:2.)  While he was checking out, Sanchez saw two

other men in line: the plaintiff, whom she recognized as a customer, and a taller man.  (Grand

Jury Tr. 10:3–11:12.)  Abbott stopped to talk to the store manager, and the plaintiff and the other

man left the store.  (Grand Jury Tr. 11:16–12:2.)  As they left, the plaintiff stopped, turned back,

and looked inside the store.  (Grand Jury Tr. 12:3–12:13.)  Sanchez went outside to the parking

lot to get shopping carts, and saw that the plaintiff and the other men had stopped near a chicken

place.  (Grand Jury Tr. 12:10–14:2.)  Abbott then walked through the parking lot, in the same

---

[14] The plaintiff claims, without support, that Lee only gave these answers because Detective Gillen threatened him. The plaintiff also refers to his Exhibit W (ECF No. 164-31), which appears to be fragments of unsigned letters, in what seems to be different handwriting.  The plaintiff does not explain how unsworn, unsigned fragments of letters would ever be admissible.  In any event, to the extent that the plaintiff is claiming that these pages are parts of letters from Lee, it is noteworthy that Lee does not provide him with an alibi.  (Pl.'s Ex. W at 3167.)

direction as the plaintiff and the other men. (Grand Jury Tr. 14:3–14:16.) Sanchez learned later that morning that James Abbott had been killed. (Grand Jury Tr. 14:17–15:4.)

In a lineup held on May 14, 1994, Sanchez identified the plaintiff as the shorter man behind Abbott in the supermarket on April 9, 1994. (Grand Jury Tr. 15:8–16:5.) The plaintiff's hair was different at the lineup; it was not as "loose" as it was on April 9th. (Grand Jury Tr. 15:8–16:16.)

Andrew Carter, the third witness, testified that on April 9, 1994, he was waiting for the bus on Beach Channel Drive between Beach 48th and 49th Streets when he observed three men walk over from the direction of the C-Town. (Defs.' 56.1 ¶¶ 73, 74; Pl.'s 56.1 Counterstatement ¶¶ 73, 74.) One of them had two bags. (Grand Jury Tr. 19:9–13.) Two of the three passed him, while one stopped to light a cigarette, and nodded to Carter. (Grand Jury Tr. 19:14–20.) The man with the bags went to use the telephone. (Grand Jury Tr. 19:14–20.) When the man with the bags hung up the telephone, the other two men started hitting him. (Grand Jury Tr. 20:2–10.) The "little" man who had lit the cigarette pulled out a knife and starting stabbing the man in his head, neck, and chest. (Defs.' 56.1 ¶ 75; Pl.'s 56.1 Counterstatement ¶ 75.) The man fell to the ground, and both men kicked him "[a]ll in the chest, face, everywhere." (Grand Jury Tr. 21:16–17.)

On May 14, 1994, Carter went to the 101st Precinct and viewed a lineup. (Grand Jury Tr. 21:21–22:2.) Carter testified that the person in position one—the plaintiff—"stabbed the guy to death in front of the bus stop;" his hair had been in short, kinky braids on the day of the stabbing, but "cut" on the day of the lineup. (Grand Jury Tr. 22:3–22:20.)

Detective Gillen was the last witness to testify before the Grand Jury. (Defs.' 56.1 ¶ 78; Pl.'s 56.1 Counterstatement ¶ 78.) He conducted two separate lineups—one that Sanchez saw,

13

and the other that Carter saw; the plaintiff was seated in position number one for both lineups.[15] (Defs.' 56.1 ¶ 79; Pl.'s 56.1 Counterstatement ¶ 79.)

The Grand Jury indicted the plaintiff for two counts of Murder in the Second Degree, and one count of Criminal Possession of a Weapon in the Fourth Degree. (Defs.' 56.1 ¶ 80; Pl.'s 56.1 Counterstatement ¶ 80.)

### D. The Suppression Hearing

Prior to trial, the plaintiff's attorney, Kenneth Reiver, moved to suppress the lineup identifications and the plaintiff's post-arrest statements.[16] At a hearing held on three dates before the Honorable Steven Fisher, the State called Detective Gillen and ADA Antignani. Detective Gillen testified that on May 13, 1994, Linda Sanchez called the 101st Precinct, and said that the person who had been with James Abbott shortly before his murder was in front of 5132 Beach Channel Drive. (Sept. 9, 1994 Tr. 9:7–15.) The detectives, including Detective Gillen, arrived at the address and saw the plaintiff, who matched Sanchez's description, and was drinking a forty ounce beer. (Sept. 9, 1994 Tr. 9:7–10:3.)

The detectives put the plaintiff in the back seat of their car. (Sept. 9, 1994 Tr. 13:15–17.) The plaintiff was not handcuffed, but was "getting a little aggravated." (Sept. 9, 1994 Tr. 54:6–25.) One of the detectives said they would "overlook" the fact that the plaintiff was drinking beer "in front of the project," but that he had to come to the precinct. (Sept. 9, 1994 Tr. 54:20–25.) As they drove to the precinct, Detective Gillen attempted to get the plaintiff's pedigree information, and the plaintiff said, "This must be a mistake. Somebody must have accused me of

---

[15] The prosecutor also introduced a document entitled "Identification of Body," and James Abbott's death certificate, which indicated that he died from stab wounds to the torso with perforations of the lung, liver, and aorta. (Grand Jury Tr. 27:1–30:7.)

[16] Counsel's pre-trial motion to suppress physical evidence was denied without a hearing.

murdering somebody. Why would somebody accuse me of something I didn't do?"[17] (Sept. 9, 1994 Tr. 12:23–13:5, 52:13–53:6.) When they got to the precinct, Detective Gillen advised the plaintiff of his constitutional rights. (Sept. 9, 1994 Tr. 13:23–16:21.) The plaintiff said that he did not want to talk, refused to sign a form to that effect, and was put in a cell. (Sept. 9, 1994 Tr. 16:3–17:23.) Then the plaintiff started talking. (Sept. 9, 1994 Tr. 18:4–12.) He said that he woke up at 10:00 a.m. on the day of the murder, and was in C-Town with a friend. (Sept. 9, 1994 Tr. 18:22–19:9.) He also said that he saw the victim's body, covered by a sheet, in the street, and that he knew the victim and his family. (Sept. 9, 1994 Tr. 18:22–19:9.)

Detective Gillen arranged a lineup with five fillers.[18] (Sept. 9, 1994 Tr. 22:2–8, 33:2–5.) Because the plaintiff was the only one with short braids, Detective Gillen asked the plaintiff to push back his braids. (Sept. 9, 1994 Tr. 84:14–85:5.) The plaintiff chose the first seat.[19] (Sept. 9, 1994 Tr. 22:5–10.) Sanchez was the first to look at the lineup.[20] (Sept. 9, 1994 Tr. 22:19–23:2.) She stated that she recognized number one, the plaintiff, as "the guy who was with the victim in C-Town the day he got stabbed," and that the plaintiff was "the guy I called up on yesterday." (Sept. 9, 1994 Tr. 30:25–31:11.)

Carter viewed the lineup after Sanchez. (Sept. 9, 1994 Tr. 32:6–11.) He said that he wanted to get a closer look at the people in the lineup, so the detective asked that each participant step closer to the window. (Sept. 9, 1994 Tr. 60:18–61:11, 86:4–18.) Carter said that it was "either number one or number two," that he "thought it was number one," but that he was "also looking at number two." (Sept. 9, 1994 Tr. 33:18–34:21.) When they got outside of the lineup

---

[17] As noted above, the plaintiff denies making this statement.
[18] Carter was designated as "the male witness" in the transcript. The lineup could not take place until the day after the plaintiff was taken into custody, because Carter was in the hospital. (Sept. 9, 1994 Tr. 87:8–17.)
[19] The plaintiff disputes this, and says that he was directed to take the first seat. (Pl.'s Add. 56.1 ¶ 111.)
[20] Sanchez was designated in the transcript as "the female witness."

15

room, Carter said he was "99 percent sure it was number one," but "the hair is throwing me off." (Sept. 9, 1994 Tr. 85:9–14.) Carter was then taken to another room. (Sept. 9, 1994 Tr. 85:15–86:3.) He called the detective over and said that he thought it was "definitely number one," but that his hair was "shorter," and repeated that "the hair was just throwing [him] off." (Sept. 9, 1994 Tr. 34:14–21, 85:15–86:3.) Then he said that "it was definitely, without a doubt, number one." (Sept. 9, 1994 Tr. 34:14–21, 85:15–86:3.)

In addition to asking about the statements and the lineups, defense counsel questioned Detective Gillen about the caller who claimed to have overheard two men talking about the murder. (Sept. 9, 1994 Tr. 45:17–20.) Detective Gillen testified that he could not find the caller. (Sept. 9, 1994 Tr. 46:14–24.) He did not question the people that the caller had named because he did not have anyone to "verify" her information, and he did not want to compromise the investigation. (Sept. 9, 1994 Tr. 46:14–47:18.)

ADA Stephen Antignani testified that he was present in the room when both witnesses viewed the lineup, as was a sergeant. (Sept. 9, 1994 Tr. 94:24–95:6, 103:21–104:5.) While Carter was looking at the lineup, the participants were asked to step closer to the window. Carter said that he recognized "either one or two. I'm not sure," and that he saw "one or two stab the black guy on Beach Channel Drive between Beach 47 or Beach 48 Street." (Sept. 9, 1994 Tr. 104:24–105:11.) Less than five minutes after Carter looked at the lineup, ADA Antignani went to talk to him in order to schedule his grand jury testimony. (Sept. 9, 1994 Tr. 109:21–110:7.) Carter, who was "sort of apologetic," told the prosecutor that he "knew it was number one" who stabbed James Abbott, but that numbers one and two "resembled each other." (Sept. 9, 1994 Tr. 99:17–100:6, 124:22–125:18.) He explained that he was "positive" that it was number one, but that his hair was different on the day of the stabbing than it was at the lineup, and that the

16

plaintiff's braids were "looser" on the day of the murder. (Sept. 9, 1994 Tr. 99:17–100:6, 113:7–19.) ADA Antignani spoke to Carter before the grand jury presentation. (Sept. 9, 1994 Tr. 100:11–25.) Carter repeated what he said after the lineup: that numbers one and two "looked alike," but that he was "definite it was number one," but that he had "different hair on the date of the stabbing." (Sept. 9, 1994 Tr. 100:11–25.)

Detective Gillen was recalled on September 20, 1994, and testified about the April 22, 1994 interview of Linda Sanchez. At some point between the April 9 and April 22, 1994, Sanchez called Detective Solomeno, and said that she had some information about the homicide. (Sept. 20, 1994 Tr. 8:8–13.) During an April 22, 1994 interview of Sanchez, Detectives Solomeno and Gillen learned that she had seen Abbott in the supermarket at around 9:30 a.m. on the day that he was killed. (Sept. 20, 1994 Tr. 9:10–10:9.) She saw two black men get in line behind Abbott. (Sept. 20, 1994 Tr. 9:10–10:9, 11:17–22.) She described one man as 5'5", wearing a green jacket and green hat, with short braided hair. (Sept. 20, 1994 Tr. 10:19–11:6.) The other man was between 5'7" and 5'8". (Sept. 20, 1994 Tr. 10:19–11:6.)

Before Abbott left the store, he spoke with the store manager. (Sept. 20, 1994 Tr. 9:10–10:9.) The two other men paid for their things and left. (Sept. 20, 1994 Tr. 9:10–10:9.) Sanchez saw them walk through the parking lot, towards Beach Channel Drive. (Sept. 20, 1994 Tr. 9:10–10:9.) About halfway across the parking lot, they stopped and looked back at the store. (Sept. 20, 1994 Tr. 9:10–10:9.) Abbott left the store, and walked in the same direction as the two men, towards the chicken store. (Sept. 20, 1994 Tr. 9:10–10:9.) Sanchez went out to retrieve some shopping carts; as she walked back towards the store, she looked back, but did not see Abbott or the two men. (Sept. 20, 1994 Tr. 9:10–10:9.) Sanchez told the detectives that she knew the men

17

from "coming into the store all the time," and that if she saw them again, or saw a photo of them, she would "definitely recognize them." (Sept. 20, 1994 Tr. 12:6–12.)

After both sides rested, the plaintiff's lawyer argued that the plaintiff's statements and both lineup identifications should be suppressed. (Sept. 20, 1994 Tr. 57:10–64:17.) He contended that the plaintiff was arrested without probable cause, that the lineup was unduly suggestive, and that ADA Antignani must have "suggested" to Carter that he should identify the plaintiff. (Sept. 20, 1994 Tr. 57:10–64:17.)

Judge Fisher credited the testimony of both witnesses; he found that the detectives had probable cause to arrest the plaintiff, that the lineup was not unduly suggestive, and that the plaintiff's statements were spontaneous.[21] (Sept. 30, 1994 Tr. (ECF No. 182-1).)

### E. Criminal Trial

The central issue in the plaintiff's trial was identification. The witnesses for the prosecution included Detectives John Gillen and Michael Solomeno, Andrew Carter, Linda Sanchez, Veronica Walker, and Deborah Abbott, the victim's sister. The plaintiff's stepfather testified for the defense. I summarize the testimony of the relevant witnesses.

#### i. Detective John Gillen

Detective John Gillen testified about his role in the investigation of James Abbott's murder and the arrest of the plaintiff. On April 9, 1994, Detective Gillen and other detectives, including Detectives Michael Solomeno and Darren Lane, went to the scene of the stabbing; when they arrived, Abbott's body was still there. (Trial Tr. 480:4–81:7.) Detective Lane spoke to Andrew Carter, who lived in a nursing home. (Trial Tr. 482:1–12.) The detectives canvassed the area for witnesses. (Trial Tr. 481:13–25.) About a week later, on April 15, 1994, Detective

---

[21] As Judge Fisher was discussing Sanchez's familiarity with the plaintiff, the plaintiff interjected, "I live around there, she sees me come in the store all the time." (Sept. 30, 1994 Tr. 12:25–13:2.)

18

Case 17-1859, Document 15, 06/27/2017, 2067118, Page47 of 128

Gillen got a call from a woman who identified herself as "Anna Simmons." (Trial Tr. 482:16–24.) She said that she overheard two men talking about a murder; she identified them as "Ishmel" and "Rodney Harris." (Trial Tr. 482:16–83:9.) Detective Solomeno checked precinct files, determined that Rodney Harris and Levon "Ishmel" Melvin had been arrested in the precinct, and got their arrest photographs. (Trial Tr. 483:7–22, 546:10–14.) He put together two photographic arrays, one containing Harris's photograph and the other containing Melvin's photograph, and showed them, separately, to Carter and Sanchez. (Trial Tr. 483:7–22, 484:2–6, 486:18–87:4.) Neither witness identified either Harris or Melvin. (Trial Tr. 486:22–24, 487:10–12.)

Detective Gillen tried to find the caller at both the home address that she gave and at her workplace. (Trial Tr. 490:9–91:15.) No one at either location knew who she was. (Trial Tr. 490:9–91:15.) He did not question or arrest Harris or Melvin because he had "nothing to arrest them for." (Trial Tr. 553:21–54:24.) He was "not going to approach a suspect and ask him questions about a homicide" when he could not verify whether the caller actually heard the statement. (Trial Tr. 553:21–54:24.) He did not believe that he had probable cause to arrest either man. (Trial Tr. 608:2–7.) Moreover, Detective Gillen was never able to verify that Anna Simmons existed. (Trial Tr. 490:9–91:15, 546:18–22, 605:3–6:10.)

Detective Gillen was with Detective Solomeno at an April 22, 1994 interview of Linda Sanchez. In that interview, she said that she recognized one of the men who was behind the victim in line as a regular C-Town customer. (Trial Tr. 565:9–14, 570:3–10.)

At about 6:00 p.m. on May 13, 1994, in response to a call to the precinct, detectives went to 5124 Beach Channel Drive. (Trial Tr. 491:16–92:12.) They stopped the plaintiff, who was wearing a bright yellow sweatshirt and dark pants tucked into Timberland boots, as described in

19

the call. (Trial Tr. 493:7–17.) He was also drinking a forty ounce beer. (Trial Tr. 493:11–13.) One of the detectives told him that they were arresting him for drinking a beer in public, and put him in the back seat of their car. (Trial Tr. 493:14–94:15, 529:23–30:11.) As Detective Gillen tried to get the plaintiff's pedigree information, but before any mention of James Abbott's murder, the plaintiff yelled, "This must be a case of mistaken identity. Somebody probably accused me of murdering someone." (Trial Tr. 494:23–95:3, 529:12–16, 599:15–22, 600:2–5.) Detective Gillen wrote down what the plaintiff said in his spiral notebook, along with the notation "Statement made by defendant while being asked pedigree." (Trial Tr. 535:24–36:1.) Sometime later, the detective gave a copy of that notebook page to the prosecutor; he subsequently wrote, "spontaneous and unsolicited" on the original page, copied that page, and gave it to the prosecutor. (Trial Tr. 535:24–40:4.) Defense counsel had both versions at trial, and questioned Detective Gillen about them. (Trial Tr. 535:24–40:4.)

When they arrived at the precinct, Detective Gillen advised the plaintiff of his constitutional rights; the plaintiff said that he did not want to answer questions. (Trial Tr. 496:17–97:2, 531:18–20, 560:10–61:16.) Detective Gillen put the plaintiff in a holding cell, and started filling out paperwork. (Trial Tr. 497:14–16.) The plaintiff told the detective that he was "there that day." (Trial Tr. 499:2–501:25, 531:21–32:11.) He said that in the afternoon, he and Terrell Lee walked from the C-Town and saw James Abbott's body in the street. (Trial Tr. 499:2–501:25, 531:21–32:11.) He added that he had known Abbott "his whole life," and saw him "all the time" when he went to C-Town to buy beer. (Trial Tr. 499:2–501:25, 531:21–32:11.)

The next day, May 14, 1994, Detective Gillen put together a lineup with the plaintiff in seat number one, and five fillers. (Trial Tr. 502:14–5:7.) He asked the plaintiff to push his

20

braids back and to flatten them so that he would not stand out. (Trial Tr. 510:9–19.) Two witnesses viewed the lineup: Linda Sanchez and Andrew Carter. (Trial Tr. 504:8–12, 505:11–12.) Both witnesses identified the plaintiff, but Carter was hesitant. (Trial Tr. 509:12–21.) Carter said that "it was either one or two," and that he was not sure. (Trial Tr. 628:7–9.) Carter, who was in a wheelchair, was having a difficult time seeing, and was trying to lift himself up. (Trial Tr. 609:23–10:11.) He asked that the participants step closer. (Trial Tr. 627:22–28:6.) After each participant stepped forward, Carter repeated that he was not sure, and that it was either one or two. (Trial Tr. 628:4–9.)

