# 17-1859

## United States Court of Appeals for the Second Circuit

KAREEM BELLAMY,

*Plaintiff-Appellant*,

*against*

CITY OF NEW YORK, JOHN J. GILLEN, MICHAEL F. SOLOMENO,

*Defendants-Appellees*,

JOHN DOE 1, JOHN DOE 2, SUPERVISING OFFICERS AT THE NYPD 101ST PRECINCT, VINCENT NMI PEPE, ROBERT SCHRUHL,

*Defendants*.

On Appeal from the United States District Court for the Eastern District of New York

**BRIEF FOR APPELLEES**

ZACHARY W. CARTER
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
212-356-5045 or -2500
mmontcal@law.nyc.gov

RICHARD DEARING
MEGAN E.K. MONTCALM
*of Counsel*

December 26, 2017

Reproduced on Recycled Paper

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... v

PRELIMINARY STATEMENT ..... 1

ISSUES PRESENTED FOR REVIEW ..... 2

STATEMENT OF THE CASE ..... 3

A. The 101st precinct's investigation into James Abbott's brutal murder ..... 3

1. Detectives' initial steps leading them to Andrew Carter and C-Town supermarket ..... 3

2. The "Anna Simmons" call ..... 4

3. Interview with C-Town cashier Linda Sanchez ..... 5

4. Sanchez's call prompting detectives to pick up Bellamy and his statements en route to the precinct ..... 6

5. Bellamy's additional statements at the precinct ..... 9

6. The lineups where Carter and Sanchez each identified Bellamy ..... 10

7. ADA Antignani's interview with Terrill Lee, undermining Bellamy's alibi ..... 13

B. The grand jury's indictment of Bellamy for second-degree murder ..... 14

C. The pretrial suppression hearing ..... 16

D. The criminal jury's conviction of Bellamy for second-degree murder ..... 19

## TABLE OF CONTENTS (cont'd)


**Page**

1. Gillen's testimony about Bellamy's outbursts ....................... 19

2. Sanchez's disclosure to the DA's Office that Bellamy had threatened her twice, prompting relocation efforts to ensure her safety ........................................................ 19

3. Sanchez's testimony about her observations of Bellamy and Abbott on the day of the murder, and Bellamy's ensuing threats .................................................................. 24

4. Carter's in-court identification of Bellamy as Abbott's murderer .................................................................................... 26

5. Veronica Walker's testimony ............................................... 27

6. Bellamy's perfectly timed alibi ............................................ 30

7. Bellamy's convictions, upheld on direct and habeas review ........................................................................................ 30

E. The vacatur of Bellamy's convictions based on dubious "newly discovered" evidence .................................................... 31

F. This civil litigation, and the grant of summary judgment to defendants ............................................................................ 36

SUMMARY OF ARGUMENT ........................................................... 39

ARGUMENT .................................................................................... 40

POINT I .......................................................................................... 40

THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE INDIVIDUAL DEFENDANTS ................................................................... 40

**TABLE OF CONTENTS (cont'd)**

**Page**

A. Bellamy has made no competent showing that detectives violated his fair trial rights by fabricating evidence. .............. 41

1. There is no admissible evidence that Gillen improperly influenced Carter's lineup identification. ............................ 41

2. Bellamy's fair trial claim regarding Walker rests on evidence that was never admitted at trial. ........................... 44

3. No reasonable jury could believe Gillen fabricated the incriminating statement based on Bellamy's bare testimony. ................................................................. 46

B. Bellamy likewise cannot establish that Gillen or Solomeno intentionally suppressed materially exculpatory or impeaching evidence. ...................................... 49

1. Bellamy's claims premised upon Sanchez's post-trial statements mischaracterize the record and fail to establish wrongdoing by Gillen or Solomeno. ...................... 50

2. Bellamy's alternate theory about Walker's testimony is unpreserved and meritless. ................................................ 54

POINT II ........................................................................................ 55

THE DISTRICT COURT PROPERLY DISMISSED THE MONELL CLAIMS AS A MATTER OF LAW ............................... 55

A. Bellamy fails to establish a triable issue of fact as to whether he suffered an underlying constitutional violation. ....................................................................... 55

1. ADA Guy adequately disclosed that Sanchez was receiving money and relocation assistance. .......................... 56

## TABLE OF CONTENTS (cont'd)

**Page**

2. ADA Guy's summation did not deprive Bellamy of a fair trial. .......... 59

B. Bellamy's *Monell* claims center on prosecutorial functions for which DAs do not act as representatives of the City .......... 63

CONCLUSION .......... 70

CERTIFICATE OF COMPLIANCE .......... 71

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Askins v. Doe*,
727 F.3d 248 (2d Cir. 2013) .......... 54

*Baez v. Hennessy*,
853 F.2d 73 (2d Cir. 1988) .......... 63, 64, 65

*Bellamy v. City of N.Y.*,
No. 12 Civ. 1025 (AMD) (PK),
2017 U.S. Dist. LEXIS 75306 (E.D.N.Y. May 17, 2017) .......... *passim*

*Bellamy v. Portuondo*,
No. 1:99-cv-01832-CPS (E.D.N.Y.) .......... 31

*Bermudez v. City of N.Y.*,
790 F.3d 368 (2d Cir. 2015) .......... 49

*Boyd v. City of N.Y.*,
336 F.3d 72 (2d Cir. 2003) .......... 49

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... *passim*

*City of L.A. v. Heller*,
475 U.S. 796 (1986) .......... 56

*Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*,
955 F. Supp. 2d 118 (E.D.N.Y. 2013) .......... 62

*Dettelis v. Cnty. of Cattaraugus*,
No. 14-CV-1096A, 2016 U.S. Dist. LEXIS 57459
(W.D.N.Y. Mar. 31, 2016),
*report and recommendation adopted by*
2016 U.S. Dist. LEXIS 57229 (W.D.N.Y. Apr. 29, 2016) .......... 68

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Dufort v. City of N.Y.*¸
No. 16-1715-cv, 2017 U.S. App. LEXIS 21322
(2d Cir. 2017) .......................................................................... 41, 44

*Fappiano v. City of N.Y.*,
640 F. App'x 115 (2d Cir. 2016) (summary order)........................ 42, 50

*Garcia v. Hartford Police Dep't*,
706 F.3d 120 (2d Cir. 2013) (per curiam) .......................................... 40

*Garnett v. Undercover Officer C0039*,
838 F.3d 265 (2d Cir. 2016) ............................................................... 41

*Gentile v. County of Suffolk*,
926 F.2d 142 (2d Cir. 1991) ........................................................ 65, 67

*Goldstein v. City of Long Beach*,
715 F.3d 750 (9th Cir. 2013)............................................................... 67

*Harlen Assocs. v. Inc. Vill. of Mineola*,
273 F.3d 494 (2d Cir. 2001) ............................................................... 42

*Hewitt v. City of N.Y.*,
No. 09-cv-0214, 2011 U.S. Dist. LEXIS 11479
(E.D.N.Y. Feb. 7, 2011) ...................................................................... 69

*Hicks v. Baines*,
593 F.3d 159 (2d Cir. 2010) ........................................................ 40, 43

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ................................................ 37, 47, 48

*Johnson v. Pataki*,
91 N.Y.2d 214 (1997) .......................................................................... 64

*Jones v. City of N.Y.*,
988 F. Supp. 2d 305 (E.D.N.Y. 2013).................................................. 69

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Marcic v. Reinauer Transp. Cos.*,
397 F.3d 120 (2d Cir. 2005) ........................................ 60, 62

*McClellan v. Smith*,
439 F.3d 137 (2d Cir. 2006) ........................................ 49

*McMillian v. Monroe Cnty.*,
520 U.S. 781 (1997) ........................................ 65

*People v. Bellamy*,
247 A.D.2d 399 (2d Dep't),
*lv. denied*, 91 N.Y.2d 970 (1998) ........................................ 30

*People v. Bellamy*,
84 A.D.3d 1260 (2d Dep't),
*lv. denied*, 17 N.Y.3d 813 (2011) ........................................ 34

*People v. Bellamy*,
No. 2194/94, 2008 N.Y. Misc. LEXIS 4672
(Sup. Ct. Queens Cnty. June 27, 2008),
*appeal dismissed*, 84 A.D.3d 1260 (2d Dep't 2011) ................ 31, 35, 58

*People v. Bellamy*,
No. 2194/94, 2010 N.Y. Misc. LEXIS 47
(Sup. Ct. Queens Cnty. Jan. 14, 2010),
*aff'd*, 84 A.D.3d 1260 (2d Dep't 2011) ........................................ 32, 24

*People v. Payne*,
3 N.Y.3d 266 (2004) ........................................ 34

*People v. Steadman*,
82 N.Y.2d 1 (1993) ........................................ 57

*Spielman Motor Sales Co. v. Dodge*,
295 U.S. 89 (1935) ........................................ 65

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*United States v. Blueford*,
312 F.3d 962 (9th Cir. 2002) .......... 61

*United States v. Brown*,
582 F.2d 197 (2d Cir. 1978) .......... 57

*United States v. Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014) .......... 61

*United States v. Feliciano*,
223 F.3d 102 (2d Cir. 2000) .......... 59, 60

*United States v. LeRoy*,
687 F.2d 610 (2d Cir. 1982) .......... 57

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993) .......... 59

*United States v. Mapp*,
170 F.3d 328 (2d Cir. 1999) .......... 59

*United States v. Modica*,
663 F.2d 1173 (2d Cir. 1981) .......... 61

*United States v. Rivas*,
377 F.3d 195 (2d Cir. 2004) .......... 50, 52, 57

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994) .......... 61

*Van de Kamp v. Goldstein*,
555 U.S. 335 (2009) .......... 66, 67, 68, 69

*Walker v. City of New York*,
974 F.2d 293 (2d Cir. 1992) .......... 66, 68

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Wray v. City of N.Y.*,
490 F.3d 189 (2d Cir. 2007) ........................................................ 55

*Ying Jing Gan v. City of N.Y.*,
996 F.2d 522 (2d Cir. 1993) ........................................................ 65

*Zahrey v. Coffey*,
221 F.3d 342 (2d Cir. 2000) ........................................................ 44

**Statutes**

N.Y. Crim. Proc. Law § 440.10 ........................................................ 31

N.Y. Crim. Proc. Law § 620.10 ........................................................ 20

N.Y. Crim. Proc. Law § 620.30 ........................................................ 20

N.Y. Crim. Proc. Law § 620.40 ........................................................ 20

N.Y. Crim. Proc. Law § 620.50 ........................................................ 20

N.Y. Crim. Proc. Law § 710.30 ........................................................ 14

Penal Law § 125.25 ........................................................ 16, 30

Penal Law § 265.01 ........................................................ 16, 30

## PRELIMINARY STATEMENT

In 1995, a criminal jury convicted Kareem Bellamy for a Queens street stabbing under New York's depraved indifference murder statute. More than a decade later, a state court vacated his conviction, not for any constitutional violation, but based on another man's tape-recorded "confession," newly obtained by defense lawyers. Though the tape was revealed as a fraud—this is not disputed—the conviction's vacatur stood. Sharp changes in New York's "depraved indifference" precedent effectively precluded re-prosecution.