Detective Gillen also testified that at the suppression hearing, the plaintiff repeatedly blurted out statements during the examination of witnesses, including "It wasn't me," "That's a lie," and "He did not read me my rights." (Trial Tr. 615:12–26:17.)

On cross examination, defense counsel established that the detectives had never found a motive for the murder, nor any proof that the plaintiff had any relationship with the victim.[22] (Trial Tr. 565:3–8.)

### ii. Detective Michael Solomeno

Detective Michael Solomeno was originally the assigned detective on the case. (Trial Tr. 791:8–11.) He prepared the photographic arrays containing Rodney Harris' and Levon Melvin's photographs, and was with Detective Gillen when they were shown to Linda Sanchez and Andrew Carter. (Trial Tr. 791:19–94:18.) He interviewed Sanchez on April 22, 1994. (Trial Tr. 794:24–95:2.) Sanchez never told him that the plaintiff threatened her. (Trial Tr. 795:3–5,

---

[22] Counsel asked the following question: "Did you ever learn that a former boyfriend had a confrontation with Mr. Abbott in reference to Mr. Abbott's present wife? Did you ever learn that?" (Trial Tr. 564:17–23.) The prosecutor objected on the grounds that the question called for hearsay, and that it was "improperly phrased." (Trial Tr. 564:24–65:1.) The judge sustained the objection, and the defense attorney moved on to a different topic. (Trial Tr. 565:2–8.)

803:14–17, 813:3–5.) Shortly before Detective Solomeno's testimony, the victim's sister gave him Veronica Walker's name and contact information. (Trial Tr. 801:14–802:5.) He interviewed Walker on December 1, 1995, while the trial was underway. (Trial Tr. 802:2–12, 807:4–8.)

### iii. Linda Sanchez

Linda Sanchez was the next witness.[23] (Trial Tr. 631:20–789:1.) The prosecutor had previously disclosed, without the jury present, that he had only recently learned from Sanchez that about a week after the murder, the plaintiff came into C-Town, threatened her,[24] and warned her not to talk.[25] (Trial Tr. 520:3–21:12, 657:12–60:2.) In addition, on the day she called the police to report that the plaintiff was standing in front of 5132 Beach Channel Drive, the plaintiff gestured and wagged his finger at her, which she took as a threat. (Trial Tr. 660:3–14.) The prosecutor advised the court and counsel that his office was "mak[ing] efforts to relocate" Sanchez and was "proceeding with relocation." (Trial Tr. 520:14–21:12.) He also said that for four days they had given her $25.00 a day. (Trial Tr. 520:14–21:12.) Mr. Reiver protested that it was "amazing that 18 months after this indictment . . . that I am advised after a trial starts that there is some incident that allegedly concerns my client, and I submit to the court that this is totally unfair and unethical. I withdraw the unethical part. It's unfair and highly prejudicial." (Trial Tr. 521:13–22:2.) After a hearing at which Sanchez testified, the court ruled, over defense

---

[23] ADA David Guy got a Material Witness Order to secure Sanchez's attendance at the trial. (Pl.'s Ex. S (ECF No. 169 at ECF Page Nos. 10–11).)

[24] In a memorandum dated December 1, 1995, ADA Guy spelled out the details of the threat:

> The reason she needs to be relocated is that roughly one week after the incident in question, the defendant came back to her work location and, calling her a "fu**-ing bitch," he told her that she "knew" and that she was "next."

(Defs.' Ex. AA.)

[25] The plaintiff interjected, "I don't even know her." (Trial Tr. 520:12.)

counsel's objections, that her testimony about the threats was relevant and admissible.[26] (Trial Tr. 700:25–01:3.)

In the presence of the jury, Sanchez testified that she was unemployed and on public assistance, and had eight month old twins. (Trial Tr. 633:11–22.) She was not staying at her home, but at a place where a detective had taken her. (Trial Tr. 634:18–35:4.) She was receiving money from the District Attorney's Office: $25 a day for her and her children, to cover the cost of items like food and diapers. (Trial Tr. 633:23–34:14.)

In April of 1994, Sanchez was a cashier at the C-Town at Beach Channel Drive and 49th Street in Far Rockaway, Queens. (Trial Tr. 635:5–17, 716:19–23.) On April 9, 1994, at around 9:30 a.m., James Abbott, who was a regular customer, was in another cashier's checkout line. (Trial Tr. 636:16–38:18, 641:8–21, 785:19–21.) Standing just behind him were the plaintiff and another man, buying beer. (Trial Tr. 641:8–25, 773:15–74:7.) The plaintiff was wearing a green camouflage jacket, and had "a lot of braids sticking up." (Trial Tr. 640:21–41:4, 729:19–22, 774:3–19.) He also had a green hat, which he removed when he came into the store. (Trial Tr. 640:21–23, 729:19–22, 734:15–22.) Sanchez recognized the plaintiff as a frequent customer. (Trial Tr. 642:8–12.) In addition, she had once lived near him, and used to see him "hanging out." (Trial Tr. 767:15–68:1.) The second man, who once sold Sanchez a packet of incense sticks, was light skinned and taller than the plaintiff. (Trial Tr. 730:1–14, 733:3–10, 777:15–19.) He was wearing glasses and had braids that were "going back." (Trial Tr. 753:22–24, 730:1–4, 773:23–74:10.)

---

[26] The hearing was held in the middle of Sanchez's direct examination, but before she gave any testimony about the threats. (Trial Tr. 661:1–700:24.)

23

Abbott stopped to talk to the store manager, later identified as Judeh.[27] (Trial Tr. 754:10–17, 765:4–6.) The plaintiff and the other man left the store; once outside, one of them turned to look back inside the store, and then both turned to the right. (Trial Tr. 647:12–48:24, 649:12–50:10, 764:18–66:3, 768:19–25.) Abbott left shortly thereafter, and also went to the right.[28] (Trial Tr. 649:12–50:10, 768:19–25.) At that point, Sanchez's boss told her to retrieve shopping carts from the store's parking lot. (Trial Tr. 651:9–16, 755:19–56:5.) When she went outside, she noticed that Abbott had passed the plaintiff and the other man, who were now "right behind" Abbott, near what had formerly been a chicken store. (Trial Tr. 651:13–52:6.)

Sanchez did not speak to any of the police officers who subsequently came to the store. (Trial Tr. 652:13–53:2, 744:7–11, 745:21–46:2, 763:18–22, 784:5–11.) She did not find out that Abbott had been murdered until after the police left; her boss told her what happened. (Trial Tr. 763:18–22, 784:16–85:5.) Although the plaintiff had previously been an almost daily customer, Sanchez did not see him again until about a week later, when he approached her at her register and said, "You know, you know, you fucking bitch. You're next." (Trial Tr. 705:3–06:16, 747:12–16.) Sanchez worked the rest of the day, and thought that she called the precinct the next day. (Trial Tr. 706:20–07:9.) She spoke to "a lady," and asked to be transferred to Detective Solomeno, whose name she had seen in a local newspaper article about Abbott's murder. (Trial Tr. 707:10–20, 708:18–24, 741:10–48:10.) No one picked up the telephone after her call was transferred. (Trial Tr. 707:10–20, 708:18–24, 741:10–48:10.)

She spoke with detectives, including Detective Solomeno, on April 22, 1994. (Trial Tr. 715:15–18, 750:25–51:7.) She told them about what she saw in the store on the day of the

---

[27] Sanchez referred to him as "Jay Jay." (Trial Tr. 754:10–17.)
[28] When the plaintiff left the store on other occasions, he headed to the left, in the direction of Edgemere Houses. (Trial Tr. 650:11–23, 769:1–18.)

24

Case 17-1859, Document 15, 06/27/2017, 2067118, Page53 of 128

murder, but did not tell them about the plaintiff's threat to her a week after the murder. (Trial Tr. 749:9–20.) Detective Solomeno showed her two photographic arrays, but she did not recognize any of the people in the photographs. (Trial Tr. 715:15–16:10, 779:8–80:23.)

### iv. Andrew Carter

Andrew Carter, who had used a wheelchair since the 1980s, testified that on the morning of the murder, he was waiting for the bus on Beach Channel Drive and Beach 48th Street. (Trial Tr. 865:15–23.) Three men, one of whom he identified as the plaintiff, came toward him from C-Town, said hello, and walked "right past" him. (Trial Tr. 866:14–69:10.) One of the men, later identified as James Abbott, was carrying a C-Town shopping bag. (Trial Tr. 867:16–68:2.) The plaintiff, who was the shortest of the three men, stopped to light a "crack joint." (Trial Tr. 898:14–23.) Abbott went to use the payphone. (Trial Tr. 869:11–15.) Carter turned to look for the bus, and when he turned back, the plaintiff and the other man were "beating the hell" out of Abbott, "[k]icking him, boxing him." (Trial Tr. 869:13–70:2.) At one point, the plaintiff pulled out a "brass knuckle knife," and stabbed Abbott repeatedly. (Trial Tr. 869:18–70:2; Defs.' 56.1 ¶ 113; Pl.'s 56.1 Counterstatement ¶ 113.) Both the plaintiff and the other man kicked Abbott as he lay on the ground. (Trial Tr. 872:9–13.) When they were finished, they looked at Carter, turned around, and ran away. (Trial Tr. 872:9–13, 874:7–75:12.) Carter, shocked, went closer to where Abbott was lying, and "saw him take his last breath." (Trial Tr. 874:23–24; 875:17–21.)

On May 14, 1994, Carter viewed a lineup at the 101st Precinct, and identified "either one or two, because they got their hair different." (Trial Tr. 878:25–80:21.) After the lineup, he was put in another room. (Trial Tr. 881:4–7.) He told either the assistant district attorney or the detective that "it was either one or two because he had his hair different." (Trial Tr. 881:8–24, 883:18–84:8.) When asked whether he ultimately picked one or two from the lineup, Carter said

"Two." (Trial Tr. 882:25–83:3.) After Carter left the lineup room, he told Detective Gillen that he recognized the person in position number one; he could not be absolutely certain, but was 99 percent sure. (Trial Tr. 884:11–19.)

Carter made an in-court identification of the plaintiff as the person who stabbed Abbott. (Trial Tr. 869:16–70:20; 871:6–14.) He testified that he got a good look at the faces of Abbott's attackers, and that there was "no doubt" in his mind that the plaintiff was the one that stabbed the victim on the morning of April 9, 1994. (Trial Tr. 872:14–20.)

### v. Veronica Walker

During the trial, ADA Guy advised the court and counsel that he had learned from Deborah Abbott, the victim's sister, that Veronica Walker had information about the homicide. (Defs.' 56.1 ¶ 117; Defs.' Ex. EE (ECF No. 157-31).) The detectives interviewed Walker on December 1, 1995. (Defs.' 56.1 ¶ 118; Pl.'s 56.1 Counterstatement ¶ 118.) The parties dispute whether Walker gave the detectives the plaintiff's name, or as the plaintiff contends, the detectives said his name and showed her a photograph of the plaintiff. (Defs.' 56.1 ¶ 119; Pl.'s 56.1 Counterstatement ¶ 119.)

Detective Solomeno prepared a DD5 that summarized his interview with Walker. (Defs.' Ex. EE.) According to that report, Walker drove to the C-Town on Beach Channel Drive on April 9, 1994, and saw James Abbott leaving the store. (Defs.' Ex. EE.) He greeted her, and walked away through the parking lot. (Defs.' Ex. EE.) Walker left the store after ten minutes. (Defs.' Ex. EE.) As she drove out of the parking lot onto Beach Channel Drive, she saw Abbott hang up the payphone on the corner of Beach 48th Street. (Defs.' Ex. EE.) A black man dressed in dark clothing approached Abbott, and they started fighting. (Defs.' Ex. EE.) Walker drove past the two men, and then looked back and saw the plaintiff join the other man in kicking and

26

punching Abbott. (Defs.' Ex. EE.) Walker did not stop, and did not learn until later that a man was killed in that area; even then, she did not connect it with what she had seen. (Defs.' Ex. EE.) She did not tell anyone about these events until she saw Deborah Abbott in July of 1994.[29] (Defs.' Ex. EE.)

Walker was then called as a witness.[30] She testified that on April 9, 1994 at about 9:30 a.m., she went to C-Town. (Trial Tr. 996:11–97:1.) As she walked in, she saw James Abbott, whom she knew from the area, coming out of the store. (Trial Tr. 997:2–98:8.) They spoke briefly, and Walker went into the store. (Trial Tr. 997:2–98:8.) She left about five minutes later, and drove out of the parking lot to the corner. (Trial Tr. 997:2–98:21.) She saw James Abbott fighting with a black man on the right side of the street, near a telephone booth. (Defs.' 56.1 ¶ 126; Pl.'s 56.1 Counterstatement ¶ 126, Trial Tr. 998:25–1000:24.) She turned right onto Beach Channel Drive, and saw a man come from the other side of the street, run behind her car, and join the fight. (Defs.' 56.1 ¶¶ 127–28; Pl.'s 56.1 Counterstatement ¶¶ 127–28.)

Walker described this man as 5'6", slim, with his hair in braids. (Trial Tr. 1003:4–16.) She claimed that she did not recognize him, had never seen him before, and did not know his name.[31] (Trial Tr. 1002:22–1003:3.)

Walker recalled speaking with Detectives Gillen and Solomeno the Friday before her testimony, during which she mentioned the name "Kareem." (Trial Tr. 1003:22–4:4.) When asked if she told Detective Solomeno that the person who joined the fight looked like Kareem,

---

[29] It is undisputed that the plaintiff knew Veronica Walker. (Defs.' 56.1 ¶ 119; Pl.'s 56.1 Counterstatement ¶ 119.) Prior to 1994, she lived next door to the mother of the plaintiff's child and babysat his daughter. (Defs.' 56.1 ¶ 123; Pl.'s 56.1 Counterstatement ¶ 123.)

[30] As Walker entered the courtroom to testify, the plaintiff asked her, "Why are you doing this to me?" (Defs.' 56.1 ¶ 124; Pl.'s 56.1 Counterstatement ¶ 124.)

[31] In a hearing outside the presence of the jury, Walker testified that Detective Gillen started to take a photograph out of his pocket, but put it back, saying that he could not show it to her. (Trial Tr. 981:20–82:8, 989:13–16, 990:7–23.)

she responded, "I said it could have been him. It could have." (Trial Tr. 1005:13–5:16.) Walker did not identify the plaintiff at trial. (Pl.'s Add. 56.1 ¶ 284; Trial Tr. 1003:17–21.)

### vi. ADA Stephen Antignani

Assistant District Attorney Stephen Antignani testified that he was at the May 14, 1994 lineup at the 101st Precinct; one of his responsibilities was to "assist[] in . . . making sure that the lineup[s] [were] fair." (Defs.' 56.1 ¶ 141; Pl.'s 56.1 Counterstatement ¶ 141; Trial Tr. 948:9–20.) He made sure that the fillers resembled the plaintiff, and that the plaintiff had the chance to choose his position in the lineup. (Trial Tr. 948:9–20.) Linda Sanchez viewed the lineup around 7:30 p.m., and Andrew Carter viewed it at around 8:00 p.m. (Defs.' 56.1 ¶ 142; Pl.'s 56.1 Counterstatement ¶ 142.) Carter made statements during the lineup, and ADA Antignani spoke with Carter after the lineup.[32] (Defs.' 56.1 ¶ 143; Pl.'s 56.1 Counterstatement ¶ 143.)

### vii. Defense Case

The plaintiff's stepfather, Eugene Howard, testified that on the morning of the murder, the plaintiff went into the bathroom at around 9:00 a.m., and started watching television around 10:00 a.m. (Trial Tr. 1027:4–29:18.) The plaintiff left the apartment at around 10:15 or 10:20 a.m. (Trial Tr. 1029:9–13.) Howard saw the plaintiff again at around 11:00 a.m., just before Howard learned from his daughter and son-in-law that Abbott had been killed. (Trial Tr. 1027:4–29:18.)

### viii. Summations

Defense counsel began his summation by reminding the jury that the People had the burden to prove the plaintiff's guilt beyond a reasonable doubt, including disproving his alibi. (Trial Tr. 1075:5–17, 1104:10–23.) He then went through the testimony of the main witnesses,

---

[32] The court did not permit ADA Antignani to testify about the substance of that conversation. (Trial Tr. 950:3–59:4.)

beginning with Linda Sanchez, whose testimony he attacked as "simply not true," "not credible," "illogical, "fl[ying] in the face of common sense," and "rather strange." (Trial Tr. 1076:18–1084:5.) He assigned two motives to her: a desire to have "her 15 minutes of fame," and to get paid by the District Attorney's Office. (Trial Tr. 1086:8–87:2.)

He also addressed Andrew Carter's testimony; he conceded that Carter had no motive to lie, but attacked his identifications as unreliable. (Trial Tr. 1087:9–1090:12.) He dismissed the lineup identification as mistaken, and reminded the jurors that Carter had wavered between the plaintiff and the filler in the number two position. (Trial Tr. 1087:9–1090:12.) He also pointed out Carter's testimony that he had selected the filler in the second seat. (Trial Tr. 1087:9–1090:12.) As for Carter's in-court identification of the plaintiff, counsel posited that Carter identified him because, "Who else is sitting at that counsel table? A white lawyer, a district attorney, white court officers and Mr. Bellamy, a black man," and that Carter did not have to be a "rocket scientist to know" whom he was supposed to identify. (Trial Tr. 1099:3–18.) Counsel also dismissed Veronica Walker's testimony as insufficient to establish the plaintiff's guilt. (Trial Tr. 1091:3–93:9.)

Counsel underscored what he argued were deficiencies in the police investigation, which he characterized as a "rush to judgment." (Trial Tr. 1099:21–25.) He argued that the detectives should have done a more robust investigation of Rodney Harris and Ishmel Melvin, whom the "Anna Simmons" caller had identified. (Trial Tr. 1100:2–2:11.) He dismissed Detective Gillen's notes about the plaintiff's statements, and pointed out that the detective had added additional notes long after the original report. (Trial Tr. 1097:2–98:2.) Counsel also argued that the lineup was unduly suggestive. (Trial Tr. 1098:18–99:2.)

Counsel urged the jury to accept the alibi proffered by the plaintiff's stepfather, and went through all the reasons why the jurors should credit it. (Trial Tr. 1103:14–04:23.) And, defense counsel pointed out that the evidence did not establish that the plaintiff had any motive to kill James Abbott. (Trial Tr. 1103:4–13.)

Assistant District Attorney Guy began his summation by telling the jury that the nature and location of James Abbott's wounds demonstrated that his killer intended to kill him, and thus "clearly this was a case of intentional murder." (Trial Tr. 1110:20–11:22.) Accordingly, the prosecutor argued, the "one question" for the jurors was whether they were satisfied beyond a reasonable doubt that the plaintiff was the killer. (Trial Tr. 1111:20–12:2.) Next, the prosecutor explained that the judge would instruct the jury that "we all have to be concerned to make sure that the right man is on trial, and the judge, of course, is absolutely right. That's as it should be. That's why we are all here." (1112:3–9.)