Bellamy then brought this § 1983 action against the City and two police detectives, alleging constitutional wrongdoing. After reviewing the voluminous record, the United States District Court for the Eastern District of New York (Donnelly, J.) correctly granted defendants summary judgment. Bellamy's claims rest on speculation and distortion: for instance, while his brief describes a "Chinese Wall" in the DA's Office preventing trial prosecutors from learning about assistance given witnesses by the office's witness protection program, the record shows that the trial prosecutor here was walled off from *arranging* such

assistance—to curb any appearance of impropriety—but not from learning about the financial aspects of it.

Bellamy's other claims display similar problems. They mostly confirm that facts don't often reveal themselves in tidy packages in criminal investigations—some inconsistencies, memory lapses, and dead ends are common. But neither precedent nor policy supports equating those things with constitutional violations compensable under § 1983. This Court should affirm.

## ISSUES PRESENTED FOR REVIEW

I. Did the district court correctly grant summary judgment to the individual defendants where Bellamy's fabrication-of-evidence and *Brady* violation claims depend on conjecture and mischaracterizations of the record and, thus, fail to raise a fact issue requiring trial?

II. Did the district court properly dismiss Bellamy's *Monell* claims as a matter of law where he cannot establish a constitutional violation resulting from the trial prosecutor's disclosure of relocation assistance to a witness in his office's witness protection program or summation remarks and, in any event, the City cannot control or be liable for a DA's training and supervision as to prosecutorial functions?

## STATEMENT OF THE CASE

### A. The 101st precinct's investigation into James Abbott's brutal murder

#### 1. Detectives' initial steps leading them to Andrew Carter and C-Town supermarket

Shortly before 10:00 a.m. on Saturday, April 9, 1994, a police officer came across James Abbott, Jr. lying in a pool of blood at the intersection of Beach Channel Drive and Beach 48th Street in Far Rockaway, Queens (A229, A1988 ¶18, A2223-24; *see also* A315-17, A2222). The stabbing weapon was never found.

Detective Michael Solomeno led the investigation with assistance from several others, including Detective John Gillen (A1989 ¶22; Criminal Trial Transcript (ECF Nos. 188-1 & 189-1) ("TT") at 479-80, 790-91). Solomeno, Gillen, and other detectives responded to the scene and began searching the area for witnesses (A2223-24; TT479-81, 526).

This led them to Andrew Carter, who told Detective Darren Lane later that day that he had witnessed Abbott's murder while awaiting a bus (A234; TT479-82, 816). Carter described seeing three men walking from the nearby C-Town supermarket toward the corner of Beach Channel Drive and Beach 48th Street, the victim stopping to use a

payphone, the other two men start punching and kicking him, and then one stabbing him before both fled (A234). Gillen that day visited the C-Town supermarket a block from the crime scene to seek further witnesses (A1754, A3385-87; TT579-80).

### 2. The "Anna Simmons" call

Six days after Abbott's murder, Gillen received a telephone call from an "Anna Simmons," who reported overhearing two male acquaintances "bragging about the stabbing" (A259-60, A1729-30; TT482, 542, 544 791-92; *see also* A276). She identified the men as Rodney Harris and "Ishmel," gave addresses for them, and said they were in the "Regulators" gang (A259; TT545-47). She promised to visit the precinct after work but never showed (A260, A264).

The next day, Solomeno and Gillen re-interviewed Carter, who amplified his prior account, adding that the assailant who stabbed Abbott was smaller than the other assailant, all three men had walked through the supermarket's parking lot toward an old chicken store, and the two assailants had kicked Abbott into the street after he was stabbed (A235-36; TT557-58, 816, 1023-24).

The detectives showed Carter two photo arrays: (1) one included a picture of Levon Melvin, aka "Ishmel," a name given by the female caller (A265, A3395-96; TT804-05); (2) the other included a photo of Rodney Harris, the second man the caller had identified (A1145-47; TT482-89, 542, 544, 547-50, 553, 555, 791-92, 804-05). Carter identified no one in either array (A236, A269, A278-80, A3392-95; TT482-89, 792-93; *see also* A1613, A3382-84).

Three days later, Gillen and Solomeno looked for "Anna Simmons" at the residential and work addresses she had given (A266, A276). A man at the work address said no "Anna Simmons" worked there (A276). A woman at the residential address who refused to give her name likewise denied that any "Anna Simmons" ever lived there (A266-68, A276, A282, A284; TT489-91, 604-06; *see also* A1613, A3382-84). Gillen never could locate "Anna Simmons" (A264; TT489-91).

### 3. Interview with C-Town cashier Linda Sanchez

A few days later, Solomeno received a message that a Linda Sanchez had called regarding their investigation (TT793-95). When Gillen and Solomeno interviewed her, Sanchez described seeing Abbott come into the C-Town, where she worked, on the morning of the murder

(A237). She also described two other men from the area—one 5’5” or 5’6” with short braided hair, and the other taller—who picked up beer and stood in the same cashier’s line as Abbott (A237-238). They left the store before Abbott did, walking across the parking lot until reaching the middle of it, when they had turned and looked back inside the supermarket (A237). Next, they continued walking toward the chicken store, where they stopped (A237). When Abbott left the supermarket, he had also walked across the parking lot toward the chicken store, where the other two men were still standing (A237). Sanchez was outside collecting shopping carts from the parking lot during part of these observations (A237).

Solomeno showed Sanchez separate photo arrays that included Melvin and Harris (A280-81, A3391, A3396-97; *see also* A238; TT548-49, 551-53). Like Carter, she picked out no one (A280-81, A3396-97; *see* A238, A1613, A3382-84; TT482-89).

#### 4. Sanchez’s call prompting detectives to pick up Bellamy and his statements en route to the precinct

Three weeks after Sanchez’s interview, she called the detectives to report that one of the people she had described was then at a specified

location (A289; TT491-94). She described the individual's attire and, in a second call, added that he'd been drinking a 40-ounce beer (A289). Gillen, Lane, and Detective Jacob Jenkins responded to the location and directed the individual matching her description—Kareem Bellamy—into their police vehicle (A243-45, A262, A1348-51; *see also* A289, A774; TT491-94).

Bellamy admittedly was "intoxicated" following "a couple of hours" drinking beers with friends (A241-42, A248, A1362). After entering the detectives' vehicle, he asked why they had picked him up (A243-46, A1350-52). Gillen said it was for drinking beer in public (A262; *see also* A246, A1352; TT494, 529-30, 599-600, 626-27). Neither Gillen nor any other detective in his presence mentioned Abbott's murder (A1362; *see* A262; *see also* A246, A1352; TT494-95, 599-600).

Gillen testified at a pretrial suppression hearing and again at the criminal trial that he asked for Bellamy's name and address while they were in the backseat en route to the precinct (A2391, A2413; TT494-99, 529-30, 599-600). *See also* Bellamy Dep. (ECF No. 209-1) at 136-38. Bellamy thereafter volunteered, "This must be a case of mistaken identity—someone probably accused me of murdering someone" (A290,

A2391, A2412; *see also* A263; TT494-95, 529). He later added, "Why would someone accuse me of something I didn't do?" (A290, A2413).

Gillen recorded the first statement in his notebook right away while in the backseat (A290, A2413; *see also* A2410-11). He recorded the second statement on the same notebook page after reaching the precinct (A290, A2413; *see also* A2410-11). At some point thereafter—Gillen is unsure when—he added on the same page, "Statement made by def while being asked his pedigree – spontaneous & unsolicited" (A1707; TT535-40).

Gillen did not transcribe these notebook entries onto a DD5 (*see* A2410-11). He later described this as "basically an oversight," noting that he knew he'd recorded the statements in his notebook (A2410-11; TT527-28). He also testified at Bellamy's criminal trial that there were no strict rules about reducing every aspect of an investigation to a DD5 (TT527-28).[1] He added that he'd informed an ADA of the statements the night Bellamy made them (TT539-40).

---

[1] Bellamy's brief (at 11, 38) overstates Solomeno's testimony: he said he would reduce a suspect's statements to a DD5 (A3389-90), but never described this as "police practice" across the board. Indeed, Solomeno acknowledged that detectives take handwritten notes during an investigation that are turned directly over to the

*(cont'd on next page)*

Lane and Jenkins were in the vehicle's front seat (TT491-96; *see* A289). Bellamy's counsel called each to testify at his criminal trial but asked neither about the statements (A945-47, A949-52). Nor did counsel ask Lane about them when calling him to testify years later at a 440 hearing (A1150-61, A1162-71).

In this civil litigation, Bellamy denies having made the statement about mistaken identity regarding an accusation of murder (A1359-61, A3228-29). He cannot remember whether he made the second statement, asking why someone would accuse him of something he didn't do (A1361-62).

### 5. Bellamy's additional statements at the precinct

According to Gillen's testimony throughout criminal proceedings, after they reached the precinct, he read Bellamy his Miranda warnings (A2391-95; TT496, 531-32, 608). Bellamy didn't want to speak and refused to answer questions (A2394-95; TT531-32, 559-62, 608).

---

DA's Office and not always transcribed onto DD5s (A3389). And he confirmed that if a suspect made a statement while they were together in a police car, he would record it in his notebook, just as Gillen did (*see, e.g.*, A290). *See* Solomeno Dep. (ECF No. 207-1) at 29-30.

At some point, detectives told Bellamy that he was at the precinct for a lineup related to Abbott's murder (*see* A779). While Gillen was doing paperwork, Bellamy volunteered several further statements (A778-79, A2397; TT496-502, 531-32, 559-62). Bellamy said he'd awakened that morning at about 10:00 (after the time of the murder); he and his friend "Terrill" had walked from C-Town toward Beach Channel Drive and seen Abbott's body in the street covered with a blanket; and he had known Abbott and his family for years (A778, A2396-97; TT496-502, 531-32). Gillen recorded the statements in his notebook as they were made, without transferring them to a DD5 (A2397-98; *see* A778-79; TT532-34). Bellamy now admits making essentially these statements after being Mirandized (A240, A1355-58).

### 6. The lineups where Carter and Sanchez each identified Bellamy

The day after Bellamy was picked up, Gillen conducted two lineups at the precinct—one with Sanchez and another with Carter (A293-96, A270, A336-37, A658, A2398-2401, A2404; *see* A290-91; TT504-05, 949). Bellamy's hair was in short braids that day, with a few sticking out (A255). Because detectives couldn't find any "fillers" with

similar braids and didn't want Bellamy to stand out, Gillen had Bellamy push back his braids before the lineups (A225, A2417-18; *see* A1092-93; TT510, 960-62).