In the course of reviewing Andrew Carter's testimony, the prosecutor responded to defense counsel's argument that Carter identified the plaintiff in court only because he was the sole black man at the defense table, by arguing that the case was not about race, since the deceased was also black, but about "identification" and "recognition." (1117:14–20.)

At another point in his summation, the prosecutor discussed Carter's testimony that at the lineup he selected the person in position number two:

> Mr. Carter told you when he testified in this courtroom that when he saw the lineup he picked either one or two. He wasn't sure, and that in the next room he spoke with the detectives, and when I asked him on the stand about that conversation he told you he picked out number two, and I showed him the lineup photos and he is still stuck with number two but you know he didn't pick out number two. Number two isn't sitting over there. Number one is sitting over there.

30

(1135:8–20.)  The prosecutor also pointed out that the plaintiff, unlike the filler in the second seat, had braids.  (1135:21–36:4.)  The prosecutor argued that Carter made a mistake when he testified that he selected number two.

> We all make mistakes, but that doesn't mean that when he said I picked out number two that in fact when he viewed the lineup he picked out number two and you don't have to take my word.  Common sense will tell you that.  It's the defendant, number one, who is on trial, not some filler in a lineup.

(1137:13–19.)  ADA Guy also referenced ADA Antignani's testimony that when Carter first viewed the lineup, he "said that it was either one or two, he couldn't be sure," and that after the lineup, Carter said, "I am ninety-nine percent sure it was definitely number one;" the prosecutor then cited Carter's statement that it was the "difference in the hairstyle" that confused him.  (1137:20–38:6.)  From there, ADA Guy argued that the evidence showed the lineup was fair.  (1138:8–22.)

ADA Guy also reviewed Linda Sanchez's testimony, and argued that she had no motive to lie, that her identification of the plaintiff was reliable, and that her testimony was corroborated by other evidence.  (Trial Tr. 1118:4–21:11, 1138:23–44:20.)

In addition to the testimony of Carter and Sanchez, the prosecutor discussed the plaintiff's statements to Detective Gillen and the plaintiff's various outbursts during the proceedings.  (Trial Tr. 1129:5–17.)  In another portion of the summation, ADA Guy addressed the plaintiff's alibi defense: "People hear the word alibi and put a negative connotation on it. That wouldn't be fair to the defendant.  Alibi means evidence that at the time of the crime you were somewhere else. . . .  Alibi is not a dirty word."  (Trial Tr. 1125:12–26:10.)

The prosecutor pointed out that the plaintiff's alibi witness was his stepfather, who was "forthright enough to tell you that he loves his son, his stepson very much; that he would do almost anything for his stepson.  He would go into a burning building to save his stepson.  All of

these are commendable things." (Trial Tr. 1125:19–26:9.) The prosecutor urged the jury to "test [the witness's] testimony in the context of all his testimony" and to consider the witness' criminal conviction. (Trial Tr. 1126:10–27:23.) In addition, ADA Guy reminded the jury that the plaintiff had spoken to his stepfather about seeing Abbott's body, and argued that there were inconsistencies between what the plaintiff told his stepfather and what the first officer on the scene said about how long the victim's body was at the scene. (Trial Tr. 1128:9–29:4.) The prosecutor asked, "Why do you suppose he makes such a point of trying to say he left at ten o'clock?" (Trial Tr. 1129:5–17.)

At this point, defense counsel registered a general objection, which the trial judge "noted;" she then instructed the jurors that they were "the judges of the facts," and should "determine whether a witness told the truth or not the truth." She admonished the prosecutor, "Please, Mr. Guy, fair comment," to which the prosecutor replied, "I believe this is, Judge."[33] (Trial Tr. 1129:18–30:1.)

ADA Guy went on to discuss the importance of the time of the murder, and also argued that the alibi witness corroborated Linda Sanchez's testimony that the plaintiff was a customer at C-Town. (Trial Tr. 1130:2–31:1.)

The prosecutor rebutted defense counsel's "rush to judgment" arguments (Trial Tr. 1131:2–32:18), and also commented on the question of motive:

> Defense attorney candidly told you that the judge will tell you that the [P]eople are under no obligation to prove motive . . . that proof of motive or proof of the lack of motive are factors you are entitled to consider, but there is not proof of either one in this case. So why is he asking you to consider that? Where is there proof of motive? There is none. Where is there proof defendant had no motive to kill somebody? I submit there is no proof that he had no motive. Maybe a bit of double negative but that doesn't mean he had no motive. We may not know what his motive was. We don't have to know what

---

[33] While counsel made two other general objections, he did not object to any of the comments the plaintiff now challenges. (Trial Tr. 1127:24–25, 1143:23–44:4.)

his motive was. What's sufficient is to know who did it, how he did it, and to know the results, and that we know absolutely beyond any doubt at all.

(1132:19–33:12.) In the final portion of his closing remarks, ADA Guy made the following comments:

> I know who committed the murder.[34] You know it was an intentional murder and you and you know there's no rational explanation for why so many people are pointing their fingers at the guy just like the needle of the compass unless he is in fact the right man.

(Trial Tr. 1149:12–17.) The prosecutor urged the jurors to consider all of defense counsel's arguments, because he was "entitled to that," and that the People were also entitled to a review of their arguments. (Trial Tr. 1149:17–20.) He expressed his confidence that the jury would come to "rational findings of fact not based on emotion, not based on rhetoric, but based on common sense, logic, and evidence," and argued that the evidence pointed to "a verdict of guilty, guilty as proven and guilty as charged." (Trial Tr. 1149:21–50:2.) ADA Guy concluded: "When the defendant asked why would someone be accusing me of murder, by your verdict you can answer his question. Because you are the murderer. It's because the evidence shows that you are a murderer, and that you are not going to get away with it, not this time." (Trial Tr. 1150:4–9.) He asked the jury, "in the interest of justice" to find the plaintiff guilty. (Trial Tr. 1150:10–13.)

### ix. The Court's Charge and the Verdict

The trial judge charged the jury, and included the standard charges on the burden of proof and the presumption of innocence. (Trial Tr. 1159:25–64:10.) The judge said that the lawyers' arguments were "not evidence," and that the jurors were the "exclusive . . . judges of the facts." (Trial Tr. 1073:23–25, 1156:16–57:3.) The judge described the difference between intent and motive, and charged that while the prosecutor had to prove intent, he did not have to prove that

---

[34] The defendants argue, and the ADA testified at his deposition, that this sentence was a transcription error, and that the context of the argument makes it obvious that the prosecutor must have said, "You know who committed the murder." (Guy Dep. Tr. 232:9–23.)

33

the plaintiff had a motive to commit the crime.  (Trial Tr. 1175:12–76:13.)  Nevertheless, the court explained, the jury could consider the evidence of motive or the lack of a motive in deciding whether the plaintiff was guilty.  (Trial Tr. 1175:12–76:13.)  She also gave an expanded charge on identification, including an admonition that "judges, the prosecutors, the defense, and you the jury must be deeply concerned that no mistaken identification should result in conviction and punishment of the wrong man or a defendant who is innocent of the crime."  (Trial Tr. 1179:11–19.)  The judge submitted, in the alternative, two counts of second degree murder— intentional and depraved indifference—as well as the lesser included offense of intentional murder—first degree manslaughter—and fourth degree criminal possession of a weapon, a misdemeanor.[35]  (Trial Tr. 1182:24–85:7.)

The jury deliberated over the course of three days, during which they requested and received read-back of witnesses' testimony, including Carter's and Sanchez's, as well as items of physical evidence.  (Trial Tr.  1208:13–25:16.)  At one point, they sent a note that they were unable to reach a verdict.  The judge gave an *Allen* charge, and the jury resumed deliberations, requesting additional testimony and evidence.  (Trial Tr. 1215:18–18:14, 1221:24–26:12.)

The jury reached a verdict on December 13, 1995; they convicted the plaintiff of depraved indifference murder and criminal possession of a weapon, and acquitted him of intentional murder. (Defs.' 56.1 ¶ 159; Pl.'s 56.1 Counterstatement ¶ 159; Trial Tr. 1226:1– 29:15.)

---

[35] Defense counsel also asked that the court submit Manslaughter in the Second Degree, a lesser included offense of depraved indifference murder.  (Trial Tr. 1203:14–17.)  The judge declined, as there was no reasonable view of the evidence to support that charge.  (Trial Tr. 1203:14–5:13.)

### F. Post-Conviction

The plaintiff appealed his conviction to the Appellate Division, Second Department, claiming that his guilt was not proved beyond a reasonable doubt, that Detective Gillen gave misleading testimony about the circumstances of the plaintiff's post-arrest statements, that defense counsel was ineffective, and that the plaintiff's statements and the identifications should have been suppressed. (Defs.' 56.1 ¶¶ 160–61; Pl.'s 56.1 Counterstatement ¶¶ 160–61; Defs.' Ex. JJ (ECF No. 157-36).) The Appellate Division affirmed the plaintiff's conviction, *People v. Bellamy*, 247 A.D.2d 399 (N.Y. A.D. 2d Dep't 1998), and the Court of Appeals denied the plaintiff's application for leave to appeal. *People v. Bellamy*, 91 N.Y.2d 970 (1998).

The plaintiff's petition for a writ of habeas corpus in this District focused on the circumstances surrounding his alibi and the statement he made to Detective Gillen at the precinct; the plaintiff claimed that his attorney was ineffective for failing to cross examine Detective Gillen about a perceived discrepancy in his testimony about the plaintiff's statement, and that the prosecutor should have corrected the detective's testimony. (Defs.' 56.1 ¶¶ 164–65; Pl.'s 56.1 Counterstatement ¶¶ 164–65; Defs. Ex. KK (ECF No. 157-37).) The Honorable Charles P. Sifton denied the petition.[36] (Defs.' 56.1 ¶ 166; Pl.'s 56.1 Counterstatement ¶ 166.) The certificate of appealability was denied and the appeal dismissed. (Defs.' 56.1 ¶ 167; Pl.'s 56.1 Counterstatement ¶ 167.)

### G. First 440 Hearing

The plaintiff moved to vacate the judgment against him pursuant to New York Criminal Procedure Law Section 440.10. (Defs.' 56.1 ¶ 169; Pl.'s 56.1 Counterstatement ¶ 169.) The plaintiff's lawyer, Thomas Hoffman,[37] argued that "[w]itnesses were found who were threatened

---

[36] That habeas petition was captioned as *Bellamy v. Portuondo, et al.*, No. 1:99-cv-01832-CPS (EDNY 1999).

[37] The law firm of Cravath, Swaine, & Moore was "co-equal co-counsel." (Pl.'s 56.1 Counterstatement ¶ 171.)

to testify in a certain way and in one case threatened and frightened into not testifying at all," that police officers circumvented proper police procedures, and that an "innocent man is shackled before [the court] today." (Defs.' 56.1 ¶ 171; Pl.'s 56.1 Counterstatement ¶ 171; 440 Tr. 6:25–9:25.[38]) Between March 5, 2007 and March 12, 2008, Judge Joel Blumenfeld heard evidence in connection with the plaintiff's initial 440 application. While thirteen witnesses testified in the first set of 440 hearings, I summarize below only those relevant to this action.

### i.  Andrew Carter

Andrew Carter testified that his identification of the plaintiff as the man who stabbed James Abbott was false, and that he identified the plaintiff only because he feared some sort of reprisal from Detective Gillen. (440 Tr. 193:10–20.) While the detective never threatened him, Carter nonetheless feared him because he was "crooked." (440 Tr. 160:7–12, 178:16–21, 194:1–17, 198:12–99:11.) Throughout the hearing, Carter repeatedly claimed not to remember what he had said during different interviews or at trial, even when shown transcripts of his testimony. (*See, e.g.*, 440 Tr. 158:9–62:18.)

Nevertheless, Carter did confirm some of his trial testimony. He testified that on the morning of April 9, 1994, he was waiting at the bus stop on Beach Channel Drive. (440 Tr. 135:10–12.) Three men, including James Abbott, walked by and greeted him. (440 Tr. 135:15–20.) At their closest point, they were approximately eight feet away from him. (440 Tr. 150:6–10.) He also saw them coming back from C-Town. (440 Tr. 149:10–25.) James Abbott went to the payphone. (440 Tr. 135:15–20.) At some point, however, the other two men started kicking and beating him. (440 Tr. 136:4–10; 151:1–8.) The smaller of the two men pulled what Carter said was a "knuckle knife" and stabbed the victim multiple times. (440 Tr. 136:4–10; 151:9–19;

---

[38] The transcript of the proceedings begins numbering anew at "1" on July 9, 2007. Unless otherwise indicated, the page numbers listed after "440. Tr." refer to testimony taken prior to July 9, 2007.

155:21–56:5.)  The men looked at Carter, and he looked back at them.[39]  (440 Tr. 136:4–10; 153:24–154:6.)  They then ran down Beach 48th Street.  (440 Tr. 136:4–10, 157:9–24.)  Although Carter said he did not remember being interviewed by Detective Lane on the day of the murder, he did remember looking through photographs, and that he did not identify anyone.  (440 Tr. 159:9–63:4.)

Carter claimed that at some point, Detective Gillen and another detective came to his residence.  (440 Tr. 139:19–140:6.)  Carter had been smoking crack cocaine with a woman, and spoke to the detectives outside the door.  (440 Tr. 139:19–140:6.)  Detective Gillen offered to take Carter and the woman to a motel, and said that he would "go rip off some drug dealers and go get [Carter and the woman] some drugs."  (440 Tr. 139:19–140:6.)  Carter declined, saying, "No, thank you."  (440 Tr. 140:7–140:12.)

About a month later, Detective Gillen returned with another detective to take Carter to view a lineup.[40]  (440 Tr. 140:15–41:15.)  Carter asked the detective how he apprehended the killer.  (440 Tr. 140:15–41:15.)  Carter claimed that Detective Gillen replied that the killer was "bragging about the murder, drinking 40s out in front of the building."  (440 Tr. 140:15–41:15.)  Detective Gillen added that the suspect had "changed his appearance," and cut his hair.  (440 Tr. 144:10–45:4.)  Once at the precinct, Detective Gillen took Carter into a room; a female uniformed police officer was in the room, as was another person.[41]  (440 Tr. 142:11–19, 182:24–84:9.)  As Carter looked at the lineup, Detective Gillen pointed directly at the plaintiff, making no effort to conceal what he was doing from the other two people in the room.  (440 Tr. 142:20–

---

[39] Carter did not remember telling the jury that he "got a good look" at the men's faces.  (440 Tr. 154:5–55:16.)

[40] At the trial, Carter testified that he did not remember the names of the detectives who took him to the lineup.  (440 Tr. 180:18–81:6.)

[41] The record, including depositions and testimony from the trial and hearings, demonstrates that ADA Antignani was in the lineup room.

37

143:11; 184:24–185:18.)  He asked if Carter recognized anyone, and Carter first said either number one or number two.  (440 Tr. 188:12–14.)  Carter then said, "Number 1," (440 Tr. 186:13–19.)  Detective Gillen also asked from where Carter recognized number one, and he answered, "[F]rom the corner . . . where the stabbing took place."  (440 Tr. 187:5–10.)  Then, even though Detective Gillen pointed at number one, Carter signed a form to the effect that "it was either Number 1 or Number 2," and that he was not sure.  (440 Tr. 189:25–90:9.)  Carter did not remember speaking with ADA Antignani.  (440 Tr. 190:24–91:17.)

Later, when Detective Gillen drove Carter to the court to testify, Carter told Detective Gillen that he was not sure if he could identify the killer.  (440 Tr. 145:23–46:18.)  Detective Gillen said that "he wanted to get this case off the docket."  (440 Tr. 145:23–46:18.)

Although Carter conceded that he told Detective Gillen the killer was either one or two, he also claimed that he identified the person in the first position because he was "quite afraid" of what Detective Gillen would do to him and his family.  (440 Tr. 193:10–20.)  He also remembered testifying before the grand jury that he saw the plaintiff stab the victim, but claimed that he was lying because Detective Gillen put "fright in my heart for being so crooked," and "was so crooked when he offered me crack.  To take me and my girl to the motel.  He's pointing the man out.  He's telling before what he look like.  He telling how -- he told me where they caught him and what they were doing and everything."  (440 Tr. 198:22–199:11.)

Carter admitted that he met privately with ADA Guy, and never told him what Detective Gillen had supposedly done.  (440 Tr. 201:1–23.)  Carter also remembered testifying at the trial that he had no doubt that the plaintiff was the stabber, but claimed that the testimony was untrue. (440 Tr. 204:6–18.)

38

Carter claimed that he had wanted to "get this off [his] chest for a long time," and that he was "relieved" that "the truth can come out." (440 Tr. 206:13–25.) The plaintiff's investigators met with him in 2005, which Carter agreed would have been the "perfect opportunity" for him to "unburden" himself about the "great injustice" he had committed. (440 Tr. 207:5–09:6.) Carter did not remember telling the plaintiff's investigator at that first meeting that he was "positive" that the plaintiff killed James Abbott. (440 Tr. 207:5–10:8.)

Sometime between November and December of 2005, Carter asked defense investigators whether he would be reimbursed for his "time."[42] (440 Tr. 212:3–14.) According to him, the plaintiff's team of lawyers and investigators proposed paying him $90 an hour.[43] (440 Tr. 213:23–214:2.) Over the course of almost a month, the plaintiff's team paid Carter $1350 in cash on three separate occasions.[44] (440 Tr. 213:20–22; 216:18–17:5; 227:10–11.)

Mr. Hoffman later explained to Judge Blumenfeld that he had actually negotiated a fee with Carter: "We did extensive analysis . . . before we actually paid the money to Mr. Carter, and we determined that we had to kind of negotiate with him, get him down to the lowest price possible for what he was demanding." (March 3, 2008 440 Tr. 426:1–12.)

### i. Defense Investigator Donald Barclay

Donald Barclay, a private investigator hired by Cravath, Swaine & Moore, testified that he first interviewed Andrew Carter on May 24, 2005 in the courtyard of the nursing home where Carter lived. (Defs.' 56.1 ¶ 189; Pl.'s 56.1 Counterstatement ¶ 189.) Barclay told Carter that he

---

[42] Carter met with the plaintiff's investigators and lawyers on different occasions in 2005 and signed two affidavits. (440 Tr. 168:4–13.)

[43] Carter had used a wheelchair since being shot by police in 1983 while committing an armed robbery. (440 Tr. 177:8–178:2.) Carter was unemployed and receiving about fifty dollars a month. (440 Tr. 212:24–213:7.)