Gillen was in the viewing room with the witnesses, along with ADA Stephen Antignani and a sergeant from another precinct, who were there to supervise and ensure fairness (A336-37, A658-59, A661-62, A2421-23, A2425-26; *see also* A294-95; TT947-48). The lineups were identical in composition and arrangement, with Bellamy in seat number one (A270-71, A336-37, A658-59, A1364, A2400, A2404; TT504-05). As each witness viewed the lineup, Gillen asked three questions:

1) Do you recognize anyone?

2) Whom do you recognize?

3) From where do you recognize that person?

(A271; *see* A294, A296; TT562-64).

Sanchez recognized the person in seat number one (A294, A2402-03; *see also* A293). Gillen recorded that she recognized that individual from C-Town and said "he was with the guy who got stabbed on that Saturday" and was the person she'd "called up on" the day before (*id.*).

Carter recognized either number one or number two as the stabber (A272, A296, A2404-06, A2426-27; *see also* A295, A1174-76, A1326-29; TT596-97, 627-30, 966-67). The lineup participants stood and, one at a time, stepped nearer to the one-way mirror, to give Carter a closer look (A272, A2406; TT967-69). After looking again, he stated that he thought it was number one, but was still also looking at number two, who was pretty close (A2406, A2415-16; *see also* A272; TT596-97, 627-30). Gillen prepared a lineup form, which Carter signed, indicating that Carter recognized "either 1 or 2," but was "not sure" (A296).

After the lineup, Carter was moved into another room (A2415, A2418; *see also* A272, A1092). As Gillen entered, Carter said he was 99 percent sure it was number one, but the hair was throwing him off (A2415, A2418-19; *see* A272, A295, A2406, A2417; *see also* A2201; TT509-10, 610-13). Gillen memorialized this in a DD5 (*see* A295).

A few minutes after the lineup, ADA Antignani entered the other room and spoke to Carter outside of Gillen's presence (A299, A664, A1176-77, A2424, A2428-34, A3464-66; TT949-51, 962-65, 971-72). Carter told Antignani that he knew number one was the stabber, adding that his hair had been different on the day of the crime (A662-

64, A2423-24, A2429, A2432; *see* A3467; TT971-72). Antignani memorialized this in a file memorandum a few weeks later (*see* A304).

Antignani spoke to Carter again after the lineup but before the grand jury presentment (A299-300; *see* A2424; TT971-72). Carter repeated that he had recognized either number one or number two while in the lineup room because those individuals looked alike to him, but that it was definitely number one, and that number one had a different hairstyle on the day of the murder (A2424; TT971-72). During these conversations between just the two of them, Carter never told Antignani that Gillen had suggested whom to identify (A299-301).

#### 7. ADA Antignani's interview with Terrill Lee, undermining Bellamy's alibi

A few hours after the lineups, Antignani recorded an interview with Terrill Lee at the precinct (*see* A307-12; *see also* A1337, A2204-05, A2839-51).[2] Antignani Dep. (ECF No. 209-1) at 139, 146-48. Bellamy had claimed he was with Lee on the day of the murder (A240, A778, A1356-57, A2396-97; TT496-502, 531-32; *see also* A2840).

---

[2] Contrary to Bellamy's representation (at 14), Gillen has no recollection of interviewing Terrill Lee (A2205).

Lee told Antignani that he had not left home until the afternoon on the day of the murder, denied going to C-Town with Bellamy that day to buy beer, and denied seeing Bellamy at all that day, except possibly on the street that night (A309-12; *see also* A2844).

### B. The grand jury's indictment of Bellamy for second-degree murder

The day after the lineups, Gillen signed a criminal court complaint charging Bellamy with second-degree murder (A1597-98). In a notice dated that same day, ADA Antignani informed Bellamy that the prosecution intended to offer against him certain statements that he had made to Gillen (A1610; *see* A305-06). *See also* N.Y. Crim. Proc. Law § 710.30(1)(a). Consistent with Gillen's notes, Antignani's notice summarized the substance of Bellamy's statements as indicating that he had seen the body of the deceased in the afternoon while with Terrill Lee, and that he had asked Gillen why someone would be accusing him of murder (A1610). In a more formal typewritten notice twelve days later, Antignani included that Bellamy had made a statement to the effect that this must be a case of mistaken identity—consistent, again, with Gillen's notebook entry. Antignani Dep. (ECF No. 209-1) at 119-20.

Five days after the lineups, Antignani presented the case to a grand jury (A313-42). He called four witnesses: (1) the police officer who had found Abbott's body in the street (*see* A315-19); (2) Sanchez (*see* A320-28); (3) Carter (*see* A329-34); and (4) Gillen (*see* A336-37).

Sanchez and Carter each gave testimony similar to what they had told detectives during earlier interviews (*compare* A320-27, *and* A330-33, *with* A237-28, *and* A243-36). Each also testified about having viewed a lineup several weeks after the murder. Sanchez testified that number one was the shorter man who had been in line behind Abbott at the supermarket shortly before his murder (A327-28). And Carter testified that number one was the stabber (A333-34).

Both also remarked that number one's hair was different at the lineup than on the day of the murder. Sanchez described it as not as loose at the lineup (A328). Carter testified that while the man's hair had been in "[k]inky, short braids" on the day of the murder, it had been "cut" between then and the lineup (A334).

Gillen appeared before the grand jury only briefly to describe conducting the lineups, noting that Bellamy was in seat number one for both (A336-38). The grand jury indicted him on two counts of second-

degree murder, N.Y. Penal Law § 125.25(1)-(2), and one count of fourth-degree criminal possession of a weapon, *id.* § 265.01(2) (A343-44).

### C. The pretrial suppression hearing

Bellamy moved to suppress his post-arrest statements and proposed in-court identification testimony (*see* A345, A2385-86). Supreme Court, Queens County (Fisher, J.), held a hearing on the motion (*see* A2385-86).

Gillen and Antignani testified. Gillen described his role in the investigation, including his efforts to verify the information from "Anna Simmons," his interviews with Carter and Sanchez, the Sanchez call that prompted detectives to pick up Bellamy, the circumstances surrounding Bellamy's statements in the detectives' vehicle and at the precinct, and the lineups (*see* A767-81, A1838-39, A2216-21, A2387-2422, A3205-09). Antignani focused on the lineups—particularly Carter's viewing of it and the conversation between the two of them in the other room afterwards (A782-83, A2423-2434).

Bellamy made a number of outbursts while Gillen was testifying (*see, e.g.*, A2390-92, A2397, A2400, A2403, A2414). For example, when Gillen described reading Bellamy his Miranda warnings, Bellamy

interjected, "He did not. He did not read me my rights" (A2392). But Bellamy then presented no evidence controverting that Gillen had Mirandized him. *See* Wade/Huntley Transcript (ECF No. 195-1) at 47-57. And, indeed, in this civil litigation, Bellamy admits that Gillen did so at the precinct (A1355-56).

In another outburst, Bellamy denied Gillen's testimony that he had made statements at the precinct to the effect that he had been in C-Town with his friend on the morning of the murder, that they had walked out to Beach Channel Drive and seen a covered body in the street, and that he had known Abbott (A2396-97). In this civil litigation, in contrast, Bellamy admits having made such statements to Gillen and others at the precinct (A1355-58).

And Bellamy also accused Gillen of lying on the stand at the hearing (A2402-03). Gillen testified that Sanchez had recognized Bellamy as "the guy who was with the victim in C-Town the day he got stabbed" and the guy she had "called up" about the day before the lineup (A2403). Bellamy interjected: "That's a lie. Why you asked me to move up to the two-way mirror?" (A2403).

Bellamy's counsel argued that the post-arrest statements should be suppressed because detectives lacked probable cause to arrest him. Wade/Huntley Transcript (ECF No. 195-1) at 57-59, 63-64, 71. And counsel contended that Carter's identification testimony should be suppressed because Antignani must have suggested the identification of the person in seat number one to Carter when the two of them had spoken alone in another room after the lineup (*id.* at 58-61).

Justice Fisher denied the suppression motion (A345-59). The court found both Gillen and Antignani credible (A348). The court held that police had probable cause when they arrested Bellamy following the call from Sanchez (A348, A353-55, A359). And his statements in the detectives' vehicle and later at the precinct were made spontaneously and, therefore, not suppressible (A355-56, A359). The court also rejected Bellamy's contentions about the lineup, finding "simply no evidence" that anyone had suggested that Carter should change his identification to the person in seat number one (A358-59).

### D. The criminal jury's conviction of Bellamy for second-degree murder

The criminal trial began in November 1995. The prosecution presented the identification testimony of Sanchez and Carter; the testimony of a third witness, Veronica Walker, who had come to light only recently; and Gillen and Solomeno's accounts of their investigative work, including Bellamy's statements in their presence.

#### 1. Gillen's testimony about Bellamy's outbursts

Gillen testified on the first and second days of trial. He described the statements that Bellamy made spontaneously in the detectives' vehicle—e.g., "This must be a case of mistaken identity—someone probably accused me of murdering someone" (TT494-95). Gillen also testified about Bellamy's spontaneous statements during the suppression hearing (TT615-26).

#### 2. Sanchez's disclosure to the DA's Office that Bellamy had threatened her twice, prompting relocation efforts to ensure her safety

Leading up to trial, Sanchez had not responded to repeated contact efforts by the DA's Office (*see* A1603-04; *see also* A1506, A1781-82). Accordingly, ADA David Guy applied for an order directing her to

appear for a hearing to determine whether she should be adjudged a material witness and required to post bail to secure her future attendance at trial (*see* A1601-04). *See* N.Y. Crim. Proc. Law § 620.30(1)-(2) (establishing requirements for commencing a proceeding to adjudge a person a material witness); *see also id.* §§ 620.40-.50.[3]

On the first day of trial, detectives from the DA's Office found Sanchez and told her that she had to go with them (A1505-08, A3049-50; *see* A1519, A3043). They took her to their office, where she spoke with them about "the whole situation, the whole case," and told them that Bellamy had threatened her at work about a week after Abbott's murder (A3049-50; *see* A1507-08, A1519-20, A3052; *see also* A1247, A1609, A3040-41, A3047-48). She had not previously disclosed the threat to Gillen or Solomeno (*see* A1245-47, A3051-52; TT748-50, 757,

[3] By citing Criminal Procedure Law § 620.70, Bellamy implies (at 15) that a court already had issued a material witness order adjudging Sanchez to be a material witness and fixing bail to secure her future appearance, and that she had failed to appear as required, prompting issuance of a warrant directing officers to "bring [her] to the court forthwith." *See* N.Y. Crim. Proc. Law § 620.10 (defining material witness order); *see also id.* § 620.30-.50 (outlining steps for issuing material witness order). But the record does not support that any of that happened. Instead, it shows that Guy took the first step of applying to commence a proceeding to adjudge Sanchez to be a material witness (A1601-04). The "order" and "warrant" that appear in the record with that application are not signed (*id.*). Presumably, after detectives found Sanchez, Guy no longer found it necessary to proceed with that application.