[44] Each time, the firm had a car take Carter to and from meetings with the plaintiff's team. On November 5, 2011, he got $500, on November 17th, he got $580, and on December 2nd, he received $270 after signing the second affidavit. (440 Tr. 222:17–227:11.)

worked for the plaintiff's attorneys, but did not raise the issue of money. (Defs.' 56.1 ¶ 190; Pl.'s 56.1 Counterstatement ¶ 190.)

Carter told Barclay that he remembered the murder well, that it was "not something that you forget." (Defs.' 56.1 ¶ 191; 440 Tr. 1228:8–11.) He was "positive" that the plaintiff was the killer, and there was "no doubt in his mind." (Defs.' 56.1 ¶ 191; 440 Tr. 1228:12–21, 1234:17–24.) He also offered to take a lie detector test.[45] (Defs.' 56.1 ¶ 191; 440 Tr. 1228:22–25, 1234:17–24.) According to the investigator, Carter told him that the police had "bugged the hell out of him," and the lineup "did not seem right." (Pl.'s 56.1 ¶ 191; 440 Tr. 1234:9–13.) Nevertheless, Carter asserted that he recognized the plaintiff as the killer when he testified at trial. (Defs.' 56.1 ¶ 191; 440 Tr. 1228:17–21.)

In November of 2005, the plaintiff's counsel directed their investigator to contact Carter again. (Defs.' 56.1 ¶ 192; 440 Tr. 1229:4–15.) Barclay said that when he contacted Carter, Carter raised the issue of money:

> He brought up the fact that he had expenses, that was the term that he used. He had expenses. And he also brought up the fact that another witness had been -- that he had heard that another witness was compensated for her expenses. So I asked him what he wanted. He said that he wanted money.

(Pl.'s 56.1 ¶ 192; 440 Tr. 1231:2–24.) After this discussion, there were three subsequent meetings for which the plaintiff's counsel compensated Carter for his time.[46] (Defs.' 56.1 ¶ 193; Pl.'s 56.1 Counterstatement ¶ 193.)

---

[45] At the hearing, Judge Blumenfeld asked Carter if he would take a lie detector test. Carter replied, "No, I'm not. It's no reason to." [sic] (440 Tr. 219:7–14.)

[46] The plaintiff maintains that Cravath paid Carter only after consulting a legal ethicist, and with full disclosure to the District Attorney's Office. (Pl.'s 56.1 Counterstatement ¶ 193.)

40

Case 17-1859, Document 15, 06/27/2017, 2067118, Page69 of 128

### ii. Linda Sanchez

Thomas Hoffman met with Linda Sanchez before her testimony at the hearing.[47]  (440 Tr. 482:14–17.)  Mr. Hoffman told her a number of things: that she had made a mistake in identifying the plaintiff at the criminal trial, that Mr. Hoffman knew who the real killer was, and that the police also knew the identity of the real killer.  (440 Tr. 482:14–84:3.)  He told her that she should say something different than what she had said previously.  (440 Tr. 482:14–84:3.)  He also told her that Andrew Carter had asked the plaintiff's forgiveness.  (440 Tr. 483:20–25.)  In addition, Mr. Hoffman told her that she was confused about the date on which the murder occurred.  (440 Tr. 490:5–91:7.)  He told her that he was looking for "justice" and the "truth."  (440 Tr. 492:4–9.)  Sanchez asked, "What is in it for me?  What am I getting?"  Mr. Hoffman asked what she wanted, and she replied, "The only thing I want is just peace."[48]  (440 Tr. 485:16–86:3.)

Linda Sanchez's testimony was largely consistent with her trial testimony.  She confirmed that she knew the plaintiff from the area, that he was a frequent customer at C-Town, and that he and another man were in the store with James Abbott on the day of the murder.[49]  (440 Tr. 473:7–74:1, 477:3–6.)  She also testified that she initially told detectives that she did not see anything, because she had not seen the murder.  (440 Tr. 474:8–75:1.)  In fact, at the point when detectives were asking questions, she did not yet know that Abbott had been murdered; her supervisor, "JJ," told her about the murder after the police left.[50]  (440 Tr. 492:19–93:9, 494:5–

---

[47] Before Sanchez testified, the judge advised the parties that a lawyer for Sanchez reported that she had "a lot of fear" about testifying.  (440 Tr. 295:7–12.)

[48] At some point, one of the plaintiff's lawyers also let her know that the plaintiff's sister had seen her with her children.  (440 Tr. 486:6–87:10.)

[49] The plaintiff argues that Sanchez actually saw the plaintiff on Sunday, not Saturday, and that detectives concealed this from the plaintiff's trial lawyer.  While Sanchez did say at one point that the events occurred on a Sunday, she made it clear that she made her observations on the day of the murder.  (440 Tr. 473:7–74:1, 477:3–6.)

[50] At her deposition, Sanchez said that "JJ" told her "to keep [her] mouth shut" about what she had seen.  (Sanchez Dep. Tr. 136:15–37:1.)

95:1.) As she did at the trial, she testified that the plaintiff came into the store shortly after the murder and threatened her. (440 Tr. 481:4–8.)

Sanchez's testimony about being relocated prior to trial was also consistent.[51] She clarified that she did not want to move, but that investigators told her she had to be relocated for her safety. (July 27, 2007 440 Tr. 319:7–21:7.) She also testified that after the trial she researched Section 8 housing on her own, and obtained it for herself. (July 27, 2007 440 Tr. 305:3–15, 313:17–25.)

Detectives took her to view the lineup, at which she identified the plaintiff. (440 Tr. 461:25–62:4.) They also picked her up before her grand jury testimony. (440 Tr. 462:14–16.) The only conversation she had with them was about "the guy in the wheelchair," presumably Andrew Carter. (440 Tr. 463:9–25.) One detective said he "need[ed]" her "help" because "they were having problems with the guy with the wheelchair." (440 Tr. 463:9–64:18.) No detectives ever threatened her or told her whom to identify.

### iii. ADA Stephen Antignani

Assistant District Attorney Stephen Antignani testified that he went to the 101st Precinct on May 14, 1994, and was present for the lineup involving the plaintiff. (Defs.' 56.1 ¶ 184; Pl.'s 56.1 Counterstatement ¶ 184.) He was in the viewing room with Detective Gillen and a sergeant from another precinct when Linda Sanchez looked at the lineup, and did not see any officer suggest to Sanchez that she should identify a specific person in the lineup. (Defs.' 56.1 ¶ 186; Pl.'s 56.1 Counterstatement ¶ 186.)

---

[51] At her deposition, Sanchez gave additional detail about the circumstances surrounding the relocation. At the time of the trial, Rakeem Reilly, the father of her children, and a drug dealer who knew the plaintiff, called her a "rat," and threatened to "rat [her] out" to the plaintiff and his friends; Reilly also wanted her to tell him "what's going on" and that he needed "some explanation to do in the streets," because "everybody from the neighborhood knew what happened." (Sanchez Dep. Tr. 119:6–120:4, 132:1–33:7.) She did not want to move, but was "very scared," because she had infant twins. (Sanchez Dep. Tr. 70:16–23, 115:4–16:2.)

He was also in the viewing room with Detective Gillen and the sergeant when Andrew Carter looked at the lineup, and did not hear or see any police officer suggest whom Carter should identify. (Defs.' 56.1 ¶ 187; Pl.'s 56.1 Counterstatement ¶ 187.) According to ADA Antignani, Carter looked at the lineup and said that it was either the person in position one or in position two who stabbed Abbott. (Defs.' 56.1 ¶ 185; Pl.'s 56.1 Counterstatement ¶ 185.)

After the lineup, Detective Gillen escorted Carter from the lineup room. (440 Tr. 1135:8–21.) About five minutes later, ADA Antignani met with Carter, who said that he was certain that the attacker was the person in position number one, but that his hair was different. (Defs.' 56.1 ¶ 185; Pl.'s 56.1 Counterstatement ¶ 185; 440 Tr. 1135:8–1136:5.)

### iv. Michael Green

Michael Green, an unemployed convicted felon, testified that he knew Levon Melvin, was the godfather to Melvin's children, and worked for him as a house cleaner. (Feb. 13, 2008 440 Tr. 7:19–9:10, 32:13–33:15, 35:24–36:4.) Green claimed that sometime between August and November of 2007, he and Melvin were driving to a work site, when Melvin told him that he was angry at Rodney Harris for talking to detectives about a murder that happened "14 years ago." (Feb. 13, 2008 440 Tr. 10:12–11:18.) Melvin went on to say that he killed a man who was "messing with his girl," Yolanda Doves.[52] (Feb. 13, 2008 440 Tr. 15:5–16:10, 55:8–56:15.) According to Green, Melvin said that one afternoon fourteen years ago, he and Harris were driving a truck and saw Abbott on the street in Far Rockaway. (Feb. 13, 2008 440 Tr. 15:5–16:10, 47:14–48:4.) They stopped, argued with him, and Melvin stabbed him. (Feb. 13, 2008 440 Tr. 15:5–16:10, 48:5–12.) He and Harris also kicked and beat Abbott, and then drove away. (Feb. 13, 2008 440 Tr. 15:5–16:10, 48:5–21.)

---

[52] On cross examination, Green admitted that Melvin did not name James Abbott. (Feb. 13, 2008 440 Tr. 42:3–44:2, 49:3–50:12.) One of the plaintiff's investigators gave Abbott's name to Green. (Feb. 13, 2008 440 Tr. 49:3–50:12.)

Green had been close with Melvin for years, but Melvin had never before mentioned that he had murdered someone. (Feb. 13, 2008 440 Tr. 57:6–61:18.) Although Green was a police informant in the 101st Precinct at the time, he did not tell any of his contacts about this conversation. (Feb. 13, 2008 440 Tr. 51:9–53:3, 54:16–55:7.) Some months later, Green saw one of the plaintiff's investigators, retired detective Ed Henson, in Far Rockaway. (Feb. 13, 2008 440 Tr. 17:23–18:20, 36:20–37:8.) Henson told him that he was investigating the murder of James Abbott; Green said that he had information on the murder, and shortly thereafter, told Henson and another investigator what Melvin supposedly told him. (Feb. 13, 2008 440 Tr. 17:23–18:20.) After that, he gave a deposition to the plaintiff's team. (Feb. 13, 2008 440 Tr. 38:17–39:4.)

Green also gave a statement to ADA Brad Leventhal. (Feb. 13, 2008 440 Tr. 21:16–22:10.) During that interview, Green agreed to be "wired up," and to attempt to get Melvin's statement on tape. (Feb. 13, 2008 440 Tr. 23:2–18.) Green eventually agreed with plaintiff's counsel that he would attempt to tape record a conversation with Melvin.[53] (Feb. 13, 2008 440 Tr. 23:22–24:6.) Green and Mr. Hoffman went to a "spy store," and bought a small tape recorder. (Feb. 13, 2008 440 Tr. 23:22–24:12.) At some point, Green claimed that Melvin left him a message on his cell phone, accusing Green of talking to the police and threatening him. (Feb. 13, 2008 440 Tr. 30:6–31:21.) Green somehow managed to tape record that message, but could no longer retrieve the original message from his cell phone, because his it was "stuck." (Feb. 13, 2008 440 Tr. 32:2–5.)

---

[53] Melvin's lawyer contacted the ADA and the plaintiff's investigator, and told them not to speak with Melvin. (Feb. 13, 2008 440 Tr. 127:12–29:23.) As the ADA advised the plaintiff's investigator, the District Attorney's Office could not use Green to get a statement from Melvin, assuming that Green really had been talking to Melvin, because Melvin was represented by a lawyer. (Feb. 13, 2008 440 Tr. 127:12–29:23.); *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988). It is not clear why plaintiff's counsel, if he thought Green was going to speak with Melvin, would have thought that it was appropriate to use Green to get a statement from someone who was represented by counsel. NYRPC Rule 4.2(a).

44

Sometime thereafter, while supposedly aware that Green had told someone about Melvin's admission to the murder, Melvin called Green and asked him to meet him at a restaurant. (Feb. 13, 2008 440 Tr. 24:13–25:7.) Melvin talked again about the killing, saying that he was going to try to "come up with" a self-defense case, but Green did not tape that conversation.[54] (Feb. 13, 2008 440 Tr. 24:13–26:4.) As luck would have it, though, Melvin had another conversation with Green about the murder, and Green recorded that conversation. (Feb. 13, 2008 440 Tr. 26:5–27:7.) Green then called Mr. Hoffman, and gave him the tape recorder. (Feb. 13, 2008 440 Tr. 29:18–30:5.) Mr. Hoffman paid Green $1500, supposedly so that his wife could go to South Carolina, as well as "fifty dollars here, fifty dollars there" three or four times. (Feb. 13, 2008 440 Tr. 33:16–34:22, 70:18–71:19.) In addition, Mr. Hoffman gave Green $500, so that Green could pay his telephone bill, and also promised him a "reward" of $2,500. (Feb. 13, 2008 440 Tr. 72:12–74:21, 76:12–81:13.)

### v. Yolanda Doves

Yolanda Doves, Levon Melvin's ex-girlfriend and mother of his children, was employed as a corrections officer at the time of the hearing. (Feb. 13, 2008 440 Tr. 346:2–9.) She and Melvin were dating in 1994 when James Abbott was murdered. (Feb. 13, 2008 440 Tr. 347:2–48:8.) She knew who Abbott was, but had never had any kind of romantic relationship with him, and Melvin had never accused her of having any such relationship. (Feb. 13, 2008 440 Tr.

---

[54] There were no safeguards employed to ensure that Green actually was meeting with Melvin; no one took photographs or monitored Green in any way. At one point, the plaintiff's counsel asked Detective Kevin Cashen from the 101st precinct to sit outside a restaurant where Green and Melvin were supposed to meet. (Feb. 13, 2008 440 Tr. 260:24–62:9.) Detective Cashen waited at the restaurant for three hours, and did not see either Green or Melvin. (Feb. 13, 2008 440 Tr. 260:24–62:9.)

348:8–49:20, 350:5–16.)  She did have an affair with another man, which made Melvin angry, but he did not attack or hurt that person in any way.[55]  (Feb. 13, 2008 440 Tr. 351:13–52:14.)

### vi.  Detective Kevin Cashen

Detective Kevin Cashen of the 101st Precinct was assigned to look into the case after the plaintiff's team raised questions about it.  (440 Tr. 505:2–14.)  As part of that investigation, he interviewed the plaintiff.  (440 Tr. 595:3–10.)  The plaintiff told him that he might have been in the C-Town supermarket on the day of the murder at about 10:30 in the morning.  (440 Tr. 602:14–03:6.)  Detective Cashen asked him, "[W]ell, you know, how is it that the cashier in C-town, who seems to know you, said, you know, she saw you in there at 9:30?"  (440 Tr. 602:14–03:6.)  The plaintiff replied that "maybe" he was in the store at 9:30.  (440 Tr. 602:14–03:6.)  Detective Cashen also did a search for "Anna Simmons;" he checked housing records, ran computer checks and followed up on information that the plaintiff's legal team gave him.  (440 Tr. 594:10–95:2.)  He never found any evidence that Anna Simmons existed.  (440 Tr. 594:10–95:2.)

### vii.  Judge Blumenfeld's Decision

On June 27, 2008, Judge Blumenfeld granted the plaintiff's motion to vacate his conviction, and ordered a new trial.  *People v. Bellamy*, 20 Misc. 3d 1131(A), *16–17.  Judge Blumenfeld determined that Green's testimony and the conversation he allegedly recorded of Levon Melvin constituted newly discovered evidence that could have changed the outcome of the trial.  *Id.*, at *17.

---

[55] Levon Melvin was aware that the case was being investigated and was staying with his and Doves' children while she testified; he did nothing to dissuade her from testifying.  (Feb. 13, 2008 440 Tr. 355:11–16, 370:11–19, 377:14–78:4.)

However, Judge Blumenfeld rejected the plaintiff's additional claims, finding that there were no *Brady* or *Rosario* violations, and that trial counsel had represented the plaintiff effectively. *People v. Bellamy*, 20 Misc. 3d 1131(A), at *8, 11. In particular, Judge Blumenfeld rejected the plaintiff's contention that the prosecutors committed a *Brady* violation in connection with Linda Sanchez and her receipt of Section 8 Housing. *Bellamy*, 20 Misc. 3d 1131(A), at *11. Judge Blumenfeld observed that the jury knew that Sanchez had been relocated, and that no one knew at the time of trial that she would eventually secure Section 8 housing. *Id.*

Judge Blumenfeld also rejected the plaintiff's claims about Andrew Carter, and determined that Carter's 440 hearing testimony was not credible. *Bellamy*, 20 Misc. 3d 1131(A), at *17–18. The judge pointed out that Carter initially stood by his trial testimony, and that it was only after he negotiated an hourly fee of $90 that he came up with the story about Detective Gillen. *Id.*, at *17.

Thus, Judge Blumenfeld did not credit Carter's accusations that Detective Gillen pointed out the criminal defendant during the lineup, that Detective Gillen told him the defendant confessed on videotape and changed his appearance, or that Detective Gillen offered to get Carter and his girlfriend crack and put them up in a motel. *Id.*, at *17–18. Judge Blumenfeld concluded that Carter used "street smarts" to get $1350 for telling defense counsel what he assumed they wanted to hear. *Id.*, at *18.

### H. Reopened 440 Hearing

After the court's decision, the prosecutor learned that Michael Green's entire testimony was false—that the tape was a fraud and that Levon Melvin had never confessed to Michael Green. The lawyers from Cravath Swain & Moore gave the prosecutors an additional tape recording—one between one of their investigators and the real Levon Melvin. (2d 440 Tr.

404:3–08:14.) Although they had this tape in their possession at the same time they had Green's fraudulent tape, and at the same time they were urging the prosecutor to reinvestigate the case against the plaintiff, they had not previously revealed the existence of the tape recording. (2d 440 Tr. 404:3–08:14.) Nor had they disclosed that their retained expert had concluded that the voices on the two recordings—the faked Green tape and the recording of Melvin's voice—were in all probability not the same. (2d 440 Tr. 421:1–23:3.)

Judge Blumenfeld relieved Mr. Hoffman and Cravath Swain & Moore as counsel, and appointed a lawyer from the Legal Aid Society to represent the plaintiff. (Oct. 31, 2008 Tr. 5:3–16.) He re-opened the hearing, at which eleven witnesses testified. I summarize the relevant testimony below.

### i. Levon "Ishmel" Melvin

Levon Melvin had known Michael Green for about fifteen years. (2d 440 Tr. 60:3–12.) Although Green referred to himself as the godfather of Melvin's children, he actually had "nothing to do with" them. (2d 440 Tr. 60:3–12.) Green often helped Melvin in his cleaning business, an arrangement that ended when $20,000 in pipes disappeared from a building that Green was supposed to watch. (2d 440 Tr. 60:13–61:5.)