794-95). Although she may have told Antignani while preparing for the grand jury, he has no recollection of her doing so (TT758, 782, 970-71).

As a threatened witness, Sanchez was potentially eligible for the DA's witness protection program (A1484). When entering that program, witnesses generally were told that it was there to keep them safe regardless of whether they testified and regardless of the trial's outcome (A369; *see also* A1229-30, A2234). Indeed, the program's administrators had nothing to do with underlying trials (A369). And trial prosecutors generally were not involved in the process of providing witness protection, to avoid the situation where a witness might ask for a quid pro quo in exchange for testimony (A1229-30, A2234). Trial prosecutors were nevertheless informed about the financial aspects of providing witness protection (A1229-30, A2234-35).

After the DA's Office deemed Sanchez eligible for the witness protection program, they told her they would keep her safe and checked her into a hotel at their expense later that day (*see* A367-68, A1242-44, A3035-36, A3055; *see also* A1519-20, A1609, A3040, A3043-44). Until then, Sanchez had been living in a small rented room with her eight-month-old twins and their father (A1243, A1505, A3036-38, A3053-54).

She did not want to leave her home and had not asked for protection, relocation, or placement into the program (A1242-44, A3035-38, A3040-41, A3044, A3048-49; *see* A376). But the DA's Office determined that she should be in it (*see* A1242-43; *see also* A3049).

As ADA Guy disclosed to the court and defense counsel outside the jury's presence, relevant circumstances included that Bellamy had gone back into C-Town about a week after Abbott's murder and, "using some expletives," told Sanchez "in sum and substance that she should shut up" (TT520). In the middle of Guy's disclosure, Bellamy interjected, "I don't even know her" (*id.*).[4]

Sanchez also disclosed that several weeks after that threat, shortly before she had called detectives to report having seen Bellamy at a particular location, he had seen her and wagged his finger at her, which she perceived as another threat (TT522-23).

In a contemporaneous internal memorandum, Guy also observed that an accomplice to Abbott's murder still had not been identified or

[4] This contradicted an earlier outburst at the suppression hearing, where, when the court observed that Sanchez identified Bellamy without difficulty, he interjected: "I live around there, she see me come in the store all the time" (A357-58).

apprehended (A1609). That accomplice potentially could act on Bellamy's threats, jeopardizing Sanchez's and her children's safety (*id.*). The DA's Office accordingly had represented to her that it had the ability to move and protect her (*id.*).

Guy advised the court and defense counsel outside the jury's presence that his office had made efforts to relocate Sanchez and would be continuing those efforts going forward (TT520-21). He also disclosed that his office had given her "meal money" of $25 per day for several days, totaling approximately $100 (*id.*).

Before Sanchez took the stand later that day, she understood from her interactions with the DA's Office that she would continue staying at the hotel for the time-being; she would not have to pay for her room while there; she would receive $25 per day to cover her expenses for diapers, formula, and food; and she would need to find permanent housing on her own after the trial was over (A371-73, A1513-15, A1521, A3034-35; *see also* A374-75, A1238-39, A1509-10). She had been receiving public assistance benefits previously and understood that once she found permanent housing, the DA's Office would cover her first month's rent, security deposit, and fees (A3033-34, A3055; *see* A1609).

Until then, however, she knew that she could stay at the hotel or a safe house without paying rent and would continue receiving a per diem to assist with meals and her children's expenses (A371, A1510, A1513-15; *see also* A1238-39).

Sanchez had no perception that she was being promised money or benefits to induce her testimony (A3053; *see also* A1241, A1510). Indeed, Daniel Cox, formerly with the Queens County DA's Office, testified at deposition that when witnesses entered the protection program, the situation was fluid, and he would make them no specific promises (A1402-06).

#### 3. Sanchez's testimony about her observations of Bellamy and Abbott on the day of the murder, and Bellamy's ensuing threats

When Sanchez took the stand, ADA Guy elicited testimony from her that she was not married, had eight-month-old twins, and was not working, but rather supported herself on public assistance (TT633, 635). She disclosed receiving $50 from the DA's Office before testifying, that she expected to receive $50 more, and that she was receiving $25 per day to purchase food and children's diapers (TT633-34). Moreover,

she was staying overnight somewhere other than her home, and a detective had both taken her there and brought her to court (TT634-35).

Sanchez reiterated much of what she had told Gillen and Solomeno and the grand jury about her observations of Bellamy and Abbott inside and outside of C-Town on the morning of the murder (TT636-53). She testified that she had not spoken to police that morning and did not find out what had happened to Abbott until after the police had left the store (TT652-53, 744-46, 763, 784-85).

Although Bellamy previously had been a frequent customer, Sanchez did not see him again until about a week later, when he approached her register and said, "You know, you know, you fucking bitch. You're next" (TT705-06, 747). That prompted her to call the precinct either that day or the next and leave a message for Solomeno (TT707-08, 741-48). She then told him about what she had seen on the morning of the murder, but not about the threat (TT715, 749-51).

Several days after Sanchez testified, Detective Cox requested approval for expenditures totaling approximately $2800 to assist with her relocation, meant to eventually cover her first month's rent, first month's security, and a broker's fees, and to help with furniture (*see*

A1385-86, A1628, A2952, A2962). The DA's Office did not pay those funds to vendors until after Sanchez had found permanent housing (A2960-63; *see* A2952). Partly due to complications in the administration of her public assistance benefits, she did not move into permanent housing until about a year after the trial had ended (*see* A2957-58, A2962-65). Ultimately, she found permanent housing on her own through a Section 8 program (A375-76, A1241, A1244, A1512, A3040, A3044). She did not know when testifying at trial that she eventually would obtain such housing (A374; *see also* A1241).

#### 4. Carter's in-court identification of Bellamy as Abbott's murderer

When asked about the lineup at trial, Carter gave inconsistent answers. First, he testified that he had told detectives in the lineup room that he recognized "either one or two, because they got their hair different" (TT878-80, 902). Then, after he had gone to another room, he had told either an ADA or a detective again that "it was either one or two because he had his hair different" (TT881-84). He maintained that he then had picked out "two" (TT882-84, 895-97, 903). But he also remembered having told Gillen that he was 99 percent sure that it was

number one (TT884, 904). In addition, he testified that Bellamy had braids at the lineup but not on the day of the murder, contradicting his grand jury testimony (TT894-97).

Nevertheless, Carter made an in-court identification of Bellamy as the stabber, prompting several exclamations from Bellamy in front of the jury (TT869-71). Carter testified that Bellamy and the other men had walked right past him within a few feet (TT868, 871, 873-74). He got a good look at their faces and had "no doubt" that Bellamy was the stabber (TT872).

### 5. Veronica Walker's testimony

During the trial, ADA Guy informed the court and defense counsel that he'd learned from Abbott's sister that a woman named Veronica Walker had information about the murder (*see* A275, A286; TT797-99). Bellamy knew Walker, who'd lived next door to the mother of one of his children (A251-52). Solomeno and Gillen interviewed her while the trial was underway (*see* A285-86; *see also* A433-34).

Per Solomeno's DD5, Walker drove to C-Town on the morning of the murder, entering the store as Abbott was leaving (A433). After they exchanged greetings, Abbott walked away through the parking lot (*id.*).

Minutes later, Walker left the store and exited the parking lot onto Beach Channel Drive, where she saw Abbott hang up the corner payphone, and then a black man approach and start fighting him (*id.*). Walker looked back after driving past, now seeing Bellamy join in kicking and punching Abbott (*id.*). She didn't stop and made no connection after hearing about a killing in the area (*id.*). She hadn't told anyone about it until she met Abbott's sister several months later (*id.*).

Before Walker testified, ADA Guy disclosed to the court and defense counsel outside the jury's presence that during detectives' recent interview with her, Gillen had reached into his pocket and started to bring out a photograph (TT975-76). At a hearing held at defense counsel's request (TT989-90), Walker testified that Gillen had started to remove a photograph from his jacket pocket but never fully removed it, and that she didn't see its front or make out any details (TT981-83; *see* TT989-90). He asked if she would know the person, but then he put the photograph away without showing it to her (TT982-83, 989-90). The court found no attempt at improper suggestion (TT992).

Walker testified to the jury about having seen Abbott, whom she knew from the area, coming out of C-Town on the morning of his

murder (TT996-98). When she had driven out of the parking lot to the corner minutes later, she had seen him fighting with a black man on the right-hand side of the street near a phone booth (TT998-1000).

As she turned right onto Beach Channel Drive, she saw another man come from the other side of the street, run behind her car, and join the fight (TT1001-02). She described that other man as 5’6” and slim, his hair in braids (TT1003). She claimed that she had not recognized that person, seen him before, or known his name (TT1002-03). When asked if she recognized anyone in the courtroom from the incident, she responded that she could not say (TT1003).

Walker recalled having spoken to Gillen and Solomeno the week before and mentioning the name “Kareem” (TT1003-04). When asked if she had told them that the person she had seen looked like “Kareem,” she responded, “I said it could have been him. It could have” (TT1005).[5]

---

[5] Bellamy relies extensively (at 20-22) on testimony that Walker gave at subsequent proceedings and civil deposition. Solomeno denies that he or Gillen showed her photographs of Bellamy during their interview (A2180-82); told her they would relocate her if she were afraid to testify (A2183-84); or threatened her with perjury charges (*id.*). Solomeno maintains that Walker told detectives she had seen Bellamy fighting with Abbott, but refused to sign a written statement (A2184-85; *see* A2128-30).

### 6. Bellamy's perfectly timed alibi

Bellamy called his stepfather as an alibi witness. The stepfather testified that Bellamy did not leave home until about 30 minutes after police had discovered Abbott's body and returned home with his friend "Terrill" in less than an hour (TT1028-29, 1031-33, 1037).

### 7. Bellamy's convictions, upheld on direct and habeas review

After the parties' summations, the court charged the jury comprehensively and reminded them that they were sole judges of the facts (TT1153-1202). During deliberations, the jury requested testimony readings and examined evidence and, after reporting deadlock on the second day, received an *Allen* charge (TT1208-29). On the third day, the jury acquitted Bellamy of intentional murder, *see* N.Y. Penal Law § 125.25(1), but found him guilty of depraved indifference murder, *see id.* § 125.25(2), and the weapons possession charge, *see id.* § 265.01(2) (A536; TT1229). He was sentenced to 25 years to life (A1811-24).