Melvin knew James Abbott; he did not kill Abbott, nor did he ever have a conversation with Green about the murder. (2d 440 Tr. 61:12–25.) Melvin also knew Ed Henson, a retired detective from the 101st Precinct. (2d 440 Tr. 65:6–14.) According to Melvin, Henson was a "dirty cop" who had often threatened to arrest Melvin. (2d 440 Tr. 65:6–14.) In January of 2008, Melvin learned that Henson was "riding around" in Far Rockaway, buying beer for people that Melvin knew, and telling them that Melvin killed Abbott. (2d 440 Tr. 66:10–19.) Melvin called Henson on January 13, 2008, and asked him why he was accusing Melvin of something

48

that he did not do.[56] (2d 440 Tr. 66:10–25, 72:19–73:22.) Henson replied, "I got you this time. You in trouble this time. You are going to jail." (2d 440 Tr. 72:19–73:22.) Henson told Melvin that he was coming to "get" Melvin that Thursday. (2d 440 Tr. 72:19–73:22.)

Following this conversation, Melvin went to see a lawyer, Eugene Levy, and told him about Henson's conduct. (2d 440 Tr. 74:4–76:3.) Levy called Henson and told him he was representing Melvin, and directed Henson not to talk to him again. (2d 440 Tr. 75:14–76:11.) He also instructed Melvin not to speak with anyone else. (2d 440 Tr. 80:10–12.)

Months later, in August or September of 2008, Melvin learned from a newspaper article that Green claimed to have a recording of Melvin confessing to a murder. (2d 440 Tr. 80:18–82:19, 127:8–23.) Melvin told Levy that he had never made any such admission. (2d 440 Tr. 80:18–82:19.) At one point, Melvin confronted Green about it; Green denied that he had named Melvin as the killer. (2d 440 Tr. 82:13–19.) In September of 2008, Melvin and Levy went to the Queens District Attorney's Office and listened to the tape. (2d 440 Tr. 83:5–84:12.)

> ii. *Michael Green*

Michael Green admitted that Levon Melvin never told him that he was in any way involved in the murder of James Abbott. (2d 440 Tr. 269:11–270:1.) Green gave Melvin's name to investigators because he was angry with Melvin for firing him. (2d 440 Tr. 276:23–277:2.)

Green did not know how Abbott was killed "at first." (2d 440 Tr. 278:3–5.) He learned about the details from Mr. Hoffman, who showed him "what was going on;" he showed him pictures of Abbott's body, videotapes of the plaintiff's trial, and letters the plaintiff had written. (2d 440 Tr. 278:3–279:6.) Green "started feeling sorry for the man. Man, you know after I seen the Court TV thing and it convinced me that the guy was innocent too." (2d 440 Tr. 541:14–23.)

---

[56] Melvin's cell phone records reflect calls to Henson's number on this date. (2d 440 Tr. 67:5–68:21.)

Case 17-1859, Document 15, 06/27/2017, 2067118, Page78 of 128

Then, Mr. Hoffman gave Green a recording device, and asked him to "try to get Ish on the tape."

(Defs.' 56.1 ¶ 204; Pl.'s 56.1 Counterstatement ¶ 204; 2d 440 Tr. 273:11–22.)

Because Levon Melvin had never said anything about killing anyone, Green recruited an

acquaintance, Jonathan Tatum, to play the role of Melvin on tape. (Defs.' 56.1 ¶ 202; Pl.'s 56.1

Counterstatement ¶ 202.) As Green explained:

> [Me] and Tom [Hoffman] and us, they started telling me about Kareem Bellamy. Then after a while, you know, they just gave me an opportunity to, you know, to try to help this guy. And when Tom [Hoffman] said to me to try to get Ish on the tape, I knew I couldn't get Ish on the tape because Ish never said anything to me about that. I know he didn't know anything about that. So, I came to the conclusion to get Johnny to make the tape to help this guy.

(2d 440 Tr. 273:11–22.)

In addition to urging Green to get Melvin on tape, Mr. Hoffman also "kept telling" Green

to find Anna Simmons. (2d 440 Tr. 288:19–89:1.) According to Green, Mr. Hoffman and the

plaintiff's team "showed [Green] alleyways like they was looking for something. And here I am

to give it to them." (2d 440 Tr. 288:19–89:1.) Accordingly, Green "made up a story" that he

had met Simmons, and Mr. Hoffman "went for it." (2d 440 Tr. 288:19–89:1.) Hoping to make

additional money, Green made another fraudulent tape, this time using a female relative to play

the role of Simmons. (2d 440 Tr. 288:19–93:10.) He gave the tape to Mr. Hoffman, and told

him that he was going to meet Simmons in Atlantic City. (2d 440 Tr. 296:7–13.) Mr. Hoffman

got a hotel room for Green and gave him $1000. (2d 440 Tr. 296:7–18.)

Green went to Mr. Hoffman's office after he got back from Atlantic City, and Mr.

Hoffman told him that the Cravath lawyers did not believe that it was Anna Simmons on the

tape. (2d 440 Tr. 296:22–97:12.) Mr. Hoffman commented that he had "been taking care of

[Green] from the beginning," and asked Green to "be straight" with him, and to tell him whether

it was really Simmons on the tape. (2d 440 Tr. 296:22–97:12.) Green admitted that it was not

50

Simmons. (2d 440 Tr. 296:22–97:12.) Mr. Hoffman did not question the authenticity of the Levon Melvin tape that Green had made earlier. (2d 440 Tr. 297:13–98:10.)

At some point in August of 2008, Green met with Levon Melvin's attorney, Eugene Levy, and learned that Mr. Levy knew that the recording purporting to be a conversation between Green and Melvin was a fake. (2d 440 Tr. 285:5–86:1.) After that meeting, Green met with Mr. Hoffman and told him that the tape was fake, that it was not Melvin's voice on the tape. (2d 440 Tr. 286:9–11.) According to Green, Mr. Hoffman told him to leave: "Get out of town. Go down south." (2d 440 Tr. 286:9–20.) Green testified that Mr. Hoffman promised to pay him $500 each week for the next six months. (2d 440 Tr. 286:9–20.) Green also admitted that the plaintiff's lawyer gave him more money than he previously testified. (2d 440 Tr. 281:13–16.) In all, Mr. Hoffman paid him $6000 in cash.[57] (2d 440 Tr. 281:13–25.)

### iii. Jonathan Tatum

Jonathan Tatum testified that in February of 2008, Michael Green gave him fifteen dollars to make a tape.[58] (2d 440 Tr. 13:14–22, 22:13–17.) Green wanted him to "act like" some other person, and to talk about a stabbing. (2d 440 Tr. 22:24–23:5.) Green told him what to say. (2d 440 Tr. 22:24–23:5, 40:24–41:16.)

### iv. Eugene Levy

Eugene Levy, a criminal defense attorney, testified that Levon Melvin contacted him in early January of 2008, and told him that two investigators were "going around in the Far Rockaway" asking questions about Melvin in connection with a 1994 homicide. (2d 440 Tr. 320:9–322:2.) Mr. Levy called both investigators and told them that Melvin had advised Mr.

---

[57] Green accompanied the plaintiff's counsel to ATM machines and banks, so that counsel could take out cash. (2d 440 Tr. 282:1–7.) Counsel disputes this accusation. (Pl.'s 56.1 Counterstatement ¶ 203D.)

[58] Tatum identified the recording—purportedly of Melvin talking to Green—as the tape he made with Green. (2d 440 Tr. 16:25–19:1.)

Levy that he had nothing to do with the murder, and that they should not contact him again. (2d 440 Tr. 322:9–24:12.) He also told them that Melvin was "very upset" that the investigators had intimated to Melvin's children that he had murdered someone. (2d 440 Tr. 322:9–24:12.) At one point, a Cravath lawyer sent Mr. Levy a subpoena for Melvin; Mr. Levy told the lawyer that Melvin would come to court, but would invoke his Fifth Amendment right not to testify. (2d 440 Tr. 324:16–24, 349:8–51:19.)

Later that summer, Melvin contacted Mr. Levy again; he was "very upset" about a newspaper article reporting that he had confessed to the 1994 murder. (2d 440 Tr. 325:14–27:2.) Mr. Levy spoke with the prosecutor, Brad Leventhal, and eventually brought Melvin to ADA Leventhal's office, where he listened to the fraudulent tape. (2d 440 Tr. 327:6–8, 330:14–31:22.) In September of 2008, Mr. Hoffman contacted Mr. Levy and said that Mr. Levy "might want to meet with" Mr. Hoffman, because he had "information" that Melvin was involved in the murder of James Abbott. (2d 440 Tr. 348:3–25.)

### v. *Judge Blumenfeld's Decision*

Judge Blumenfeld issued a written decision, in which he adhered to his earlier decision granting the plaintiff a new trial. (Defs.' 56.1 ¶ 209; Pl.'s 56.1 Counterstatement ¶ 209.) The judge rejected Green's admission that he concocted the entire story about Melvin's admission to a murder; while the judge acknowledged that the tape was a fraud, he concluded that Green's testimony at the first hearing—that Melvin admitted the murder while they were on their way to a job site—was actually true, notwithstanding Green's testimony at the second hearing that the whole story was a lie. *Bellamy*, 26 Misc. 3d 1210(A), at *6. The Appellate Division, Second Department affirmed the judge's decision. (Pl.'s Add. 56.1 ¶ 2; Defs.' Resp. 56.1 ¶ 2.) *People v. Bellamy*, 84 A.D.3d 1260 (N.Y. A.D. 2d Dep't 2011).

### I. Dismissal

On September 16, 2011, the Queens County District Attorney's Office dismissed the indictment against the plaintiff.  (Defs.' 56.1 ¶ 212; Pl.'s 56.1 Counterstatement ¶ 212.)  ADA Brad Leventhal, who handled the hearing, advised the court that the District Attorney's Office did not view the case as an exoneration or as a case of "actual innocence."  (Defs.' Ex. OO (ECF No. 157-41), Dismissal Tr., ECF Page No. 4.)  It was the Office's position that the plaintiff and his attorneys had perpetrated "an outright fraud" on the court.[59]  (Dismissal Tr., ECF Page No. 4.)  Nevertheless, because of a change in the law defining depraved indifference homicide—the only crime for which the plaintiff was convicted—the District Attorney's Office was compelled to dismiss the indictment.[60]  (Defs.' 56.1 ¶¶ 212–13.)

The indictment was sealed pursuant to Criminal Procedure Law Section 160.60, which provides for a "termination of the criminal action in favor of the accused," and that upon sealing "the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution."  (Pl.'s Add. 56.1 ¶ 4; Defs.' Resp. 56.1 ¶ 4.)  The certificate of disposition stated that "the conviction was terminated in favor of Mr. Bellamy."  (Pl.'s Add. 56.1 ¶ 5; Defs.' Resp. 56.1 ¶ 5.)

---

[59] ADA Leventhal stated:

> [A]pproximately 15 years ago, Kareem Bellamy was convicted by a jury of his peers for the murder of James Abbott in the Far Rockaway section of our county.  That conviction has been upheld on direct appeal and review and federal habeas corpus proceeding as well.  Mr. Bellamy has been freed from the conviction based on an outright fraud perpetrated against this Court.  He has not, and I repeat he has not, been exonerated.  This is not a case of actual innocence.  The sole basis for the vacatur of this defendant's conviction was the patently false testimony of Michael Green, a career criminal who received a substantial amount of money from the defense, which induced his original hearing testimony.

(Dismissal Tr., ECF Page No. 4.)

[60] The prosecutor also characterized the "Anna Simmons" tip as "an effort to misdirect the initial police investigation," and pointed out that the plaintiff, despite having spent "a small fortune" on "numerous private investigators," never established that Simmons was a real person.  (Dismissal Tr., ECF Page No. 6.)

## II.    Procedural History

On March 1, 2012, the plaintiff filed this lawsuit against the City of New York, Detective John Gillen, Detective Michael Solomeno, and unnamed individuals (the "John Doe defendants").  The plaintiff asserts claims for malicious prosecution, denial of a right to a fair trial, Fourteenth Amendment due process claims, failure to intercede and supervisory liability against the John Does, municipal liability, and infliction of emotional distress.

On February 10, 2014, the Honorable William F. Kuntz, II denied the defendants' motion to dismiss the initial complaint.[61]  Thereafter, the plaintiff filed an amended complaint on October 31, 2014 (ECF No. 82), which the defendants moved to dismiss on December 19, 2014. (ECF No. 86.)  On May 8, 2014, Magistrate Judge Viktor Pohorelsky granted the defendants' motion to bifurcate discovery, and postponed discovery on the plaintiff's *Monell* claim pending a decision on the issue of whether the District Attorney's Office did anything to violate the plaintiff's federal constitutional rights.  (ECF No. 52.)  By stipulation dated August 14, 2015, the plaintiff withdrew his first amended complaint,[62] and the defendants withdrew their motion to dismiss and consented to proceed with discovery on the *Monell* claims.  (ECF No. 110.)  After a pre-motion conference on April 15, 2015, I reinstated the stay of discovery on the plaintiff's *Monell* claims and set a briefing schedule for summary judgment.[63]

After years of contentious civil litigation, the parties' cross-moved for summary judgment.  The defendants move on the following grounds: that the plaintiff cannot establish a malicious prosecution claim, that the individual detectives are entitled to qualified immunity, that the plaintiff "cannot show that any alleged fabrication of evidence . . . caused [the plaintiff] to

---

[61] This case was reassigned to me in November of 2015.
[62] The original March 1, 2012 pleading is the operative complaint.  (ECF No. 110.)
[63] None of the depositions noticed for purposes of *Monell* discovery have taken place.  (Pl.'s Add. 56.1 ¶ 17; Defs.' Resp. 56.1 ¶ 17.)

suffer injury," that his due process claims are duplicative, that the claims against the John Does are time barred,[64] that his *Monell* claims fail as a matter of law, as do his claims of infliction of emotional distress.[65] The plaintiff cross-moves on only one issue: that the dismissal of the indictment against the plaintiff was favorable termination for purposes of the malicious prosecution claim.

I heard oral argument on the cross-motions for summary judgment on October 11, 2016, and received additional briefing in March of 2017 regarding Andrew Carter's availability to testify at trial, and the admissibility of his prior statements. (ECF Nos. 185–87.) It is undisputed that Carter died in August of 2008. (ECF No. 185-1.)

For the reasons discussed below, the defendants' motion for summary judgment is granted. Thus, the action is dismissed in its entirety.

### ANALYSIS

A district court may grant a motion for summary judgment if the record evidence—in the form of affidavits, deposition transcripts, or other documentation—shows that there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a) & (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In deciding whether there is a genuine dispute as to a material fact, the court does not make credibility determinations, and must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545–46 (2d Cir. 2010); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010).

---

[64] The plaintiff withdrew his claims against the John Doe defendants by stipulation on August 15, 2015. (ECF No. 110.)

[65] In his opposition to the defendants' motion to dismiss, the plaintiff withdrew his negligent infliction of emotional distress claim. (Pl.'s Opp. to Motion to Dismiss at 2 (ECF No. 24).)

Case 17-1859 Document 15 06/27/2017 2067118 Page 84 of 128

However, the party opposing summary judgment may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (emphasis in original) (citation omitted). A mere "scintilla of evidence in support of the [non-movant's] position" is inadequate. *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted). Put another way, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then the court must deny the request for judgment as a matter of law. *Liberty Lobby*, 477 U.S. at 248.

Among other claims, the plaintiff asserts Section 1983 claims of malicious prosecution, denial of a fair trial, and violation of due process. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted). While federal courts look to state law to determine the elements of a particular claim arising under Section 1983, it is the violation of a constitutional right that is actionable under Section 1983. *Morse v. Spitzer*, No. 07-cv-4793-CBA-RML, 2012 WL 3202963, at *2 (E.D.N.Y. Aug. 3, 2012) (citations omitted). Thus, the court must identify the specific constitutional right allegedly infringed before evaluating a claim under Section 1983. *Id.* (quoting *Albright*, 510 U.S. at 271).

I.      **Malicious Prosecution Claims**

A plaintiff who claims that law enforcement deprived him of his rights by maliciously prosecuting him "invokes the protection of the Fourth Amendment." *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015). The elements of a Section 1983 malicious prosecution claim are "substantially the same" as the elements under New York law, and "the analysis of the state and the federal claims is identical." *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010) ("In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law"). Under New York law, the plaintiff in a malicious prosecution case must prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161 (citations omitted). "Because 'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs. . . .'." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (quoting *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)).

A.  **Favorable Termination**

In order to prevail on his malicious prosecution claims, the plaintiff must prove that the proceeding terminated in his favor. *Manganiello*, 612 F.3d at 161. While this determination must be made in light of "the circumstances of each case," *Cantalino v. Danner*, 96 N.Y.2d 391, 396 (N.Y. 2001), the issue is one of law for the court. *Genovese v. Cty. of Suffolk*, 128 F. Supp. 3d 661, 672 (E.D.N.Y. 2015).

57

This is an unusual case.  The Queens County District Attorney's Office was compelled to dismiss the plaintiff's case, but not because they believed that he was exonerated.  On the contrary, ADA Leventhal made it clear that the District Attorney's Office believed that the plaintiff's attorneys had perpetrated a fraud on the court—in the form of Michael Green's faked tape recording and perjured testimony—that convinced the state court judge to set aside the plaintiff's conviction.  However, after that ruling, the only available count for which the plaintiff could be tried—depraved indifference murder—was not an option, in view of an intervening change of the law; in the years following the plaintiff's conviction, the New York Court of Appeals sharply limited the circumstances under which a defendant can be tried for depraved indifference murder.  *See People v. Payne*, 3 N.Y.3d 266, 271 (2004); *People v Feingold*, 7 N.Y.3d 288 (2006).  Nor could the prosecutor try the plaintiff on the intentional murder count, since the jury acquitted him of that crime.  In short, the prosecutor had no alternative but to dismiss the indictment.[66]

The parties cross-move for a decision as a matter of law regarding whether the dismissal of the indictment pursuant to Criminal Procedure Law Section 160.60 constitutes a "favorable termination" for purposes of the malicious prosecution claim.

"An acquittal is the most obvious example of a favorable termination." *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995).  If the plaintiff has not been acquitted, he must establish that the termination of his criminal proceeding is not "inconsistent with innocence." *Rothstein*, 373 F.3d at 286 (citing *Smith–Hunter*, 95 N.Y.2d at 198–99).  New York law does not demand that a plaintiff alleging malicious prosecution prove his innocence, nor even that the disposition in the

---

[66] There were no additional crimes for which the plaintiff could constitutionally be charged.  In light of the fact that the plaintiff was acquitted of the intentional murder charge, he could not be charged with manslaughter in the first degree, a lesser included offense, *see People v. Biggs*, 1 N.Y.3d 225, 230 (2003) (citations omitted), and the statute of limitations had run.  *People v. Turner*, 5 N.Y.3d 476, 481 (N.Y. 2005); CPL 30.10(2)(b); (4)(a).

criminal proceeding was "indicative of innocence." *Genovese v. Cty. of Suffolk*, 128 F. Supp. 3d 661, 671 (E.D.N.Y. 2015).