The Appellate Division affirmed Bellamy's conviction on direct appeal, *People v. Bellamy*, 247 A.D.2d 399 (2d Dep't), *lv. denied*, 91 N.Y.2d 970 (1998). A federal district court denied his habeas petition

(A601-17), and this Court dismissed his appeal, *Bellamy v. Portuondo*, No. 1:99-cv-01832-CPS (E.D.N.Y. Nov. 16, 2000), ECF No. 23.

### E. The vacatur of Bellamy's convictions based on dubious "newly discovered" evidence

More than ten years after the verdict, Bellamy moved to vacate his conviction on numerous grounds under New York Criminal Procedure Law § 440.10. After an evidentiary hearing spanning more than a year and featuring dozens of witnesses, Queens County Supreme Court (Blumenfeld, J.) granted his motion and ordered a new trial on the basis of alleged newly discovered evidence. *People v. Bellamy*, No. 2194/94, 2008 N.Y. Misc. LEXIS 4672, at *16-42 (Sup. Ct. Queens Cnty. June 27, 2008), *appeal dismissed*, 84 A.D.3d 1260 (2d Dep't 2011).

Key to the court's analysis was the testimony of Michael Green, who claimed to have heard Levon "Ishmel" Melvin—whom the elusive "Anna Simmons" had mentioned during the original investigation—confess to Abbott's murder (A671-72). *See Bellamy*, 2008 N.Y. Misc. LEXIS 4672, at *16-42. Green testified that he had known Melvin for many years (A2866-67, A2893-94, A2911-15). And Green claimed that sometime in the fall of 2007, after Bellamy's 440 hearing was

underway, Melvin had told Green that he was angry with Rodney Harris—the other person mentioned by "Anna Simmons"—for talking to detectives about a murder 14 years earlier when Melvin had stabbed an unnamed man numerous times (A2868-69, A2873-74, A2894-95, A2898-2903, A2909-10). Green testified that he learned the victim's name only after speaking with Bellamy's investigators (A2903-04).

With aid from Bellamy's counsel, Thomas Hoffman, Green purportedly was able to record similar statements from Melvin (A2881-82, A2884-85). Hoffman entered that recording into evidence at the 440 hearing (A2885-87). Green acknowledged that Hoffman had made several payments to him, including $1500 for Green's wife to leave the area because she purportedly feared for her safety, $500 toward a phone bill, and "$50.00 []here, $50.00 there," and also promised him "reward money" (A2891-92, A2917-21, A2923-27).

After the court vacated Bellamy's conviction and granted a new trial, the Queens County DA's Office learned that Green's recording was a fake and moved to reopen the hearing. *See People v. Bellamy*, No. 2194/94, 2010 N.Y. Misc. LEXIS 47, at *1-8 (Sup. Ct. Queens Cnty. Jan. 14, 2010), *aff'd*, 84 A.D.3d 1260 (2d Dep't 2011). At the reopened

hearing, Green conceded the recording did not contain Melvin's voice but rather that of a guy named "Johnny" whom Green had paid for his help (A3115-19, A3127-28). Green admittedly never heard Melvin confess to involvement in Abbott's murder (A3113-15, A3119-22). But Green had given Melvin's name to investigators initially out of anger because Melvin had fired him from a job (A3120-22).

Green learned the details of Abbott's murder from Hoffman, who had convinced Green of Bellamy's innocence (A3118, A3122-25, A3191). Then Hoffman gave Green a recording device and asked him to try to get Melvin on tape (A3118-19, A3124-25). After Green learned that Melvin's attorney knew about the fake recording in August 2008, Green told Hoffman that it did not contain Melvin's voice (A3129-31). According to Green, Hoffman then told him to "get out of town" and promised him $500 per week for the next six months (A3131). Green admittedly already had received more money from Hoffman than disclosed previously—totaling about $6000 in cash (A3125-27).

The "Johnny" on Green's recording—Jonathan Tatum—testified at the reopened hearing that Green had paid him $15 to talk about a stabbing and told him what to say on the tape (A3075-76, A3080-83).

Melvin also took the stand and denied any involvement in or speaking with Green about Abbott's murder (A3085, A3097).

Nevertheless, the court ultimately adhered to its order of vacatur and grant of a new trial. *Bellamy*, 2010 N.Y. Misc. LEXIS 47, at *34-39. The court held that while the recording was fraudulent, Green's original testimony about Melvin's initial confession to him was sufficiently credible, given other evidence, to warrant a new trial. *Id.* at *18-38.

After the Appellate Division affirmed, *People v. Bellamy*, 84 A.D.3d 1260 (2d Dep't), *lv. denied*, 17 N.Y.3d 813 (2011), the DA's Office dismissed the indictment against Bellamy (*see* A692-709). A sea change in the law defining depraved indifference murder in the years after his conviction meant the case was no longer prosecutable in good faith (A697-99, A707-08). *See, e.g.*, *People v. Payne*, 3 N.Y.3d 266 (2004). The ADA made clear that his office did not view this as a case of "actual innocence" but believed Bellamy and his team had perpetrated "an outright fraud" against the court (A695-98).

During the 440 proceedings, Carter, Sanchez, and Walker each testified. The record disclosed that when Bellamy's investigators initially approached Carter in 2005, he remembered the stabbing well

and expressed no doubt about Bellamy's role (A665-68, A2862). But after Carter had negotiated an hourly rate of $90 for his "time" (A2745-58, A2857-61), he recanted his earlier grand jury and trial testimony and accused Gillen of having coerced his lineup identification (*see, e.g.*, A637-38, A641-46, A2732-33). The 440 court did not credit Carter's recantation testimony or his claims of Gillen's improper conduct. *See Bellamy*, 2008 N.Y. Misc. LEXIS 4672, at *35-36, *42. Walker made similar accusations against Gillen (*see, e.g.*, A1061-66), but the court did not credit her testimony either. *Bellamy*, 2008 N.Y. Misc. LEXIS 4672, at *42.

Having heard Sanchez testify that the incident occurred on a Sunday, not Saturday (A1095-96, A1100-01), and that she had identified Terrill Lee as the second perpetrator (A2785-87, A2789), the court concluded that both recollections were "probably due to a faulty memory." *Bellamy*, 2008 N.Y. Misc. LEXIS 4672, at *37-38. And the court found no *Brady* violation in connection with her receipt of Section 8 housing. *Id.* at *22-23.

### F. This civil litigation, and the grant of summary judgment to defendants

Bellamy, with Hoffman's representation, thereafter filed this § 1983 lawsuit against Gillen, Solomeno, the City, and others, alleging denial of the right to a fair trial and municipal liability, among other claims (*see* A26-152). After four years of litigation, the parties cross-moved for summary judgment (A171-72, A754-55). The district court thoroughly reviewed the voluminous record, which includes thousands of pages of trial and deposition transcripts, and granted summary judgment to defendants on each claim in a comprehensive, 80-page decision. *Bellamy v. City of N.Y.*, No. 12 Civ. 1025 (AMD) (PK), 2017 U.S. Dist. LEXIS 75306 (E.D.N.Y. May 17, 2017).

The court concluded that Bellamy had failed to identify genuine disputes of material fact on his fair trial claims. *Id.* at *94-101. First, as to the claim that Gillen improperly influenced Carter to falsely identify Bellamy, the court held that Carter's 440 testimony was inadmissible because he had died and no recognized exception to the hearsay rule applied. *Id.* at *87-91. Without Carter's testimony, Bellamy had no proof of Gillen's alleged wrongdoing. *Id.* at *95.

Second, the court also found no fact issue on the claim that Gillen fabricated an incriminating statement by Bellamy in the detectives' vehicle—i.e., "This must be a case of mistaken identity—someone probably accused me of murdering someone." *Id.* at *95-97. Citing *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the court emphasized that Bellamy lacked any direct evidence to substantiate his claim other than his own denials, despite opportunities to explore the matter over years of criminal proceedings. *Bellamy*, 2017 U.S. Dist. LEXIS 75306, at *96-97.

Third, as to the claim that Gillen and Solomeno fabricated records of their interview with Walker to reflect that she had identified Bellamy, the court held that he could not establish a constitutional violation because Walker had not identified him at trial. *Id.* at *97. Because the allegedly fabricated evidence had not reached the jury, it caused no deprivation of liberty, as necessary for such a claim. *Id.*

Fourth, as to the claim that Gillen and Solomeno withheld evidence that Sanchez had seen Bellamy on a Sunday rather than Saturday, that she initially had told Gillen that she "didn't see anything" on the day of the murder, and that she had identified Terrill

Lee as the person in line with Bellamy at C-Town that morning, Bellamy had not shown how the information was material, or that the detectives had suppressed it intentionally. *Id.* at *99-101. Moreover, a close reading of the record shows that Sanchez observed Bellamy and Abbott on the morning of the murder, and said that she "didn't see anything" before learning what had happened to Abbott. *Id.*

As for Bellamy's *Monell* claims, the court granted the City's motion for judgment on the pleadings on grounds that it cannot be liable for the DA's alleged policies and practices that concern trial advocacy and prosecutorial duties. *Id.* at *105-08. And even if the City were a proper defendant, Bellamy had not shown the existence of a triable question whether he suffered a constitutional injury. *Id.* at *108-13. Indeed, the prosecutor had disclosed that his office was relocating Sanchez, such that Bellamy could show no *Brady* violation regarding the assistance she received. *Id.* at *108-11. Likewise, ADA Guy's summation remarks were not improper and not likely to have influenced the jury's decision, and so did not deprive him of a fair trial. *Id.* at *108, *111-13.

## SUMMARY OF ARGUMENT

The district court correctly determined that no genuine disputes of material fact preclude summary judgment to Gillen and Solomeno on Bellamy's fabrication-of-evidence and *Brady* violation claims. Even after taking a trial-and-error approach in efforts to expose alleged corruption and improper motives over the past 20-plus years, Bellamy still has no credible evidence showing that Gillen or Solomeno engaged in wrongdoing that deprived him of a fair trial. In particular, he cannot show that Gillen coerced Carter into a lineup identification; that the detectives' allegedly falsified records summarizing their mid-trial interview with Walker had any impact whatsoever on the jury's verdict; that Gillen deliberately fabricated an incriminating statement; or that either detective intentionally suppressed Sanchez's statements, which, in any event, likely would not have affected the trial's outcome.

Nor do Bellamy's *Monell* claims warrant further litigation—indeed, they fail as a matter of law for two independent reasons. First, Bellamy cannot show that he suffered an underlying constitutional violation because ADA Guy disclosed rather than suppressed information regarding Sanchez's receipt of assistance from his office

after entering its witness protection program, and he caused no substantial prejudice in delivering his summation. Second, and in any event, the City cannot control or be held liable under *Monell* for a DA's policies concerning prosecutorial functions, including as to ADAs' training and supervision regarding the conduct of criminal proceedings.