"As a general rule, a final termination of a criminal proceeding in favor of the accused is a favorable termination for the purposes of a subsequent malicious prosecution claim." *Rothstein*, 373 F.3d at 286. Nonetheless, the Second Circuit has identified exceptions to this general principle, and reasoned that certain kinds of terminations are not "favorable" because they are inconsistent with innocence. *Rothstein*, 373 F.3d at 286; *see also Arum v. Miller*, 273 F. Supp. 2d 229, 234 (E.D.N.Y. 2003) (same). Generally, dismissals that have been found to be inconsistent with innocence fall into three categories: "(1) misconduct on the part of the accused in preventing the trial from going forward, (2) charges dismissed or withdrawn pursuant to a compromise with the accused, and (3) charges dismissed or withdrawn out of mercy requested or accepted by the accused." *Anilao v. Spota*, 774 F. Supp. 2d 457, 508 (E.D.N.Y. 2011) (citation omitted). The defendants do not assert any of these exceptions apply to this case.[67]

Instead, the defendants argue that I should find an additional exception to the general rule. The defendants rely on the Restatement [Second] of Torts, Section 661, which provides that "[t]he formal abandonment of proceedings by a public prosecutor is not a sufficient termination in favor of the accused if the abandonment is due to the impossibility or impracticability of bringing the accused to trial." The defendants assert that the sole reason for dismissal in this case was that the prosecution was no longer feasible due to an intervening change in the law.

---

[67] Notably, the defendants do not allege that the dismissal was caused by "misconduct on the part of the accused in preventing the trial from going forward." *Anilao*, 774 F. Supp. 2d at 508. Although there was considerable evidence that the plaintiff's lawyers employed unseemly tactics—paying some witnesses, pressuring and misleading others—the state court was aware of all of it, and still set the verdict aside.

The defendants' argument is not without appeal, given the confluence of circumstances in this case. Nevertheless, for the purposes of this decision, I assume that the plaintiff has established that criminal proceeding terminated in the plaintiff's favor.

### B. Probable Cause

Because lack of probable cause is an element of a malicious prosecution claim, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (citation omitted). The court considers the issue of probable cause "in light of facts known or reasonably believed at the time the prosecution was initiated." *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 34 (E.D.N.Y. 2015) (collecting cases). The Second Circuit has described probable cause, for the purposes of a malicious prosecution claim, "as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury*, 721 F.3d at 95 (citations omitted).

A grand jury indicted the plaintiff, which creates a presumption of probable cause that the plaintiff bears the burden of rebutting. *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003). This presumption "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Id.* (quoting *Colon v. City of N.Y.*, 60 N.Y.2d 78, 83 (1983)). "Courts have repeatedly determined that a plaintiff's own testimony is insufficient to rebut the presumption of probable cause arising from a grand jury indictment." *Bonds v. City of N.Y.*, No. 12-cv-1772-ARR-MDG, 2014 WL 2440542, at *7 (E.D.N.Y. May 30, 2014) (internal quotation marks and citation omitted); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005) (the plaintiff's "testimony—which was largely unsubstantiated by other direct evidence—was so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to

credit the allegations made in his complaint."). Thus, in order to raise a triable issue of fact on the element of probable cause, the plaintiff cannot merely rely on his testimony denying that he committed the murder.

### i. Andrew Carter

In this case, the plaintiff cites Andrew Carter's claim at the 440 hearing, which took place more than a decade after the criminal trial, that Detective Gillen somehow forced him to identify the plaintiff. The principal flaw in the plaintiff's claim is that there is no admissible evidence to support it. Andrew Carter is dead. His testimony before Judge Blumenfeld is hearsay, and falls within no recognized exception to the hearsay rule.[68] *O'Brien v. City of Yonkers*, No. 07-cv-3974, 2013 WL 1234966, at *7 (S.D.N.Y. Mar. 22, 2013) (adopting Report and Recommendation) ("Testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay.") (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219–20 (2d Cir. 2004)).

Carter's testimony is not, as the plaintiff argues, admissible as prior testimony under Federal Rule of Evidence 804(b)(1). "In order to admit prior testimony under Rule 804(b)(1), the proponent has the burden to show by the preponderance of the evidence that (1) the witness is unavailable; (2) the party against whom the testimony is offered is the same as in the prior proceeding; and (3) that that party had the same motive and opportunity to examine the witness." *Annunziata v. City of N.Y.*, No. 06-cv-7637-SAS, 2008 WL 2229903, at *7 (S.D.N.Y. May 28, 2008) (quoting *United States v. Amato*, No. 03-cr-1382-NGG, 2006 WL 1891119, at *2 (E.D.N.Y. June 27, 2006)).

---

[68] Carter's 2005 affidavits, signed in advance of the 440 Hearing, are likewise inadmissible hearsay.

Detectives Gillen and Solomeno were not parties in the state post-trial proceedings. *See United States v. Amato*, No. 03-cr-1382, 2006 WL 1788190, at *1-3 (E.D.N.Y. June 26, 2006) (state government was not a "predecessor in interest" to the federal government in the prosecution); *O'Brien*, 2013 WL 1234966, at *7 (defendant officers in a Section 1983 action "were not parties to the prior criminal proceeding"); *Annunziata*, 2008 WL 2229903, at *8 ("[T]he prosecutor in plaintiff's criminal trial (the Kings County District Attorney's Office) and the defendants in the instant action (the City of New York and Detective Henn) are not the same parties, nor are they in privity with each other."). The detectives did not have their own lawyers at the trial. And, the assistant district attorneys, charged with prosecuting cases on behalf of the People of the State of New York, did not represent either detective, and did not cross-examine Carter with the detectives' interests in mind.

The plaintiff's characterization of the prosecutor as a "predecessor in interest" is not persuasive. The plaintiff maintains that the prosecutor had a "similar motive" and "adequate opportunity" to discredit Carter at the hearing. But the fact that the prosecutor sought to discredit aspects of Carter's testimony does not change the analysis. The prosecutor's aim was to bolster Carter's trial testimony, and undermine the testimony he gave at the 440 hearing. It was not his job to represent the detectives. *See Annunziata*, 2008 WL 2229903, at *8 (the prosecutor did not have the same motive to question a witness as the defendants in the civil action because the issue was "of little, if any concern to the State" and the prosecutor had other evidence to support a conviction); *accord Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3876915, at *3 (N.D. Ill. Sept. 1, 2011) ("the motive of a prosecutor to cross-examine a witness is different than the motive of a defendant in a later-filed civil rights lawsuit in relation to the potential penalties or financial stakes involved.").

62

There is also nothing about Carter's testimony that would warrant departing from the requirements of Rule 804(b)(1). Certainly, his testimony had none of the "guarantees of trustworthiness" that are the hallmark of exceptions to the hearsay rule. *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 233 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) ("The traditional exceptions to the hearsay rule, in turn, provide the benchmark against which the trustworthiness of evidence must be compared in a residual hearsay analysis.") On the contrary, Carter's 440 testimony was perhaps the "exceptional circumstance[] where a witness['s] testimony is so fanciful and lacking in any corroboration that it could be insufficient to create an issue of fact because no rational jury could believe it." *Blake v. Race*, 487 F. Supp. 2d 187, 203 (E.D.N.Y. 2007); *see also Jeffreys*, 426 F.3d at 555 (summary judgment properly granted because "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint").

When first interviewed by one of the plaintiff's investigators, Carter was adamant that the plaintiff was the man he saw stab James Abbott; he even volunteered to take a lie detector test to that effect. It was only after the plaintiff's team agreed to pay him $90 an hour for his "time" that Carter, an unemployed felon, did an about-face and claimed that Detective Gillen pressured him to identify the plaintiff. Moreover, his testimony about what Detective Gillen did was illogical and inconsistent; Carter claimed that Detective Gillen directed him to identify the plaintiff, but then documented Carter's uncertainty in a police report, and testified about it at multiple court proceedings.[69]

---

[69] Notably, Carter's post-trial account of what happened at the lineup does not support the plaintiff's current theory—that Detective Gillen told Carter whom to identify after the lineup.

63

Judge Blumenfeld also concluded Carter's testimony was not credible, and that he used his "street smarts" to wrangle $1350 out of the plaintiff's team for telling them what they wanted to hear. In short, there is no scenario under which Carter's prior testimony is admissible.

### ii. Plaintiff's Statements

The plaintiff claims Detective Gillen fabricated testimony about what the plaintiff said in the squad car: "This must be a case of mistaken identity—someone probably accused me of murdering someone." As the plaintiff acknowledges, Detective Gillen did not testify about this statement in the grand jury, and thus it could not have formed the basis of the grand jury's decision to indict. Consequently, even if Detective Gillen had fabricated the statement, it could not have had any effect on the grand jury's decision to indict the plaintiff, and is not evidence that the indictment was procured by "fraud, perjury, the suppression of evidence," or other police misconduct. *See Rothstein*, 373 F.3d at 283 (plaintiff "was required to rebut that presumption [of probable cause] by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*." (emphasis added)). Because this evidence does not rebut the presumption, created by the indictment, that there was probable cause, it cannot form the basis of a cognizable malicious prosecution claim.

### iii. Linda Sanchez

Linda Sanchez testified before the grand jury, as she did later at trial, that she saw the plaintiff and another man behind James Abbott shortly before Abbott was murdered. According to the plaintiff, however, Sanchez actually saw the plaintiff on a different day, and the defendants kept this "fact" from the grand jury; the plaintiff cites Sanchez's testimony more than ten years later, in the 440 hearing, that she might have seen the plaintiff on a Sunday rather than a Saturday, the day of the murder. Of course, even if Sanchez actually believed these events

occurred on a Sunday, nothing in the record establishes that her grand jury testimony was the product of police misconduct. Moreover, the Saturday/Sunday conflict was not critical; Sanchez made it clear that she saw the plaintiff and another man in the store with Abbott, and that on that same day—regardless of whether it was a Saturday or a Sunday—she learned from her co-workers, after the arrival of the police, that Abbott had been murdered shortly after he left the store. As Judge Blumenfeld observed:

> The fact that she confuses the day is not a mistaken identity issue. She doesn't ever claim to have seen the crime. She only knows that she saw the person in the supermarket. She was interviewed. She knows the day the cops came. And if she forgets whether it was a Saturday or a Sunday doesn't change the fact that the cops came to her on the day that Abbott was murdered which turns out to be a Saturday. So that's not a mistaken identity kind of argument.

(440 Tr. 581:4–14.)

#### iv. Conclusion

Even assuming that the disposition of the underlying criminal proceeding was a "favorable termination" for purposes of a malicious prosecution claim, there is no genuine issue of material fact as to the existence of probable cause to prosecute the plaintiff. In light of this conclusion, the plaintiff's malicious prosecution claims are dismissed.

### II.    Fair Trial Claims

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights," *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir.), *cert. denied sub nom. Fappiano v. City of N.Y., N.Y.*, 137 S. Ct. 341 (2016), and is separate and distinct from a malicious prosecution claim. *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015); *see also Morse v. Spitzer*, No. 07-cv-4793-CBA-RML, 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012) ("even where . . . there was probable cause to act (thereby rendering a malicious prosecution claim unavailable), an independent constitutional claim for the denial of

65

the right to a fair trial can proceed under § 1983 based on allegations that a police officer fabricated evidence, if that fabrication caused a deprivation of the plaintiff's liberty.").

A detective denies a defendant a fair trial when he generates "false information likely to influence a jury's decision and forwards that information to prosecutors." *Fappiano*, 640 F. App'x at 118 (quoting *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997)). Additionally, a fair trial claim may arise if law enforcement withholds *Brady* material from a defendant. *Id.*; *Bermudez v. City of N.Y.*, 790 F.3d 368, 376 n.4 (2d Cir. 2015) ("Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors."). Probable cause is not a defense to a fair trial claim. *Jovanovic v. City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012).

### i. Allegations of False Information

The plaintiff's fair trial claims are based on the following assertions: that Detective Gillen pressured Andrew Carter to identify the plaintiff, that Detective Gillen fabricated his testimony about the plaintiff's post-arrest statements, and that both detectives lied about investigating the anonymous report that two other men committed the murder. Additionally, the plaintiff maintains that other exculpatory evidence was not turned over, in violation of *Brady*.

### 1. Andrew Carter's Testimony

For the reasons discussed above, I conclude that the claims based on Andrew Carter's 440 testimony do not survive the defendants' motion for summary judgment. *See Morse*, 2012 WL 3202963, at *6 (in cases involving claims that police officer fabricated evidence and forward it to prosecutors in order to provide probable cause for a prosecution, the plaintiff's malicious prosecution and fair trial claims rise or fall together).

66

2.   Plaintiff's Alleged Statements in the Police Car

The plaintiff claims that Detective Gillen lied about what the plaintiff said on the way to the precinct—"This must be a mistake.  Somebody must have accused me of murdering somebody.  Why would somebody accuse me of something I didn't do?"—and denied him his right to a fair trial.  While this claim does not form the basis of a malicious prosecution claim, because the statement was not put before the grand jury, a Section 1983 claim for denial of a fair trial is separate from a malicious prosecution claim, *Bailey*, 79 F. Supp. 3d at 446; *see also Morse*, 2012 WL 3202963, at *5, and probable cause is not a defense.  *Jovanovic*, 486 F. App'x at 152.

Thus, the question before me is whether the plaintiff demonstrates sufficient evidence to create a genuine issue of material fact such that the plaintiff's fair trial claim, based on the alleged fabrication of the statement, survives the defendants' motion for summary judgment.  I find that it does not.

In order to establish that he was denied a fair trial, the plaintiff must demonstrate that: the "(1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Jovanovic*, 486 F. App'x at 152.

The only evidence the plaintiff cites to support his claim that Detective Gillen lied about what the plaintiff said is his own denial that he made the statements.[70]  The plaintiff's claims are "unsubstantiated by any other direct evidence." *Jeffreys*, 426 F.3d at 555.  Moreover, the subject

---

[70] While it is not pertinent to my decision, it is somewhat difficult to understand why a detective who was willing to lie about a suspect's statements would fabricate this kind of statement rather than something more obviously inculpatory.

was thoroughly explored at the plaintiff's criminal trial.[71]  Under the circumstances, I conclude

that there is no genuine issue regarding whether Detective Gillen fabricated the plaintiff's

admission.

### 3.   Veronica Walker

The plaintiff's next claim is that both detectives denied him a fair trial when they "tried,

and failed to persuade [Veronica] Walker to identify Bellamy."  The flaw in this reasoning is

apparent, since as the plaintiff acknowledges, Walker did not identify him at the trial.  The

plaintiff cannot make out a cognizable fair trial claim based on an allegedly suggestive

identification because Walker's identification "did not reach the jury." *Fappiano v. City of N.Y.*,

No. 01-cv-2476-SLT-SMG, 2015 WL 94190, at *18 (E.D.N.Y. Jan. 7, 2015) (citing *Zahrey v.

Coffey*, 221 F.3d 342, 348 (2d Cir. 2000)) *aff'd*, 640 F. App'x 115 (2d Cir. 2016), *cert. denied

sub nom. Fappiano v. City of N.Y., N.Y.*, 137 S. Ct. 341 (2016).  Because a constitutional

violation only occurs if the fabricated evidence results in a deprivation of liberty, this claim is

dismissed.

### 4.   Levon Melvin and Rodney Harris

During the investigation, before the plaintiff was arrested or even a suspect, a woman

called the 101st Precinct and claimed that she overheard two men—later identified as Levon

Melvin and Rodney Harris—admit to killing James Abbott.  Detectives put together separate

photographic arrays with both men's photographs, and showed them to Andrew Carter and Linda

Sanchez, neither of whom identified Melvin or Harris.  The plaintiff faults the defendants'

---

[71] A component of the plaintiff's claim is that Detective Gillen improperly added the notation "Statement made by def while being asked his pedigree – spontaneous & unsolicited" to his memo book, but this evidence was not suppressed; both versions of the notebook were turned over to defense counsel, who used them in cross-examination.

investigation of the call and of Harris and Melvin, and says they denied him a fair trial by lying about their attempts to find the caller and by failing to question Melvin or Harris.

In order to prevail on a claim that law enforcement denied the plaintiff a fair trial, the plaintiff must establish that the detectives generated "false information likely to influence a jury's decision." *Fappiano*, 640 F. App'x at 118. The plaintiff's allegations do not satisfy that requirement. Here, Detective Gillen recorded that a caller had identified other men as the killers; he tracked down the photographs of these men, prepared photographic arrays, and showed them to witnesses. He turned the information over to the prosecutors, who in turn gave it to the plaintiff's criminal lawyer. The tactical decision not to question Harris and Melvin—about whom the detective had no solid information—did not deprive the plaintiff of a fair trial.[72]

### ii. Alleged Brady Violations

The plaintiff also claims that he was deprived of a fair trial because the detectives suppressed *Brady* material. A *Brady* violation includes three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). The Second Circuit has expressly declined to find that "anything less than an *intentional Brady* violation establishes a § 1983 due process claim for damages." *Fappiano*, 640 F. App'x at 118 (emphasis added). Moreover, to prove prejudice, the plaintiff must establish that the evidence was material, meaning that the "evidentiary suppression undermines confidence in the outcome of the trial." *Fappiano*, 640 F. App'x at 118 (quoting *Leka v. Portuondo,* 257 F.3d 89, 104 (2d Cir. 2001)).

---

[72] The plaintiff's team expended considerable resources to find the elusive "Anna Simmons," without success. It was the prosecutor's position that no such person existed.

69

The plaintiff maintains that the detectives withheld the following pieces of supposedly exculpatory evidence: that Linda Sanchez saw the plaintiff on a Sunday rather than Saturday, that on the day of the murder, she told Detective Gillen that she "didn't see anything," and that she identified Terrell Lee as the person she saw with the plaintiff.

As discussed earlier, the plaintiff seizes on testimony Sanchez gave long after the criminal trial—testimony that appears to have been prompted by the plaintiff's counsel. Moreover, as explained above, the Saturday/Sunday controversy is not significant, since Sanchez made it clear that she made her observations on the day of the murder. In any event, there is no evidence that the detectives, in 1994 and 1995, had proof that Sanchez saw the plaintiff on a Sunday, and intentionally withheld evidence that evidence. The plaintiff's claim that the detectives withheld this information does not survive summary judgment.[73]

The plaintiff has not demonstrated that the remaining allegedly suppressed evidence—that Sanchez told canvassing detectives that she "didn't see anything," and that she identified Terrell Lee as the person with the plaintiff—was material. As Sanchez explained at the hearing, she initially said that she did not see anything because at that point, she did not know that Abbott had been murdered; she learned about the murder after the detectives left the supermarket.[74] As for Terrell Lee, even if Sanchez had identified him as the plaintiff's companion, it is difficult to see how that would have been helpful to the plaintiff.