## ARGUMENT

## POINT I

### THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE INDIVIDUAL DEFENDANTS

It is familiar law that when assessing a record for genuine disputes of fact at summary judgment, a court must resolve ambiguities and draw inferences in the non-movant's favor. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) (per curiam). But it is equally true that the non-movant may not avoid summary judgment merely based on "conclusory allegations or denials" or "speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation omitted).

Despite years of criminal proceedings followed by extensive civil discovery, Bellamy still can muster only speculation and gross distortion of the record to justify his ever-shifting theories about

supposed police misconduct during the investigation. The district court thus properly granted summary judgment to defendants.

### A. Bellamy has made no competent showing that detectives violated his fair trial rights by fabricating evidence.

To succeed on his fabrication-of-evidence claims, Bellamy must show that officers knowingly created false evidence that was likely to influence the jury and forwarded it to prosecutors, causing a deprivation of liberty. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279-80 (2d Cir. 2016); *see also Dufort v. City of N.Y.*¸ No. 16-1715-cv, 2017 U.S. App. LEXIS 21322, at *35-37 (2d Cir. 2017). The district court correctly determined that Bellamy's fair trial theories should not proceed to trial.

#### 1. There is no admissible evidence that Gillen improperly influenced Carter's lineup identification.

Bellamy cites no evidence whatsoever—direct, circumstantial, or otherwise—to suggest that Gillen "coerced" Carter into identifying

number one at the lineup as the stabber (*see* App. Br. 41).[6] Instead, Bellamy can only speculate as to what he thinks Gillen "likely" said to Carter, even though Bellamy was not there, and even though Gillen consistently has testified otherwise. Bellamy's speculation cannot defeat summary judgment. *See Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (fair trial claim properly rejected where plaintiff proffered only speculation that detective improperly influenced victim's identification); *see also, e.g.*, *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001).

Gillen testified at Bellamy's pretrial suppression hearing and again at civil deposition that after Carter had viewed the lineup and been moved into another room at the precinct, he told Gillen that he was 99 percent sure that it was number one, but the hair was throwing him off (*see* A272, A2201, A2406, A2415, A2418-19; *see also* TT509-10, 610-13). Carter then had a similar exchange with ADA Antignani outside of Gillen's presence (*see* A662-64, A2423-24, A2429, A2432;

---

[6] Bellamy rightly does not challenge the district court's ruling that Carter's testimony at the 440 hearing is inadmissible hearsay given that Gillen and Solomeno had no opportunity to cross-examine him then, and he has since passed away (App. Br. 24 n.10). *See Bellamy*, 2017 U.S. Dist. LEXIS 75306, at *87-91.

TT971-72). That Carter had not mentioned the assailants' hair to detectives previously does not impugn the credibility of Gillen's and Antignani's consistent testimony about what Carter told each of them independently (*see* App. Br. 41). And that is particularly so given undisputed evidence that Bellamy had pushed back his braids before the lineup (A255, A2417-18; TT510, 960-62). Indeed, Sanchez also commented on his changed hairstyle (*see* A328).

Nor could Walker's testimony about a separate conversation that she purportedly had with Gillen support any reasonable inference about what had taken place privately between Gillen and Carter more than 18 months earlier (*see* App. Br. 41). Again, such speculation and conjecture will not suffice. *See Hicks*, 593 F.3d at 166.

The claim is only further undermined where Bellamy previously argued that it was Antignani—not Gillen—who had improperly influenced Carter's identification. Wade/Huntley Transcript (ECF No. 195-1) at 58-61. This claim has been a moving target all along—and all along unfounded.

### 2. Bellamy's fair trial claim regarding Walker rests on evidence that was never admitted at trial.

Bellamy's claim that Gillen and Solomeno falsified records summarizing their mid-trial interview with Walker fails as a matter of law because those records did not reach the jury, and Walker did not identify Bellamy at trial. Insofar as Bellamy claims that detectives tried to manipulate the evidentiary record by feeding the prosecutor false information about what Walker told them, their alleged attempt at manipulation failed, and its potential impact on the trial was fully mitigated by what was actually disclosed to jurors. *See Dufort*, 2017 U.S. App. LEXIS 21322, at *35-37 ("[m]ere attempts" to falsify evidence cannot violate due process where they fail to impact the criminal trial); *see also Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) ("The manufacture of false evidence, in and of itself … does not impair anyone's liberty …." (internal quotation omitted)).

This Court's recent analysis in *Dufort*, 2017 U.S. App. LEXIS 21322, at *35-37, controls. The civil plaintiff there argued that police officers had unfairly distorted the evidentiary record at his criminal trial by failing to disclose the suggestive nature of a lineup shown the

sole identification witness, who had been unable to identify him other than by the color of his clothes. *Id.* at *5-10, *35. At the civil plaintiff's criminal trial, however, that witness could not identify him in the courtroom, and then admitted to only having recognized him previously by the color of his clothing. *Id.* at *12. Because the evidence that officers purportedly had withheld or misrepresented came to light at trial, the trial proceeded on an accurate record, and the plaintiff was not denied a fair trial. *Id.* at *35-37.

Likewise, here, jurors heard directly from Walker that she could not identify Bellamy as a participant in the incident that she had seen. And they also heard from her that she had told detectives, at most, that one of the attackers "could have been" Bellamy. To the extent detectives previously had recorded her account differently, that information never reached the jury, and the trial therefore proceeded fairly.

Bellamy's current claim (at 40) that he was somehow prejudiced by the prosecution's allegedly misinformed decision to call Walker as a witness is especially disingenuous, given the way that he leveraged her testimony on summation and direct appeal. Indeed, defense counsel himself read much of what Walker said back to the jury, emphasizing

that she had not identified Bellamy, and suggesting that she had instead created reasonable doubt (*see* TT1091-93, 1106). And Bellamy also trumpeted her testimony on direct appeal in arguing that the evidence was legally insufficient (*see* A566-67, A579; *see also* A544).

Insofar as Bellamy maintains that Guy's questioning of Walker and his summation introduced false assertions from the detectives' written records (*see* App. Br. 40), the court repeatedly told jurors that counsel's questions on their own, without a witness's answers, were not evidence (*see, e.g.*, TT432, 827, 1140), and that nor were counsel's summations (*see, e.g.*, TT1073-74, 1156-57).

Accordingly, the detectives' written records summarizing their interview with Walker did not contribute to a deprivation of liberty, given her disclosures on the stand. The district court thus properly granted summary judgment.

#### 3. No reasonable jury could believe Gillen fabricated the incriminating statement based on Bellamy's bare testimony.

The district court properly rejected Bellamy's claim that Gillen created out of whole cloth his first incriminating statement in the detectives' vehicle. Given the long history of these criminal and civil

proceedings, no reasonable jury could have found that Gillen engaged in deliberate fabrication based on Bellamy's spare testimony—offered years after the fact—denying that he made the statement. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553-55 (2d Cir. 2005). Accordingly, the record poses no "genuine" dispute of material fact for trial.

To be clear, the statement at issue is that "[t]his must be a case of mistaken identity—someone probably accused me of murdering someone" (A290, A1707; *see* A66-67). Throughout the criminal proceedings, Bellamy made similar spontaneous exclamations that he may have believed, in the moment, would aid his case. He made numerous outbursts at his suppression hearing (*see, e.g.*, A2390-92, A2397, A2400, A2403, A2414), and continued to do so at trial (*see, e.g.*, TT520, 665, 870).

Some of these exclamations contradicted each other (*compare* A357-58, *with* A520), and some indeed belie the account of key events that he gives now in this civil lawsuit. In particular, he denied that Gillen gave him his Miranda warnings at the precinct before admitting it (*compare* A2392, *with* A1355-56), and denied making certain statements to Gillen at the precinct before admitting that too (*compare*

A2396-97, *with* A1355-58). Given his ever-changing versions of events that day—the same day he made the statement at issue—it is impossible to know which version of his story he believes is the truth.

In *Jeffreys*, this Court recognized that "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory or incomplete," a court has no choice but to make some assessment of the account's credibility in determining whether a "genuine" issue of material fact exists. 426 F.3d at 554. And where there is no evidence upon which a reasonable jury could base a verdict for the plaintiff, it would be a waste of judicial resources and jury time to send the case to trial. *Id.* at 553-55. The same is true here.

Nor does circumstantial evidence bolster Bellamy's claim (*cf.* App. Br. 38). Although he called the other detectives in the vehicle to testify at his trial, he asked neither if they had heard the statement (A945-47, A949-52). Gillen recorded the statement in his notebook right away, while he and Bellamy were still in the vehicle (A290, A2413; *see also* A2410-11). And Gillen informed an ADA about the statement on the same night Bellamy made it (TT539-40). ADA Antignani disclosed it in two notices within the next two weeks (*see* A1610). *See also* Antignani

Dep. (ECF No. 209-1) at 119-20. Bellamy identifies no controlling authority that would have required more (*see* App. Br. 38).

Bellamy has thus failed to present a plausible claim of deliberate fabrication, even if his denials could bear some weight. *Cf. Boyd v. City of N.Y.*, 336 F.3d 72, 77 (2d Cir. 2003) (fact issue on bad faith where evidence went "beyond simple conflict of stories," as police paperwork directly contradicted officers' testimony on key point); *McClellan v. Smith*, 439 F.3d 137, 146 (2d Cir. 2006) (same, where extensive evidence suggested that officer pressed prosecution "solely" due to "personal animus"); *see also Bellamy*, 2017 U.S. Dist. LEXIS 75306, at *97 n.70 (district court observing that Bellamy's statement was not sufficiently incriminating to be a plausible police fabrication). For this reason, too, summary judgment was proper.

### B. Bellamy likewise cannot establish that Gillen or Solomeno intentionally suppressed materially exculpatory or impeaching evidence.

There is likewise no merit to Bellamy's theory that Gillen or Solomeno failed to forward exculpatory or impeaching evidence to prosecutors, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See, e.g.*, *Bermudez v. City of N.Y.*, 790 F.3d 368, 376 n.4

(2d Cir. 2015). To establish this claim, Bellamy must prove that detectives withheld evidence that was favorable to him—either exculpatory or impeaching—and that the withholding was prejudicial because the evidence was material, meaning there is a "reasonable likelihood" that its timely disclosure "would have affected the [trial's] outcome." *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). As Bellamy concedes (at 42), in a civil case under § 1983, he must also show that any suppression of the evidence was intentional. *See Fappiano*, 640 F. App'x at 118.