---

[73] One piece of "evidence" upon which the plaintiff relies—the opinion of Roger Ruben, proffered as an expert in documents and handwriting—hardly warrants mentioning. At the first 440 hearing, plaintiff's counsel asserted that his "expert," who did not testify, reviewed a copy of Detective Gillen's lineup report, and noticed some dots near the word "Saturday," which in his view could have been the result of someone whiting out a word and inserting "Saturday." (440 Tr. 966:10–68:10.) The expert acknowledged that the dot could have been "a trash mark as a result of generations of photocopying." (Report of Roger Rubin, Pl.'s Ex. S (ECF No. 169 at ECF Page No. 18).) Apparently, the expert could not state anything with a reasonable degree of scientific certainty. (440 Tr. 971:6–17.)
[74] Sanchez also testified at the trial that she learned about the murder after the detectives left the store.

Accordingly, the defendants' motion to dismiss the plaintiff's fair trial claims related to the *Brady* alleged *Brady* violation are dismissed as a matter of law.

### III. Fourteenth Amendment Due Process Claims

A Fourteenth Amendment substantive due process claim is not cognizable where a more specific constitutional provision is directly applicable. *Jackson ex rel. Jackson v. Suffolk Cty.*, 87 F. Supp. 3d 386, 399 (E.D.N.Y. 2015) (citations omitted). Because the Fourth Amendment provides the basis for a Section 1983 claim premised on an allegedly malicious prosecution, the plaintiff cannot state a substantive due process claim against the defendants for that conduct. *See id.*; *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) (plaintiff's malicious prosecution claim arises under the Fourth Amendment, rather than the due process clause); *see also Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) ("the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process"). In light of the fact that the Fourteenth Amendment Due Process claim is duplicative of the plaintiff's malicious prosecution claim, his Due Process claim is dismissed.

### IV. Intentional Infliction of Emotional Distress Claim

The plaintiff's state law claim for intentional infliction of emotional distress does not survive summary judgment. In the first place, there is no genuine issue of material fact that the detectives' conduct was "extreme and outrageous." *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996). Additionally, New York law precludes a claim for intentional infliction of emotional distress if the conduct underlying the claim falls within the purview of traditional tort liability. *Sankar v. City of N.Y.*, 867 F. Supp. 2d 297, 314 (E.D.N.Y. 2012). Because the plaintiff's intentional infliction of emotional distress claim is "subsumed" by his state law malicious

prosecution claim, summary judgment is granted on the plaintiff's claim for intentional infliction of emotional distress.  *See id.*

## V.  Qualified Immunity

The doctrine of qualified immunity shields law enforcement officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Second Circuit has ruled that qualified immunity is justified in part by the risk that "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006).

Arresting officers are entitled to qualified immunity on malicious prosecution claims if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," or because it "was 'objectively reasonable' for [them] to believe that [their] actions were lawful at the time of the challenged act." *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014).  "The issue of 'reasonableness' for purposes of probable cause is distinct from the issue of 'reasonableness' for purposes of qualified immunity." *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 38 (E.D.N.Y. 2015).  The Second Circuit has set out this standard, which is referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law.  [I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful— should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (emphasis in original) (internal quotation marks and citations omitted).  At summary judgment, a police officer is entitled to

qualified immunity if the undisputed facts and all permissible inferences favorable to the plaintiff establish that officers of "reasonable competence could disagree" on whether probable cause existed. *McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006).

At a minimum, even if Detectives Solomeno and Gillen had some doubts as to the accuracy of Carter's lineup identification, or as to Sanchez's assertion that the plaintiff threatened her, they would be protected by qualified immunity, because Carter and Sanchez's identifications provided at least arguable probable cause to believe that the prosecution against the plaintiff would result in conviction. *O'Brien*, 2013 WL 1234966, at \*11.

## VI.    *Monell* Claims Against the City

The plaintiff sets out two claims against the City of New York. First, the plaintiff asserts that the Queens County District Attorney's Office had a policy or practice of failing to provide witness protection information to defense counsel. Second, the plaintiff contends that the Queens County District Attorney's Office had a practice of not disciplining assistant district attorneys for improper summation remarks. The defendants move for judgment on the pleadings on the grounds that the plaintiff cannot state a claim for municipal liability for conduct by the District Attorney's Office.[75]

Municipalities may be sued directly under Section 1983 for constitutional deprivations caused by a "governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.* Unless the plaintiff demonstrates that his constitutional rights were violated by "persons for whose conduct

---

[75] Discovery on *Monell* liability has been stayed, and there has been no discovery on the question of the existence of a policy or practice that caused the plaintiff to be deprived of a constitutional right. Thus, the defendant cannot move for summary judgment on this issue. *See* Fed. R. Civ. P. 56(d).

73

the municipality can be responsible, there is no basis for holding the municipality liable." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

### A. City of New York as a Defendant

Under New York law, the City cannot be liable for the Queens County District Attorney's Office's decisions regarding prosecution. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1153 n.14 (2d Cir. 1995) (finding no municipal liability for acts of an assistant district attorney if not related to the management of the office or arising from a long history of negligent disciplinary practices). This is because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State" and not the municipality. *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988); *see also Miller v. Cty. of Nassau*, 467 F. Supp. 2d 308, 316 (E.D.N.Y. 2006) (Plea bargaining is intertwined with prosecutorial decisions regarding prosecution and trial. As a result, the County cannot be held liable for a plea bargaining policy of the District Attorney."); *Jones v. City of N.Y.*, 988 F. Supp. 2d 305, 314 (E.D.N.Y. 2013) ("While, the City is a properly named interested party, it is not itself liable for the conduct of the district attorney in failing to properly train his assistants with respect to specific aspects of prosecuting criminals.").

By contrast, a district attorney acts as municipal policymaker when he or she "acts as the manager of the district attorney's office." *Pinaud*, 52 F.3d at 1153 n.14; *Walker v. City of N.Y.*, 974 F.2d 293, 301 (2d Cir. 1992); *see also Jones*, 988 F. Supp. 2d at 316 ("With respect to building management, maintenance decisions, or discrimination against employees, for example, the district attorney can be considered a municipal actor.").

To the extent that the plaintiff asserts that the alleged practices of the District Attorney are administrative in nature, and not related to his prosecutorial function, his argument fails; the

74

Supreme Court in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), held that matters of supervision and training related to the prosecutor's basic trial advocacy responsibilities are prosecutorial, not administrative.[76]  *Van de Kamp*, 555 U.S. at 345–48.  Specifically, in *Van de Kamp*, the plaintiff asserted that the district attorney's office management failed to train and supervise their line prosecutors on the disclosure of impeachment material to defendants, and failed to implement a system to access that information.  *Id.* at 344.  The Court held that these responsibilities are distinct from "administrative duties concerning . . . workplace hiring, payroll administration, the maintenance of physical facilities, and the like."  *Id.*  Further, the Court reasoned that the supervisory liability claims hinged upon underlying misconduct by the line prosecutors, who were entitled to absolute immunity.  *Id.*

In light of the Supreme Court's decision in *Van de Kamp*, acts taken in connection with a prosecutor's "basic trial advocacy and prosecutorial duties—including *Brady* decisions—should . . . be treated as 'prosecutorial conduct.'"  *Jones v. City of N.Y.*, 988 F. Supp. 2d 305, 317 (E.D.N.Y. 2013); *see also Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 244 (E.D.N.Y.), *on reconsideration*,[77] 47 F. Supp. 3d 152 (E.D.N.Y. 2014); *Scalpi v. Town of E. Fishkill*, No. 14-cv-2126-KMK, 2016 WL 858955, at *6 n.7 (S.D.N.Y. Feb. 29, 2016) ("courts in the Second Circuit have routinely held that a municipality cannot be held liable for a district attorney's

---

[76] The Supreme Court's decision in *Van de Kamp* did not, as the defendants suggest, remove municipal liability for the managerial policies of a county district attorney's office.  *See Norton v. Town of Islip*, No. 04-cv-3079-NGG-WDW, 2009 WL 804702, at *28 (E.D.N.Y. Mar. 27, 2009) (Section 1983 liability extends to a municipality where a county District Attorney's Office failed to supervise or train), *rev'd in part on other grounds*, 378 F. App'x 85 (2d Cir. 2010); *see also Connick v. Thompson*, 563 U.S. 51, 71 (2011) (policymaker for the district attorney's office was not liable for failing to train prosecutors to avoid *Brady* violations because plaintiff did not prove a pattern of similar violations).  Instead, *Van de Kamp* held that in cases alleging failure to train and properly supervise, supervisory prosecutors were entitled to absolute immunity.  *Van de Kamp*, 555 U.S. at 345–48.

[77] On reconsideration, the Honorable Arthur Spatt reinstated the declaratory judgment claim for municipal liability against the County because the Honorable Nicholas Garaufis, in a related case, held that the alleged policy or custom addressed the interlocking relationship between two tiers of government, and thus was administrative, rather than prosecutorial.  *Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 162 (E.D.N.Y. 2014).  For that reason, Judge Spatt concluded that the *Monell* claim could proceed against the municipality.  *Id.*

75

prosecutorial decisions"), *appeal dismissed* (June 3, 2016); *Dettelis v. Cty. of Cattaraugus*, No. 14-cv-1096A-SR, 2016 WL 1729554, at *6 (W.D.N.Y. Mar. 31, 2016), *report and recommendation adopted*, No. 14-cv-1096-A, 2016 WL 1728771 (W.D.N.Y. Apr. 29, 2016); *cf. Norton v. Town of Islip*, No. 04-cv-3079-NGG-WDW, 2009 WL 804702, at *25–27 (E.D.N.Y. Mar. 27, 2009), *rev'd in part on other grounds*, 378 F. App'x 85 (2d Cir. 2010).

Here, the plaintiff raises two challenges: the disclosure of the benefits offered to witnesses as part of protecting the witnesses, and appropriate training on summation comments. Both are inextricably linked to prosecuting a criminal matter. Because the conduct about which the plaintiff complains was prosecutorial, the City of New York is not the proper defendant. Accordingly, the *Monell* claims against the City are dismissed as a matter of law.

## B. Failure of Proof of Underlying Constitutional Violation

Even if the City were the proper defendant for purposes of the plaintiff's *Monell* claims, the claims could not survive summary judgment, because the plaintiff has not established that the prosecutor withheld details about Sanchez's relocation, or that the prosecutor's comments in summation deprived the plaintiff of a constitutional right.

Liability under Section 1983 arises when a municipality created a custom or policy that violated a plaintiff's constitutionally protected rights, and pursuant to that practice, a municipal actor tortiously injured the plaintiff. *Askins*, 727 F.3d at 253. *Monell* did not craft an independent cause of action under which a plaintiff may bring suit over a governmental practice, "regardless of whether he suffered the infliction of a tort resulting from the policy." *Id.* Consequently, in order for the plaintiff to prevail on his claims against the municipality, he must demonstrate that there is a triable question of whether his constitutional rights were violated.

76

### i. Disclosure of Witness Protection Information

As discussed above, a true *Brady* claim has three components: "The evidence at issue must be favorable to the accused, . . . that evidence must have been suppressed by the State, . . . and prejudice must have ensued." *Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (citation omitted). In order to prove prejudice, the plaintiff must establish that the evidence was material; in other words, the plaintiff must demonstrate that the "evidentiary suppression undermines confidence in the outcome of the trial." *Fappiano*, 640 F. App'x at 118. However, "materiality does not depend on factual innocence, but rather what would have been proven absent the violation." *Poventud*, 750 F.3d at 134.

The plaintiff contends that prosecutors promised Sanchez "thousands of dollars in direct payments, free housing for an indefinite period, and assistance relocating to subsidized housing," and then withheld this information from the plaintiff's criminal defense attorney. This characterization distorts the record evidence.

Before Linda Sanchez testified at the trial, the prosecutor advised the court and counsel that the District Attorney's Office was "relocating" Sanchez because of the plaintiff's threats. Sanchez testified that she received $50 from the Queens County District Attorney's Office before appearing in court, that she was told she would get $50 more, and that she received $25 per day. She agreed that she was staying overnight in a "different location,"[78] but did not explain that the Queen's District Attorney's Office had also paid for her hotel. In summation, the

---

[78] There was no testimony that Sanchez was in a witness protection program or that she was moved because of the plaintiff's threats. Any criminal defense lawyer would have objected that such evidence was unfairly prejudicial. *Penick*, 144 F. Supp. 2d at 157 (defense counsel might reasonably have concluded that the value of the argument that the witness invented her story "was far outweighed by the prejudice of opening the door to testimony regarding the reason for protective custody.")

plaintiff's defense counsel argued that she was not credible because she only testified that the

plaintiff had threatened her in order to receive assistance from the District Attorney's Office.

There is no evidence that the prosecutor withheld any information about what his office

was doing for Sanchez. He told counsel that the District Attorney's Office was relocating her,

which obviously implied that the Office was paying for her lodging, and that she was being

given a daily expense allowance. Sanchez testified about these payments, and was cross-

examined about them. To the extent that the District Attorney's Office continued to assist

Sanchez with relocation expenses—the first month's rent, security, or brokerage fee—these

benefits did not arise until *after* the plaintiff's trial, and did not affect the trial itself. *Penick v.*

*Filion*, 144 F. Supp. 2d 145, 157 (E.D.N.Y. 2001) (evidence cited as part of the *Brady* claim that

did not arise until after the trial "would have had no effect on the trial itself."). Under the

circumstances, there was no *Brady* violation, and the plaintiff was not denied a fair trial.

### ii. Summation Remarks

The plaintiff maintains not only that ADA Guy's comments in summation deprived him

of a fair trial, but that the Queen's County District Attorney's Office had a policy of ignoring

prosecutorial misconduct in summation, and that they failed to train and discipline prosecutors

that crossed the line in summation. However, the plaintiff cannot establish that the prosecutor's

summation deprived him of a constitutional right, and thus, the summation cannot form the basis

of a *Monell* claim.

A person is deprived of a fair trial only if, among other things, there was a constitutional

violation, which was "likely to influence a jury's decision." *Jovanovic*, 486 F. App'x at 152.

The plaintiff isolates passages from ADA Guy's summation, which he claims were

prejudicial or inflammatory. These include: 1) responses to defense counsel's attacks on Linda

78

Sanchez's credibility; 2) comments on Andrew Carter's testimony; 3) arguments undercutting the plaintiff's alibi; 4) comments on Veronica Walker's testimony; and 5) certain rhetorical flourishes.

A "court must consider remarks in a summation in their entirety, not in isolation." *Guzman v. Jay*, 303 F.R.D. 186, 194 (S.D.N.Y. 2014). This is because isolated statements made by prosecutors in their summations, "even if seemingly improper, do not necessarily exceed 'the broad range of rhetorical comments allowed in closing arguments.'" *Jones v. Poole*, No. 06-cv-15, 2008 WL 2828836, at *8 (W.D.N.Y. July 21, 2008) (quoting *Harper v. Kelly,* 704 F. Supp. 375, 379 (S.D.N.Y. 1989), *rev'd on other grounds*, 916 F.2d 54 (1990)). In this case, the prosecutor's comments were garden variety summation comments, almost none of which prompted any objection. Thus, the prosecutor stressed that the critical issue in the case was identification; he also responded to defense counsel's arguments about Carter's identification, the alibi, and the timing of the murder.

Even if the prosecutor's remarks were improper—and I do not find that they were—the plaintiff must establish that the alleged violation was "likely to influence a jury's decision." *Jovanovic*, 486 F. App'x at 152. The plaintiff's argument that the summation included "more than a dozen" misleading and inflammatory comments—that were not responsive to the defense summation, and deprived Bellamy of a fair trial—is "seriously undercut" by counsel's "failures to lodge a contemporaneous objection" and to raise the issue on appeal or in the plaintiff's habeas petition. *Guzman*, 303 F.R.D. at 195. Significantly, the plaintiff's defense lawyer registered only one objection—to the prosecutor's argument that the plaintiff crafted an alibi to cover the time of the murder. There was nothing improper about this argument. In any event, the judge, whose instructions the jury is presumed to have followed, gave comprehensive

79

instructions—on the burden of proof, including the prosecutor's burden to disprove the plaintiff's alibi, and that the parties' comments in summation were not evidence.  Under the circumstances, the plaintiff has not established a violation of his constitutional rights.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in its entirety, and the claims against the individual defendants are dismissed.  The *Monell* claims against the City of New York are dismissed as a matter of law.  Thus, the action is dismissed in its entirety.

**SO ORDERED.**

/s/ Ann M. Donnelly
_____

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
        May 17, 2017

Case 17-1859, Document 15, 06/27/2017, 2067118, Page109 of 128
Case 1:12-cv-01025-AMD-PK  Document 152  Filed 05/06/16  Page 1 of 18 PageID #: 3189

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -  X

KAREEM BELLAMY,                    :

                                          12 CV 1025
          Plaintiff,         :

      -against-              :
                                   United States Courthouse

                                   Brooklyn, New York

CITY OF NEW YORK, ET AL,     :

                                   April 15, 2016
          Defendants.        :     12:30 o'clock p.m.

- - - - - - - - - - - - - -  X

                TRANSCRIPT OF CONFERENCE
                BEFORE THE HONORABLE ANN M. DONNELLY
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:           THOMAS HOFFMAN, ESQ.


For the Defendants:          MATTHEW J. MODAFFERI, ESQ.
                             Assistant Corporation Counsel


Court Reporter:              Gene Rudolph
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2538


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

GR      OCR      CM      CRR      CSR

Case 17-1859 Document 15 06/27/2017 2067148 Page 110 of 128

2

THE CLERK:  Civil cause for premotion conference, docket number 12 CV 1025, Bellamy versus the City of New York, et al.

Counsel, state your appearances. Plaintiff first.

MR. HOFFMAN:  My name is Thomas Hoffman.  I represent Mr. Bellamy.

I have with me a law student intern that you have agreed or approved to have him appear.  I may ask him, with your permission, to make certain arguments.

THE COURT:  Okay.

MS. HILES:  My name is Jonathan Hiles.

THE COURT:  Okay.

MS. HILES:  Thank you.

MS. MODAFFERI:  Good afternoon, Your Honor.

Matthew Modafferi on behalf of the city defendants.

THE COURT:  All right.  Good afternoon.

I know neither side has appeared before me before. I thought before we started I just would let you know a couple of things.

This is a very low drama courtroom.  I know there has been a lot of tension, let's say, between the parties.  It is really not necessary here.  I don't find it particularly helpful.

I am fairly new to this courthouse but I have some experience on the state side in the criminal area.  I am

GR     OCR     CM     CRR     CSR

familiar with some of the things that happen in state court. I am not pretending to know everything but I have had some experience there before.