Bellamy's *Brady* violation claims depend on a tortured reading of the record and, in any event, he fails to establish that allegedly withheld information was material or that Gillen or Solomeno intentionally suppressed it.

**1. Bellamy's claims premised upon Sanchez's post-trial statements mischaracterize the record and fail to establish wrongdoing by Gillen or Solomeno.**

Bellamy (at 43-45) maintains that Sanchez initially told Gillen on the day of the murder that she "didn't see anything," told him at some unspecified time thereafter that she had seen Bellamy on a different

day of the week than when the murder indisputably occurred, and identified Terrill Lee as the person with whom she had seen him on that occasion. But all these claims mischaracterize the record.

First, when Sanchez testified at the 440 hearing that she spoke to Gillen on the day of the murder, she directly contradicted her trial testimony more than a decade earlier (*compare* A1096-97, *and* A1099, *and* A2808-10, *with* TT652-53, 784-85). In any event, she also made clear at the 440 hearing that when she told Gillen on the day of the murder that she "didn't see anything," she was in the middle of working and had not yet heard what police were investigating (A2808-11). This was not an inference by the district court (*see* App. Br. 44); it was explicit, sworn testimony by Sanchez.

Sanchez also testified that whether or not Gillen had photographs with him then, he did not show them to her (A1097, A2811; *see also* A1493-94). And she only learned about Abbott's murder from a co-worker after detectives had left the store (A2808-11).

Sanchez's initial comment to Gillen about not having seen anything on the day of the murder was therefore not material because she did not know then what he was inquiring about. As a result, her

comment likely would not have affected the outcome at Bellamy's criminal trial. *See, e.g.*, *Rivas*, 377 F.3d at 199. Moreover, Bellamy points to no evidence suggesting that Gillen intentionally withheld it.

Second, although Sanchez testified at the 440 hearing more than a decade after the murder that she believed her observations of Bellamy at C-Town had occurred on a Sunday (*see* A1095-96, A1099-1101), she had no doubt in her mind even all those years later that she had seen Bellamy and Abbott in the store at the same time on the morning of the murder (A2794-95, A2798). And, as she clarified years later at a deposition in this case, she had been confused at the 440 hearing about whether the murder had been on a Saturday or Sunday, but had determined since then that it was the former (A2227-28). There is no reasonable likelihood that her confusion about that fact more than a decade after the murder could have had an impact on Bellamy's trial.

In connection with that confusion, Sanchez also has maintained that she told Gillen "at some point" that Bellamy had been trying to buy beer on a day that he could not do so but cannot remember when she gave Gillen that information (A1495-1500). Her testimony therefore

does not establish that Gillen knew the information at relevant times in 1994 and 1995 and intentionally failed to forward it to the prosecution.

Finally, as to the claim that Sanchez identified Terrill Lee as the person with whom she had seen Bellamy, the record does not establish that Gillen or Solomeno knew that at relevant times, let alone that they intentionally suppressed it. Sanchez could testify only that she was "shown" a photograph after viewing the lineup, "they" had asked her if she recognized the person, and "they" had then told her that it was Lee (A2785-87, A2789). She does not know with whom she had this exchange (A2789). Gillen denies that he or anyone in his presence showed Sanchez a photograph of Lee (A2206), and Antignani, who was at the precinct to ensure the lineups' fairness, also did not see this occur (A659-61). Solomeno, meanwhile, was not even at the precinct that day and does not know who Lee is (A2179, A2193; TT795). The record as a whole thus does not establish that Gillen or Solomeno knew this information, let alone that they deliberately held it back.

Because the record shows that Sanchez's statements more than a decade after the criminal trial likely would not have affected its outcome, and Bellamy in any event cannot prove that Gillen or

Solomeno intentionally suppressed such information, the district court properly rejected this *Brady* violation claim.

**2. Bellamy's alternate theory about Walker's testimony is unpreserved and meritless.**

Bellamy complains the district court failed to address his claim that the detectives' alleged falsification of records summarizing their interview with Walker, if disclosed, could have been used to impeach their credibility (*see* App. Br. 45-46). But, he did not present that theory to the district court in his memorandum below (*see* A1908-09). Accordingly, he failed to preserve that argument for appeal. *See, e.g.*, *Askins v. Doe*, 727 F.3d 248, 252 (2d Cir. 2013).

In any event, all relevant information was available to defense counsel. Walker testified in open court that she could not identify Bellamy as the person she had seen run behind her car. And ADA Guy elicited that she had told detectives no more than that it "could have been" Bellamy. Defense counsel also had copies of Solomeno's handwritten notes and DD5 from the mid-trial interview with Walker (TT797-800). It appears that counsel simply made a strategic choice not to press the matter.

## POINT II

## THE DISTRICT COURT PROPERLY DISMISSED THE MONELL CLAIMS AS A MATTER OF LAW

Bellamy pursues two theories of *Monell* liability against the City: (1) that the Queens County DA's Office had a policy or practice of failing to provide witness protection information to defense counsel; and (2) that the office had a policy or practice of failing to discipline ADAs for improper summation remarks. These *Monell* claims fail for two independent reasons. First, Bellamy cannot establish any underlying violation of his constitutional rights. Second, and in any event, the *City* cannot be held liable for the alleged policy choices of the Queens County DA's Office regarding prosecutorial training and supervision. A DA's Office is an independent entity and the City has no control over such allegedly deficient policies.

### A. Bellamy fails to establish a triable issue of fact as to whether he suffered an underlying constitutional violation.

To establish municipal liability under § 1983, a plaintiff must plead and prove that an official municipal custom or policy caused the denial of his or her constitutional rights. *Wray v. City of N.Y.*, 490 F.3d

189, 195 (2d Cir. 2007). Thus, absent a showing that Bellamy's own constitutional rights were violated, his *Monell* claims fail. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986). He cannot make that showing.

### 1. ADA Guy adequately disclosed that Sanchez was receiving money and relocation assistance.

Bellamy faults the ADA's disclosures regarding Sanchez's receipt of assistance. But before presenting her testimony, Guy disclosed to the court and defense counsel outside the jury's presence that he recently learned that Bellamy had threatened her twice. Due to those threats and corresponding concerns for her safety, the DA's Office was making efforts to relocate her and giving her "meal money" of $25 per day.

When Sanchez testified, she had only been in the witness protection program for two days. Guy affirmatively elicited from her that she was not working and instead supporting herself on public assistance, that she had received $50 from his office and expected to receive $50 more, and that she was receiving $25 per day for food and children's diapers. She also affirmed that she was "staying overnight at a different location," and that a detective had placed her there. Defense counsel chose not to cross-examine her on those matters, but argued in

summation that her account was patently unbelievable and that the prosecution's payments of $25 per day would be particularly significant for someone like her with twins who had been surviving on social services benefits (TT1076-87).

Given these circumstances, Bellamy cannot make out a *Brady* violation. The prosecution disclosed rather than suppressed evidence that it was giving Sanchez relocation and financial assistance. *See, e.g.*, *Rivas*, 377 F.3d at 199. Thus, defense counsel knew or should have known the "essential facts" to impeach her and, indeed, mentioned at least some of that information in summation. *See, e.g.*, *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (prosecution has not suppressed evidence if defense "either knew, or should have known," of essential facts permitting him to take advantage of it); *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978). Bellamy therefore also fails to establish the element of prejudice. *See, e.g.*, *Rivas*, 377 F.3d at 199.[7]

---

[7] Bellamy strains (at 47) to compare his case to *People v. Steadman*, but that case only underscores his claim's weaknesses: there, prosecutors (1) failed to disclose, despite specific inquiry from defense counsel, that they had promised a witness he would avoid jail time on open felony charges if he testified; and (2) failed to correct the witness's express testimony, under probing questioning from the defense, that no promises of leniency had been made. 82 N.Y.2d 1, 4-8 (1993).

That defense counsel apparently made a strategic determination not to probe the matter of Sanchez's relocation does not mean the prosecution engaged in misconduct. Moreover, no one could have known a mere two days after Sanchez had entered the program how long it would take to find permanent housing.

The matter of her relocation and whether any promises were made before her testimony were thoroughly explored at the 440 hearing (*see, e.g.*, A1681-86, A1667-78, A2952-85, A3033-55). The court there rejected Bellamy's claim that the prosecution had committed a *Brady* violation in connection with her receipt of Section 8 housing. *See Bellamy*, 2008 N.Y. Misc. LEXIS 4672, at *22-23. Sanchez's testimony about her relocation at the 440 hearing and in this civil litigation do not materially differ (*compare* A3033-34, *with* A3308-12).

And, here, again, Bellamy's argument mischaracterizes the record, which discloses no evidence that Sanchez was "secretly and illegally detained" or "bribe[d]" to give particular testimony (*cf.* App. Br. 54-55). Sanchez has testified specifically that she went to a hotel with detectives voluntarily (A3048), and no one from the DA's Office promised money or benefits to induce her testimony (A3053).

### 2. ADA Guy's summation did not deprive Bellamy of a fair trial.

Bellamy maintains that ADA Guy committed "egregious" summation misconduct, citing more than a dozen individual statements in his summation (App. Br. 57-60). Yet defense counsel made only three contemporaneous general objections, none of which the court sustained, and the court only once advised to make fair comment (TT1127, 1129, 1143-44). Twice when defense counsel objected, the court reminded jurors that they could request a reading of any testimony they wished to hear again and they were the judges of the facts (TT1129, 1143-44). Bellamy raised none of these complaints about the summation on direct appeal (*see* A537-600) or habeas review (*see* A601-17; *see also* A622).

To establish a due process violation in this context, Bellamy bears the "heavy burden" of showing misconduct "so severe and significant" as to deny him a fair trial. *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). Accordingly, summation misconduct rarely causes the "substantial prejudice" necessary to trigger a constitutional violation. *See United States v. Feliciano*, 223 F.3d 102, 123 (2d Cir. 2000); *United States v. Mapp*, 170 F.3d 328, 337 (2d Cir. 1999). This is particularly true where, as here, the allegedly improper statements were made

during a long summation at the end of a long trial where more than sufficient evidence supported the verdict. *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124, 127-28 (2d Cir. 2005).

In analyzing whether prosecutorial misconduct caused a constitutional violation, courts consider three factors: (1) the severity of the misconduct; (2) the measures adopted to cure it; and (3) the certainty of conviction absent the improper statements. *Feliciano*, 223 F.3d at 123. Here, the district court correctly found no constitutional violation. *Bellamy*, 2017 U.S. Dist. LEXIS 75306, at *111-13. The court first held that no misconduct—much less severe misconduct—had occurred. *Id.* at *43-49, *111-12. Then the district court accounted for the curative instructions given by the criminal trial court both during the summation and before deliberations. *Id.* at *46-47, 113. Finally—and most importantly—the court determined that the alleged misconduct was unlikely to have influenced the jury's decision, as implicitly acknowledged by defense counsel's failure to object contemporaneously or raise the point on appeal. *Id.* at *112-13.