I have reviewed this record pretty thoroughly. I have spoken with Judge Kwo and I do have a couple of questions that I just want to clarify, but I really am just looking for an answer to the question. I am fairly familiar with the background of the case. I don't require a long explanation of what happened.

As I understand it, the parties are here on a couple of issues. The first question is this question of the protective order. Then the second issue is whether or not the city can move for summary judgment.

Do I have that correct so far?

MR. HOFFMAN: Generally, that's true.

MS. MODAFFERI: Yes, Your Honor.

THE COURT: All right. I just have a couple of questions, just so I am clear.

As I understand it, the -- well, first, there are two defendants, I don't know if it is Detective or Officer Pepe and Schruell who it seems should be terminated as parties. I don't think -- is that correct?

MR. HOFFMAN: Actually, there has been a stipulation so ordered by judge -- Magistrate Judge Pohorelsky back in August.

GR     OCR     CM     CRR     CSR

Case 17-1859, Document 15, 06/27/2017, 2067148, Page112 of 128

4

THE COURT:  Okay.

MR. HOFFMAN:  Where we agreed to dismiss the amended -- proposed amended complaint.

THE COURT:  All right.  They shouldn't be on the caption then.

The second thing I am going to ask the parties, just because I think because we are in 2016, I am going to ask you both to find a term other than Chinese Wall to describe whatever is happening in the DA's office.  I would prefer not to see that term anymore, if that's okay with you.

The third thing is, just so I understand what the claim, the claim against the named defendants, which are the detectives, basically, I know there is lots more than this but basically that they coerced witnesses and fabricated evidence.

Do I have that correct just generally?

MR. HOFFMAN:  Yes.

THE COURT:  All right.  The Monell claim relates really to the District Attorney's office, correct?

MR. HOFFMAN:  Yes.

THE COURT:  The two elements, as I understand it, of the Monell claim are again, just generally, the question of the prosecutor's summation at the trial, correct so far?

MR. HOFFMAN:  Correct.

THE COURT:  Generally.  And the second Monell issue relates to this practice of shielding trial lawyers from

5

benefits that the witnesses may or may not receive.  Is that also correct?

MR. HOFFMAN:  Correct, or other Brady information.

THE COURT:  These are the two, just generally?

MR. HOFFMAN:  Generally.

THE COURT:  Okay.  On both of these issues, just so I am clear, is it the case that with respect to the summation, that this was never the subject of any finding in the New York State courts, correct?

MR. HOFFMAN:  Yes.

THE COURT:  For example, the Second Department never found the summation comments were reversible error under state law, correct?

MR. HOFFMAN:  Correct.

THE COURT:  Okay.  Were the prosecutor's comments in summation the subject of a habeas -- I know there is a federal habeas petition.

MR. HOFFMAN:  No.

THE COURT:  Okay.  My other question about that, I just really want to know if -- it is a yes or no question -- the question about failure to discipline.  Does that relate to both the summation claim and the question of shielding trial lawyers from benefits that witnesses receive?

MR. HOFFMAN:  It relates also to failure to discipline prosecutors who shield Brady information.

GR       OCR       CM       CRR       CSR

Case 17-1859 Document 15 06/27/2017 2067148 Page 114 of 128

6

THE COURT:  All right.  So just kind of a general --

MR. HOFFMAN:  Yes.

THE COURT:  How many members of the District Attorney's staff have also been deposed?  Lawyers, paralegals, whatever; do you know?

MS. MODAFFERI:  Your Honor, with respect to the Monell claims, none.  But during fact discovery, there were a series of witnesses who were deposed  because of their role with the District Attorney's office at the time.

So, for example, there was an ADA, former ADA who is now a Criminal Court judge, who supervised, so to speak, the lineup and he handled the grand jury.  He was deposed in this matter, as well as the trial ADA.  He is no longer an ADA.  He is now a defense attorney.  He was also deposed. Then two members from the District Attorney's office who were not Assistant District Attorneys were also deposed.

THE COURT:  The witness --

MS. MODAFFERI:  Yes, that is correct, the Witness Protection Program director and the Witness Protection Program coordinator.

THE COURT:  All right.  Is it also the case that -- we will talk about scheduling in a bit.  But are the defendants agreeing to make the Chief Assistant District Attorney available for deposition?

MS. MODAFFERI:  Your Honor, our position all along

GR     OCR     CM     CRR     CSR

Case 17-1859, Document 15, 06/27/2017, 2067148, Page115 of 128

was, just sort of streamline to get to summary judgment, we were willing to produce one witness under the veil of 30(b)(6), to bind the DA's office; one witness for the failure to discipline summation remark theory of Monell liability, and that would be Chief Ryan.

THE COURT:  Okay.

MS. MODAFFERI:  And one witness who can testify as to the Witness Protection Program, and bind the city under Rule 30(b)(6).  That was our proposal, but obviously that wasn't agreed upon so that's why we are here.

THE COURT:  Okay.  That has not actually happened?

MS. MODAFFERI:  That has not happened.

THE COURT:  All right.  This is a question that I have because it did come up in the state court proceedings.  I am sure you have thought about this.  I am somewhat concerned that Mr. Hoffman may become a witness at any trial that we have.  Have you talked about that or discussed that?  Just given the series of events at the two 440.10 hearings.

MR. HOFFMAN:  I don't see what my testimony would be relevant at this trial.  Suffice it to say, that my deposition was not sought throughout the fact finding hearing -- fact finding process.  Suffice it to say, that it only implicates one particular person, whose name is Michael Green, who -- you have read the papers.

THE COURT:  I have read the papers.

Case 17-1859, Document 15, 06/27/2017, 2067148, Page116 of 128

8

MR. HOFFMAN: So Michael Green has not been sought to be deposed. The issue in this case is whether or not --

THE COURT: I understand the issue.

MR. HOFFMAN: -- the police committed misconduct.

THE COURT: Just a question. I think it was a concern certainly of Judge -- is it Judge Blumenfeld?

MR. HOFFMAN: Judge Blumenfeld.

THE COURT: I think it was a concern of his.

Was there another witness that received some kind of payment as well, Mr. Carter? I am sure you have thought about this. It is something that occurred to me, that this might pose something of a difficulty. If it is not a difficulty, that is fine.

MR. HOFFMAN: Okay. I co-counseled with Cravath Swaine Moore. Mr. Carter was asked -- we asked to interview him and he requested reimbursement for money for his expenses.

THE COURT: I understand all of that. I am just --

MR. HOFFMAN: The --

THE COURT: Given that that's the case, my question really is -- you don't have to answer me today. It is something that you -- I don't know if you will become a witness. If it is going to become an issue in the case, I think it is something that you should think about. If it is not an issue in the case, that is that.

MR. HOFFMAN: All right.

GR     OCR     CM     CRR     CSR

9

THE COURT: It is --

MR. HOFFMAN: We certainly have thought about it.

THE COURT: Okay.

MS. MODAFFERI: Your Honor, if I may on that subject?

THE COURT: Yes.

MS. MODAFFERI: Prior counsel, prior defense counsel who is no longer with the office, I spoke to him prior to coming on the case and he informed me that he included Mr. Hoffman in our Rule 26(a) disclosures as a potential witness. I believe based on the information that was provided to me that both Magistrate Pohorelsky and District Judge Kuntz did mention the same issue that Your Honor is bringing up. My understanding or my position on this was, I didn't want to raise this issue during discovery because it would potentially create issues for Mr. Bellamy's ability to get discovery. It was something we were holding in abeyance until that was sort of complete.

THE COURT: Okay.

MS. MODAFFERI: Then we would raise the issue.

THE COURT: That makes some sense.

Having reviewed this and considered the arguments of both parties, I will tell you what I am going to do. I am going to reserve decision on the question of the protective order. I don't think that is necessary to decide today. I am

GR        OCR       CM       CRR       CSR

Case 17-1859   Document 15   06/27/2017   2067118   Page 118 of 128

10

going to permit the city to file a summary judgment motion. We need to set a schedule for that.

MR. HOFFMAN:  We would like an opportunity to address the Court as to why that shouldn't be done and why it would be extremely prejudicial.

THE COURT:  Do you have something additional -- prejudicial for me to consider summary judgment?

MR. HOFFMAN:  Why it would be prejudicial to delay this case more than it has been as we are now in the fifth year of litigation.

THE COURT:  I am well aware of that.  I think there are some issues about the Monell claims that warrant an examination on summary judgment.

MR. HOFFMAN:  Which were all raised to Judge Kuntz, which were all raised to Judge --

THE COURT:  I don't think there has been summary judgment on this.  Let me finish, okay?  As I said, sometimes you are going to win and sometimes you are going to lose. Let's just keep calm about it.

My view is that there is a real issue on whether summation comments under New York State law that were not found to be reversible error by any Court can form the basis for a Monell claim.  Perhaps they can.  I don't think that is your strongest argument.

And the second Monell claim as well, I think that

GR        OCR        CM        CRR        CSR

those were appropriate subjects for summary judgment, and so I am going to permit the city to file a summary judgment and what I just need from you is how much time you need to do that.

MS. MODAFFERI: Your Honor, I would like one point of clarification.

THE COURT: Sure.

MS. MODAFFERI: Is Your Honor allowing us to move for summary judgment on just the underlying issues for the Monell claim or moving for summary judgment across the board as well as for the claims against the individual defendants? That would affect my --

THE COURT: It seems to me that the underlying case, unlike a lot of these cases, are quite separate from the named defendants. The Monell claims are really quite different, that there are factual questions on the underlying case and you can make -- I am not going to preclude you from making any argument that's a valid argument.

If there are actual questions of fact that are not appropriate for summary judgment, I never think it is a good idea to make those arguments if they are not appropriate, if there is clearly a factual question.

I do think that there is a legal question, certainly, on the Monell claims. I saw the letters were mostly focused on Monell.

GR     OCR     CM     CRR     CSR

Case 17-1859   Document 15   06/27/2017   2067118   Page 120 of 128

12

MS. MODAFFERI:  Yes, Your Honor.  Just going to Your Honor's first point, without fully diving into the other issue against the individual defendants, Your Honor may be correct with respect to the due process claim.  But something that was litigated on Rule 12 was the issue of favorable determination for the malicious prosecution claim.  That might be something that is included in our motion.  I think that Your Honor may be correct with respect to the due process claim and should that be the case it would only be a partial motion.

THE COURT:  All right.  How much time do you need to file that motion?

MS. MODAFFERI:  My schedule is actually pretty crazy.  But in light of the issues in this case, I should be able to have something in four weeks.

THE COURT:  Okay.  How much time do you need to respond?

What date does that take us to, Donna?

THE CLERK:  The 13th.

THE COURT:  May 13th?

THE CLERK:  Yes.

THE COURT:  How much time would you like to respond?

MR. HOFFMAN:  We want four weeks.

THE COURT:  All right.  That takes us to June?

THE CLERK:  June 3rd.

THE COURT:  A week to reply?

GR      OCR      CM      CRR      CSR

Case 17-1859 Document 15 06/27/2017 2067118 Page 121 of 128

13

MS. MODAFFERI: Your Honor, so this was a potential complication. On June 6th, I am starting a trial in the Southern District and then I will be out of the country from June 9th through the 19th.

THE COURT: All right.

MS. MODAFFERI: I can do it in a week so long as it's the week when I am actually here and able to work on it.

THE COURT: What date does that take us to?

MS. MODAFFERI: I will be here and able to work on it the week of Monday, June 20th.

THE COURT: Okay. All right. Is that June 27th?

MS. MODAFFERI: Yes. It would be a week.

THE COURT: All right.

MR. HOFFMAN: Your Honor?

THE COURT: Yes.

MR. HOFFMAN: As obviously we want this expedited -- first, I do want -- I do want to apologize for that term that was put into my --

THE COURT: That's okay. Don't worry about it.

MR. HOFFMAN: I didn't consider it pejorative. It was used by one of the witnesses. So I apologize for that. I should have thought it through a little better.

THE COURT: Don't give it a second thought. I just thought moving forward we'd try to find another term.

MR. HOFFMAN: We are willing to cut our time by a

Case 17-1859 Document 15 06/27/2017 2067118 Page 122 of 128

14

week so that we could not delay the reply.

THE COURT: The schedule may contract a little bit. I tend to turn these around fairly expeditiously. I know everybody has their schedules. When you get yours in, if it comes in early and counsel is able to turn to it, that's what will happen. Let's leave the schedule for now.

I will also just add one other thing. I am a person who likes to focus on the issue that is before me. I don't find it particularly helpful to get submissions from The Innocence Project. I think it is a wonderful group but it is not particularly useful to me if it doesn't relate to one of the issues that is in front of me.

The same thing, I wouldn't want statistics on crime in the city or anything like that. I like to focus on what is in front of me. If you are looking at something and you think you really want to send it to me, go ahead. As I say, I want to focus on the particular legal issues that are in front of me in this case.

Anything else that anybody has to say?

MS. MODAFFERI: Nothing from the defendant.

THE COURT: Okay.

MR. HOFFMAN: I think, as I think about it, we would like to cross move for summary judgment. We believe the statements that were made are per se egregious and the Court should find that so.

GR     OCR     CM     CRR     CSR

Case 17-1859 Document 15 06/27/2017 2067118 Page 123 of 128

15

THE COURT:  Okay.

MR. HOFFMAN:  We believe that the -- that this Brady violation -- you read our papers -- have clearly been shown were withheld and suppressed.

THE COURT:  How do you want --

MR. HOFFMAN:  We are doing --

THE COURT:  How do you want to do it schedule-wise then?  Do you just want to cross move in your response?  Does that make sense?  It is all the same issue.

MR. HOFFMAN:  Can I have a moment?

THE COURT:  Sure.

(Pause)

THE COURT:  Let me ask you this.  Do you want to wait and think about it and just let me know.  The schedule will stay the same.

MR. HOFFMAN:  The schedule would stay the same?

All right.  If we want to proceed with it, we will file a motion, cross-motion.

THE COURT:  All right.  The only other thing, just a factual question that I am sure you have addressed somewhere and possibly I have missed it, the question of the timeline for the witness Ms. Sanchez, just a couple of things.  This can probably be addressed in whatever motions the two of you choose to make.  It was a little bit unclear to me, two things, three things actually.

GR     OCR     CM     CRR     CSR

Case 1:12-cv-01025-AMD-PK Document 152 Filed 05/06/16 Page 16 of 18 PageID #: 3204

I think the issue is whether the witness got Section 8 Housing, is that correct?  Is that the issue?

MR. HOFFMAN:  No, that's not the issue.

THE COURT:  It's not the issue.  I got it wrong?

MR. HOFFMAN:  Section 8 Housing is no longer the issue.

THE COURT:  Okay.  All right.  As I say, I am just asking a question.  That is not the question.

The question to me was something about the timeline of her relocation.  I think it was addressed in the state court, in the 440.10 issue, that there was some time that she was relocated after the trial.  Is that correct?

MR. HOFFMAN:  It will take me two minutes to go over this timeline.

THE COURT:  You know what, I think you can do it in your papers.

MR. HOFFMAN:  The question is when she was relocated.

THE COURT:  Yes.

MR. HOFFMAN:  You want me to do it in the papers?

THE COURT:  Isn't that the issue, isn't that the question?  Isn't that one of the bases for your Monell claim, that she was relocated and you didn't get all the information.

MR. HOFFMAN:  No.  The issue -- it is partially the issue.

GR    OCR    CM    CRR    CSR

Case 17-1859 Document 15 06/27/2017 2067118 Page 125 of 128

17

THE COURT: All right.

MR. HOFFMAN: The issue is two days before testimony she was promised a boatload of things.

THE COURT: Okay.

MR. HOFFMAN: Which was not disclosed.

THE COURT: Okay.

MR. HOFFMAN: She was promised that she would be permanently relocated. That happened later.

THE COURT: Okay.

MR. HOFFMAN: She also was promised that she would be temporarily relocated and given a free apartment. She was homeless. All of this was not disclosed.

THE COURT: All right. I just wanted to know.

MR. HOFFMAN: That's generally the --

THE COURT: That's all I wanted to know.

Anything else?

MS. HILES: I think one thing to clarify. I am sure that this may come up but from a factual perspective, the previous Corporation Counsel, Miss Virginia Nimick, said at a hearing that the city was done with its fact discovery witnesses regarding the claims against the police department and the underlying facts of the case. Mr. Modafferi said the same thing in October before Judge Kwo, that the only deposition would be with regards to Mr. Bellamy's damages.

I think that -- obviously, to know what happened on

GR     OCR     CM     CRR     CSR

Case 17-1859 Document 15 06/27/2017 2067118 Page 126 of 128

18

your end with Mr. Wenzel, the first Corporation Counsel on the case, but that was the representation regarding their depositions.

THE COURT: And?

MS. MODAFFERI: I agree with Mr. Hiles to an extent. I agree that fact discovery is completed, from our perspective, except for the Mr. Hoffman issue and damages with respect to Mr. Bellamy. That is all.

THE COURT: Okay. All right. I will wait to hear from you on the motions.

All right. Thank you so much.

MS. MODAFFERI: Thank you, Your Honor.

MS. HILES: Thank you.

(Matter concludes.)

GR        OCR        CM        CRR        CSR

**ADDENDUM "B"**

**LIST OF PROPOSED ISSUES TO BE RAISED ON APPEAL**

1. Whether the District Court improperly granted summary judgment for Defendant City of New York on plaintiff's claims (a) that the suppression of promised payments and housing assistance to a crucial prosecution witness, and egregious summation misconduct, violated his constitutional right to a fair trial, and (b) that such violations resulted from the deliberate indifference of the Queens District Attorney to the Office's *Brady* disclosure obligations and to criminal defendants' right to a fair trial, for which the City of New York, pursuant to *Monell v. City of New York Dep't of Soc. Serv's*, 436 U.S. 658 (1978), *Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992) and *Myers v. County of Orange,* 157 F.3d 66 (2d Cir. 1998), may be held liable.

   Standard of review: *De novo*.

2. Whether the District Court improperly granted summary judgment for Defendants John Gillen and Michael Solomeno on plaintiff's federal civil rights and state law claims that they subjected him to malicious prosecution in violation of his Fourth and Fourteenth Amendment rights, and violated his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments.

   Standard of review: *De novo*.

3. Whether the District Court improperly stayed discovery, ordered by a magistrate judge pursuant to the stipulation of the parties, on the policies and practices of the Queens District Attorney's Office with respect to summation misconduct and *Brady* compliance – including the Office's deliberate indifference to *Brady* violations and summation misconduct and failure to discipline prosecutors who commit them – and then improperly decided the City's summary judgment motion in the absence of such discovery.

   Standard of review: Abuse of discretion.

4. Whether the District Court improperly excluded the post-conviction hearing testimony of witness Andrew Carter on the basis that the Queens District Attorney's Office could not be a predecessor in interest to the City of New York.

    Standard of review: Abuse of discretion.