Rather than face these findings, Bellamy (at 57-60) cherry-picks select phrases or even single words from the summation out of context.

However, these were nothing more than "garden variety summation comments" that focused on the prosecution's theories and responded to defense counsel's closing remarks. Such statements are entirely proper and cannot serve as the basis for a constitutional violation. *See, e.g.*, *United States v. Thai,* 29 F.3d 785, 807 (2d Cir. 1994) (prosecutor may reply with "rebuttal language suitable to the occasion" when defense counsel attacks credibility of prosecutor or government agents).[8]

Bellamy (at 58) also makes much of Guy's purported statement that "I know who committed the murder." As he has explained, this statement reflects a transcription error: Guy actually stated, "You [the jury] know who committed the murder" (A513-14, A3462). This explanation finds support in the statement's context (TT1149), and in defense counsel's failure to object. Moreover, even if the transcription

[8] The cases cited by Bellamy involve conduct that did not occur here. For example, in *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 95 (2d Cir. 2014), the repeated misconduct included statements referring to government witnesses from the community, mentioning facts not in evidence, and discussing the consequences of the verdict. In *United States v. Blueford*, 312 F.3d 962, 975 (9th Cir. 2002), the problem was not that the prosecutor asked the jury to find that an alibi witness testified falsely—that's appropriate where done in good faith—but rather that the inference rested on facts the government knew to be false or could not have believed given specific evidence in its possession. And in *United States v. Modica*, 663 F.2d 1173, 1179 (2d Cir. 1981), the prosecutor said "I'm here to tell you that Mr. Amato's testimony … is truthful." The prosecutor here did nothing comparable to these things.

were correct, one improper statement would not render Bellamy's entire trial unfair.

Bellamy also fails to demonstrate how the alleged improper statements deprived him of a fair trial. He tries to avoid the effect of his failure to object, stating only that this failure is "merely one factor" (App. Br. 56). Although the failure to object is not dispositive, it is persuasive because nearly all of the summation statements upon which he now relies were left unchallenged by him at trial. *See Marcic*, 397 F.3d at 124 ("Where claimed error was not objected to contemporaneously … [that] failure … deprives the trial court of the opportunity to correct the error."); *see also, e.g.*, *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 158 (E.D.N.Y. 2013) (defendant's claim of prejudice undermined by failure to object to summation remarks at trial).

Finally, Bellamy argues (at 57) that his failure to raise the alleged summation misconduct on appeal does not preclude him from raising it now. But he cites no civil damages case premised on alleged trial misconduct in open court that was neither objected to nor challenged on appeal. Section 1983 suits should not become roving audits for alleged

but unpreserved trial error. In any case, Bellamy acknowledges he must show he was deprived of a fair trial to recover here. If the summation statements had really done so, it stands to reason that his appellate counsel would have included this along with the other new trial points he raised on direct appeal.

### B. Bellamy's *Monell* claims center on prosecutorial functions for which DAs do not act as representatives of the City.

Even if Bellamy could show an underlying constitutional violation by prosecutors, the City cannot be held liable, under *Monell*, for a DA's prosecutorial training and supervision policies. That is so because DAs, when performing prosecutorial functions, occupy a unique, independent, and quasi-judicial role representing the "people of the State of New York," not a particular municipality. *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988). The City does not control DAs' prosecutorial policies, including regarding training and supervision.

This Court has long affirmed that a New York DA is not a local policymaker under *Monell* regarding the prosecutorial function. *Baez*, 853 F.2d at 77. Surveying state law, which "determines whether a particular official has the requisite policymaking authority" to render a

governmental unit liable under *Monell*, this Court determined that "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Id.* at 76-77.

This Court noted that state law authorizes the Governor to order the State AG to assume the prosecution of any criminal proceeding, in which case the DA must assist the AG. *See id.* at 76 (citing N.Y. Exec. Law § 63(2)); *see also Johnson v. Pataki*, 91 N.Y.2d 214, 223-26 (1997). Additionally, the Governor can remove a DA from office. *Baez*, 853 F.2d at 76 (citing N.Y. Const. art. XIII, § 13(a), (b)), and the Governor (not the Mayor or a county executive) has the "statutory right to fill vacancies in the office of district attorney by appointment." *Id.* at 77. The state legislature also retains power to regulate DAs' salaries, even though they are paid by the county. *Id.*

These laws, the Court noted in *Baez*, "demonstrate a recognition by the State that the security, independence, competence, and integrity of the officer responsible for the enforcement of the State's penal laws is a matter of State-wide concern." *Id.* Under New York law, a DA's responsibilities "necessitate the exercise of completely impartial

judgment and discretion" and "[n]o county policy can require them to act otherwise." *Id.* Accordingly, "a county has no right to establish a policy concerning how [a district attorney or the Attorney General] should prosecute violations of State penal laws." *Id*; *see also Spielman Motor Sales Co. v. Dodge*, 295 U.S. 89, 94 (1935) (holding that a district attorney in New York is a representative of the State, as the office is charged with enforcing laws of "statewide concern … in the interest of the State and not simply in the interest of the locality where he serves."). *Cf. McMillian v. Monroe Cnty.*, 520 U.S. 781, 790-91 (1997) (reaching a similar holding under *Monell* as to county sheriffs in Alabama, and echoing the reasoning of *Baez*).

While *Baez* firmly established that a DA in New York is not a municipal policymaker when acting in a prosecutorial capacity, this Court has held that DAs *do* constitute municipal policymakers under *Monell* when they set policies not about prosecutorial functions, but instead about the "administration of the district attorney's office." *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 536 (2d Cir. 1993). The distinction originates in a passing footnote in *Gentile v. County of Suffolk*, 926 F.2d 142, 152 n.5 (2d Cir. 1991). Citing that footnote, in

*Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992), the Court placed training and supervising ADAs about *Brady* and perjured testimony obligations on the "administrative" side of the line.

*Walker*'s narrow interpretation of the prosecutorial functions of a DA's office does not survive the Supreme Court's decision in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009). There, the Court held that absolute prosecutorial immunity shields a DA and supervisory officials from personal § 1983 claims based on their decisions about how to train, supervise, and provide information to ADAs regarding the conduct of prosecutions. 555 U.S. at 344-49. These decisions may be administrative in some sense, yet they are of "a kind" that is "directly concerned with the conduct of a trial" and "intimately associated with the judicial phase of the criminal process." *Id.* at 344, 349 (internal quotation omitted).

Prosecutorial training and supervision are thus very different from administrative duties such as hiring, payroll, and physical maintenance. *Id.* at 344. As Bellamy's brief here confirms, any § 1983 claim for failure to supervise on prosecutorial matters will have to be linked to an individual prosecutor's alleged error during specific criminal proceedings. *Id.* And deciding what information to impart in

training and supervision requires the same legal knowledge and judgment as a prosecutor's trial and pre-trial decisions. *Id.*

Accordingly, *Van de Kamp* requires a different boundary between prosecutorial and administrative functions than the one this Court has previously set forth. Bellamy distinguishes *Van de Kamp* on the ground that it addresses a federal-law question of immunity, whereas determining whether a New York DA is a municipal policymaker requires looking to New York law. But *Gentile* and its progeny cite no provision of New York law on this point. And *Van de Kamp* directly undermines the logic of drawing a bright line for *Monell* purposes between how to prosecute a particular case and how to train for and supervise core prosecutorial choices. Nor has Bellamy identified any provision of New York law that supports his parsing of the prosecutorial function.[9] DA's offices are neither controlled by nor act on behalf of the City as to prosecutorial training and supervision, any more than as to individual prosecutions.

---

[9] By contrast, in *Goldstein v. City of Long Beach*, cited by Bellamy (at 53), the Ninth Circuit listed numerous provisions of California law supporting its analysis and, moreover, made clear its holding did not reach "policies and training relating to prosecutorial functions." 715 F.3d 750, 755-58, 762 (9th Cir. 2013).

Thus, training and supervising ADAs regarding the conduct of criminal proceedings must be considered part of the prosecutorial function, rather than a separable administrative one. And Bellamy's *Monell* claims are based on the alleged indifference of the Queens County DA's Office to the need to train and supervise ADAs with regard to the conduct of criminal proceedings. He alleges a policy of deliberate indifference to the disclosure of witness protection information to defense counsel and discipline of ADAs for summation remarks. These are fundamentally prosecutorial functions.

Although this Court has not yet spoken to the issue, lower courts have held that *Van de Kamp* requires a modification to *Walker*'s prosecutorial/administrative boundary. For example, the Western District of New York specifically barred a *Monell* claim against a county based on a DA's alleged policy of deliberate indifference to the need to train ADAs with regard to speedy trial issues. *Dettelis v. Cnty. of Cattaraugus*, No. 14-CV-1096A, 2016 U.S. Dist. LEXIS 57459, at *15-16 (W.D.N.Y. Mar. 31, 2016), *report and recommendation adopted by* 2016 U.S. Dist. LEXIS 57229 (W.D.N.Y. Apr. 29, 2016). The court explained that, under *Van de Kamp*, such training was a prosecutorial function

and thus the DA "was acting as a representative of the state rather than the county" in making the alleged decision to ignore a need for speedy trial training. *Id.* at *11-16.

Other district courts have also so held. *See Hewitt v. City of N.Y.*, No. 09-cv-0214, 2011 U.S. Dist. LEXIS 11479, at *10 (E.D.N.Y. Feb. 7, 2011) (dismissing *Monell* claim because "[i]t would be illogical to treat the district attorney as a municipal policy maker for failure to train subordinates on the performance of a state prosecutorial function"); *Jones v. City of N.Y.*, 988 F. Supp. 2d 305, 317 (E.D.N.Y. 2013) ("Tasks directly connected with the prosecutor's basic trial advocacy and prosecutorial duties—including *Brady* decisions—should under *Van de Kamp* be treated as 'prosecutorial conduct.'").

Accordingly, Bellamy's *Monell* claims would not be properly lodged against the City, even if he could prove a constitutional violation.

## CONCLUSION

The Court should affirm the district court's judgment.

Dated: New York, NY
December 26, 2017

Respectfully submitted,

ZACHARY W. CARTER
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees

By: __/s/ mekm______________________
MEGAN E.K. MONTCALM
Assistant Corporation Counsel

100 Church Street
New York, NY 10007
212-356-5045
mmontcal@law.nyc.gov

RICHARD DEARING
MEGAN E.K. MONTCALM
*of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word 2010, and according to that software, it contains 13,544 words, not including the table of contents, table of authorities, this certificate, and the cover.

/s/ mekm
MEGAN E.K. MONTCALM