# 17-1859

## In the
## United States Court of Appeals
## For the Second Circuit

KAREEM BELLAMY,

*Plaintiff-Appellant,*

v.

CITY OF NEW YORK, JOHN J. GILLEN and
MICHAEL F. SOLOMENO,

*Defendants-Appellees,*

- and -

JOHN DOE 1, JOHN DOE 2, SUPERVISING OFFICERS
AT THE NYPD 101ST PRECINCT, VINCENT NMI PEPE
and ROBERT SCHRUHL,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

LAW OFFICES OF JOEL B. RUDIN, P.C.
*Attorneys for Plaintiff-Appellant*
Carnegie Hall Tower
152 West 57th Street
New York, New York 10019
(212) 752-7600

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ...............................................................................................1

ARGUMENT ......................................................................................................4

POINT I

    A REASONABLE JURY COULD FIND THAT
    PROSECUTORS VIOLATED BELLAMY'S
    CONSTITUTIONAL RIGHT TO A FAIR TRIAL, AND
    CONTROLLING SECOND CIRCUIT PRECEDENT
    DICTATES THAT THE CITY MAY BE HELD
    LIABLE FOR THESE VIOLATIONS ............................................................4

    A.    The Evidence Shows that Queens Prosecutors Violated
        Bellamy's Constitutional Right to a Fair Trial.....................................4

        1.    The Failure to Disclose Linda Sanchez's Detention and
            Bribery ...................................................................................4

        2.    The Prosecutor's Summation Misconduct................................9

    B.    *Van de Kamp v. Goldstein* Does Not Overrule this Court's Firm
        Precedent that New York Municipalities May Be Held Liable
        for a D.A.'s Officewide Managerial Policies that Affect
        Prosecutions.......................................................................................11

POINT II

    DEFENDANTS CANNOT EVADE THE MANY
    ISSUES OF FACT REMAINING TO BE TRIED
    CONCERNING PLAINTIFF'S CLAIMS AGAINST
    THE INDIVIDUAL DEFENDANTS ..........................................................16

    A.    There Is Ample Evidence that Gillen Fabricated the
        Incriminating Statements Attributed to Bellamy ...............................16

i

B.      A Jury Could Reasonably Conclude that the Defendants' Fabrication of Veronica Walker's 'Identification' of Bellamy, Together with Their Withholding of Her Exculpatory Statements, Proximately Caused His Conviction ...............................20

         1.      The Fabrication Claim ............................................................20

         2.      The *Brady* Claim...................................................................23

C.      Contrary to Defendants' Claims, the Record Permits a Jury Finding that the Individual Defendants Violated *Brady* by Intentionally Suppressing Linda Sanchez's Statements......................24

D.      There Is Strong Circumstantial Evidence from Which a Jury Could Infer that Gillen Manufactured Carter's Lineup 'Identification' of Bellamy...............................................................27

CONCLUSION........................................................................................29

ii

## TABLE OF AUTHORITIES

**Cases**

*Baez v. Hennessy*,
    853 F.2d 73 (2d Cir. 1988) .................................................................. 12, 13, 15

*Bailey v. City of New York*,
    79 F. Supp. 3d 424 (E.D.N.Y. 2015) .................................................................. 14

*Banks v. Dretke*,
    540 U.S. 668 (2004) .................................................................. 7

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................. 24

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988) .................................................................. 15

*Curro v. Watson*,
    884 F. Supp. 708 (E.D.N.Y. 1995) .................................................................. 9

*Dufort v. City of New York*,
    874 F.3d 338 (2d Cir. 2017) .................................................................. 23

*Gentile v. Cty. of Suffolk*,
    926 F.2d 142 (2d Cir. 1991) .................................................................. 12, 13, 15

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) .................................................................. 13

*Ismail v. Cohen*,
    899 F.2d 183 (2d Cir. 1990) .................................................................. 28

*Jeffes v. Barnes*,
    208 F.3d 49 (2d Cir. 2000) .................................................................. 15

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) .................................................................. 16, 17

*Jenkins v. Artuz*,
    294 F.3d 284 (2d Cir. 2002) .................................................................. 8

*Jones v. City of New York*,
 988 F. Supp. 2d 305 (E.D.N.Y. 2013) ........................................................14

*Jovanovic v. City of New York*,
 No. 04 Civ. 8437, 2010 WL 8500283 (S.D.N.Y. Sept. 28, 2010) ................14

*Kelleran v. Andrijevic*,
 825 F.2d 692 (2d Cir. 1987) .........................................................................8

*Kelley v. McGee*,
 57 N.Y.2d 522 (1982) ..................................................................................15

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
 507 U.S. 163 (1993) ....................................................................................14

*Leka v. Portuondo*,
 257 F.3d 89 (2d Cir. 2001) ...........................................................................8

*Manganiello v. City of New York*,
 612 F.3d 149 (2d Cir. 2010) .......................................................................27

*McMillian v. Monroe County*,
 520 U.S. 781 (1997) ........................................................................ 12, 13, 15

*Monell v. Department of Social Services*,
 436 U.S. 658 (1978) ....................................................................................11

*Morris v. City of New York*,
 198 A.D.2d 35 (1993) ..................................................................................13

*Myers v. County of Orange*,
 157 F.3d 66 (2d Cir. 1998) ................................................. 2, 12, 13, 15, 16

*Owen v. City of Independence*,
 445 U.S. 622 (1980) ........................................................................ 12, 14, 15

*Ramos v. City of New York*,
 285 A.D.2d 284 (1st Dep't 2001) ................................................................13

*Redd v. N.Y. Div. of Parole*,
 678 F.3d 166 (2d Cir. 2012) .................................................................. 23, 27

*Ricciuti v. N.Y.C. Transit Authority*,
    941 F.2d 119 (2d Cir. 1991) ...........................................................................11

*Shabazz v. Kailer*,
    201 F. Supp. 3d 386 (S.D.N.Y. 2016) ..........................................................23

*Strickler v. Greene*,
    527 U.S. 263 (1999)..........................................................................................7

*United States v. Meserve*,
    271 F.3d 314 (1st Cir. 2001).........................................................................22

*Van de Kamp v. Goldstein*,
    555 U.S. 335 (2009)................................................................. 2, 11, 13, 14

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992) ......................................................... 12, 13, 15

*Washington v. Schriver*,
    255 F.3d 45 (2d Cir. 2001) ...........................................................................22

*Willey v. Kirkpatrick*,
    801 F.3d 51 (2d Cir. 2015) ...........................................................................24

*Zahrey v. Coffey*,
    221 F.3d 342 (2d Cir. 2000) .........................................................................12

**Rules and Statutes**

42 U.S.C. § 1983 .................................................................................................13

CPL § 620.30 ........................................................................................................5

CPL § 620.70 ........................................................................................................5

Fed. R. Civ. P. 56 ...............................................................................................24

N.Y. Const., Art. 13, § 13 .................................................................................16

N.Y. County Law § 700 .....................................................................................16

N.Y. County Law § 927 .....................................................................................16

N.Y. Gen. Mun. Law § 50-k .............................................................................16

N.Y.C. Admin. Code § 7-110 ...................................................................16

N.Y. Pub. Off. Law § 2 ..........................................................................16

N.Y. Pub. Off. Law § 31 .........................................................................16

N.Y. Pub. Off. Law § 33 .........................................................................15

## Other Authorities

Council of the City of New York, *Report to the Committee on Finance and the Committee on Public Safety*, May 22, 2017, at 3, http://council.nyc.gov/budget/wp-content/uploads/sites/54/2017/03/901-906-DA-and-OSNP-exec-1.pdf....................................................................15

Queens D.A.'s Office, *Assistant District Attorneys*, http://www.queensda.org/ada.html (last visited Jan. 8, 2018)...................1

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
-----------------------------------------------------------------------x

KAREEM BELLAMY,                                                    :

               Plaintiff-Appellant,                      :   No. 17-1859

         -against-                                              :

THE CITY OF NEW YORK, JOHN J. GILLEN          :
AND MICHAEL F. SOLOMENO,
                                         :

              Defendants-Appellees,                    :

           -and-                                                    :

JOHN DOE 1, JOHN DOE 2, SUPERVISING
OFFICERS AT THE NYPD 101st PRECINCT,          :
VINCENT NMI PEPE AND ROBERT SCHRUHL,
                                         :

              Defendants.                                       :

-----------------------------------------------------------------------x

_____

**REPLY BRIEF FOR PLAINTIFF-APPELLANT**

_____

## INTRODUCTION

    Appellant Kareem Bellamy's opening brief cites evidence in the record

supporting every one of his fair trial claims against the individual and municipal

defendants.  Defendants' responsive brief makes little effort to demonstrate that

these facts, if believed, would be insufficient to establish that Bellamy's

1

constitutional rights were violated. What Defendants mainly contend is that their side of the case is more persuasive and that, assuming the violations occurred, they didn't cause Bellamy sufficient prejudice. But this is an appeal of summary judgment, not of a final judgment after trial. All factual issues, including causation, must be resolved in Bellamy's favor. Defendants' failure to show there is no factual dispute requires the district court's judgment be vacated.

As for the important legal issue this case raises about municipal liability, Defendants incorrectly contend that this Court has never analyzed the state law provisions that bear upon whether the District Attorney's officewide policies that caused Bellamy's unconstitutional conviction are state or local in nature. But they ignore this Circuit's controlling case, *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), which did exactly that — and squarely decided the municipal liability issue *against* the City. Defendants successfully pursued the same strategy below, making no mention of *Myers*, *see* A-741–43, after which the district court overlooked it, *see* SPA 74-75. Nothing in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), an individual immunity case, overrules or calls into question this Circuit's settled law regarding municipal liability.

Defendants' emphasis on the role of Bellamy's counsel, Thomas Hoffman and Cravath, Swaine & Moore, in the state collateral proceedings, shows once again the mud-throwing tactics it has pursued throughout this litigation. Just as

2

they did in the lower court, they try to create the impression that counsel acted unethically and that somehow the state judge who rejected these allegations was hoodwinked into setting Bellamy free. Plaintiff has refuted Defendants' allegations. *See* Pl. Op. Br. 24, 27–28, 30 n.13. Defendants, after sprinkling their aspersions throughout the Facts section of their brief, mention not one word of it in their Argument. The issue is a red herring. It is included solely to poison this Court, just as Defendants poisoned the court below.

The parties' opposing briefs present starkly different facts. Although we welcome a thorough review of the record, the Court need not plough through thousands of pages to see the facts that would support a verdict for Bellamy; we supply them in our opening brief, and here. These facts demonstrate that Kareem Bellamy is entitled to complete *Monell* discovery and a jury trial, and that the district court's judgment should be vacated.

3

## ARGUMENT

## POINT I

**A REASONABLE JURY COULD FIND THAT PROSECUTORS VIOLATED BELLAMY'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL, AND CONTROLLING SECOND CIRCUIT PRECEDENT DICTATES THAT THE CITY MAY BE HELD LIABLE FOR THESE VIOLATIONS**

**A.** **The Evidence Shows that Queens Prosecutors Violated Bellamy's Constitutional Right to a Fair Trial**

**1.** **The Failure to Disclose Linda Sanchez's Detention and Bribery**

Before Linda Sanchez testified against Bellamy at trial about supposed 18-month-old threats that she had never claimed before, and before she testified that she received only $100 in benefits from the D.A.'s office, D.A.'s representatives secretly arrested her on a material witness warrant, unlawfully detained and interrogated her, and promised her *thousands of dollars* in additional payments and housing benefits even though she wasn't in fear and didn't want to be relocated. *See* Pl. Op. Br. 15-19, 54-55. Viewed in the light most favorable to Bellamy (or, indeed, in any light), this information would have been favorable to Bellamy at trial by demonstrating Sanchez's motive to fabricate threats and other incriminating testimony, but the information was suppressed. Only during civil discovery did the truth finally emerge. *See id.* at 16-17, 24-25, 29.

The record shows that Sanchez did not cooperate with the D.A. "voluntarily," as Defendants contend. Sanchez was seized and detained unlawfully

4

under inherently coercive circumstances, including service of a material witness warrant, that were not disclosed. *See* Pl. Op. Br. 15-17, 24-25, 29.[1]  On appeal, Defendants want the Court to conclude that the material witness warrant was never signed or served on Sanchez. *See* Defs. Br. 20 n.3.  But Defendants, in their reply to Bellamy's Rule 56.1 statement, *admitted* that "detectives . . . served Ms. Sanchez with a Material Witness Order," A-2044, and the district court made an explicit finding that this was so, *see* SPA-22 n. 23.[2]

Sanchez's deposition testimony also shows that detectives served the warrant on her, and that she was compelled to go with them — a significant circumstance that was never disclosed to the defense.  She testified that detectives came to her house with a paper in hand, told her she *had* to go with them and that "we're going to talk," and then held her until she testified.  A-3301–03, 3308.  "I didn't ask for [protection]," Sanchez testified — "They took me."  A-3306. Indeed, Defendants admit detectives told Sanchez she "had to go with them."

---

[1] Defendants seize upon a mistaken citation to obfuscate the issue Bellamy plainly presents in his opening brief.  Bellamy cited CPL § 620.70, which deals with material witnesses who have been arraigned and released on bail; he meant to cite CPL § 620.30, which deals with the issuance and execution of an initial warrant.  Rather than address the argument Bellamy plainly was making, *see* Pl. Op. Br. 15, 54, Defendants exploit counsel's mistake to suggest Bellamy was trying to mislead the Court by "impl[ying]" that Sanchez already had been adjudged a material witness and had jumped bail, *see* Defs. Br. 20 n.3.

[2] Defendants suggest the warrant was never signed because the version in the summary judgment record is unsigned.  But in a joint letter to this Court, Defendants stipulate that they produced documents Bates stamped D001130-D001133 in discovery.  These documents contain the state court's endorsement of the warrant and direction to appear.

5

Defs. Br. 20. They admit Sanchez "did not want to leave her home and had not asked for protection, relocation, or placement into the program. . . . But the DA's Office determined that she should be in it." *Id.* at 22.

The record further shows that not only was Sanchez's "cooperation" compelled, but she received substantial undisclosed benefits. Defendants *admit* that, *before Sanchez testified at trial*, she understood she could stay *indefinitely*, at the D.A.'s expense, at a safehouse she described as having "humongous" rooms that dwarfed her tiny apartment, or at a hotel, A-3054; *see* Defs. Br. 24; A-1521, 3304, while she received $25 per day until she found permanent housing, at which time "the DA's Office would cover her first month's rent, security deposit, and fees," Defs. Br. 23. Defendants *admit* that, "[s]everal days after Sanchez testified" (when the trial was still underway), the Office began processing $2,800 for her relocation. *Id.* at 25. At her deposition, Sanchez, corroborated by Detective-Investigator Cox, swore that the Office explicitly promised her these benefits before she testified. *See* Pl. Op. Br. 29. It was the practice of the Office to inform witnesses like Sanchez that finding them permanent housing would likely take months, *see* A-3359, so Sanchez almost certainly knew when she testified that her lodging and support payments would eventually total thousands of dollars. Ultimately, Sanchez received a full year of such benefits from the D.A.'s Office. A-2958–59, 2963–64.

6

The record shows that prosecutors disclosed none of these promised benefits and that, pursuant to the D.A.'s "Chinese Wall" policy, even ADA Guy was not told about them. Pl. Op. Br. 17. Just before Sanchez testified, Guy made a record that the Office was helping to relocate her and had "afforded her some meal money for several days. I believe it's $25.00 a day so I believe she is getting *in total* approximately $100 . . . ." A-2465 (emphasis added). Guy then led Sanchez to testify that she had received $50, after which he asked, "have you received any information that you are going to be receiving an additional $50?" to which she responded, "Yes." A-2508–09. Guy then changed the subject, leaving the defense, and the jury, to believe Sanchez would be receiving $100, period.

Unable to dispute that the warrant and thousands of dollars of additional benefits were not disclosed, Defendants are left to argue that the limited disclosure did not prejudice Bellamy because his attorney knew the "essential facts" and "made a strategic determination not to probe the matter of Sanchez's relocation." Defs. Br. 57-58. However, when Guy represented that Sanchez would receive only $100, Bellamy's counsel was entitled to "presume" that Guy wasn't deceiving him (and the court). *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (internal quotation marks omitted). Counsel was not required to "suspect[] that additional impeaching evidence was being withheld," *Strickler v. Greene*, 527 U.S. 263, 285 (1999), and to cross-examine the witness in the blind, risking answers that would prejudice his

7

client, *see Jenkins v. Artuz*, 294 F.3d 284, 296 (2d Cir. 2002); *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001). Bellamy's counsel was severely disadvantaged by the lateness of the limited disclosure, immediately before Sanchez took the stand, *see* A-2047 ¶ 227; A-2463–66, when he had no opportunity to investigate or prepare a meaningful cross-examination, *see Leka*, 257 F.3d at 99-103.

Defendants are equally wrong that "[t]he matter of [Sanchez's] relocation and whether any promises were made before her testimony were thoroughly explored at the 440 hearing." Defs. Br. 58. On the contrary, at the hearing, numerous experienced supervisors and line prosecutors perpetuated the *Brady* violations.[3] Only during civil discovery did Bellamy finally learn about the *explicit promise* to Sanchez of additional benefits, and the secret compulsion, through use of a material witness warrant and her involuntary detention, of her "cooperation." Pl. Op. Br. 16, 24-25, 29; *see* A-759 ¶ 13.[4]

Defendants cite 440 testimony in which prosecutors led Sanchez to testify that she didn't perceive the minimal benefits then disclosed to have affected her

---

[3] At least four representatives from the D.A.'s Office appeared before Judge Blumenfeld, including the then-chief of the Homicide Bureau and one of his predecessors. *See* A-636, 676, 1307.

[4] Moreover, it is unclear how the state court decision bears upon this litigation. The equitable principle of collateral estoppel certainly doesn't apply because the judgment was obtained through fraud, *see Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987), and Bellamy never had an opportunity to appeal it, *see generally* Pl. Op. Br. 39.

trial testimony, *see* Defs. Br. 24, but, again, her 440 testimony is beside the point, since only at her later deposition did she finally reveal that far more benefits were promised her. These benefits should have been disclosed so that the trial jury could assess her credibility.

### 2. The Prosecutor's Summation Misconduct

Defendants echo the district court in contending, without elaboration, that Bellamy complains of mere "garden variety summation comments" taken "out of context." Defs. Br. 60-61. Defendants don't show how anything is taken out of context. The only specific comment they address at all — ADA Guy's statement, "I know who committed the murder," which they claim he actually didn't say, Defs. Br. 61 — illustrates why summary judgment is inappropriate. A jury should surely decide whether to credit Guy's self-serving transcript-error claim, especially since Guy never pursued available state law procedures for "correcting" the transcript. *See Curro v. Watson*, 884 F. Supp. 708, 718 (E.D.N.Y. 1995). If a jury were to conclude that Guy did make the remark, followed by his equally objectionable declaration, "you are not going to get away with it, not this time," A-1008, this would be misconduct of the most egregious and prejudicial sort.

Guy's summation misconduct must be evaluated together with the other fair trial violations. *See* Pl. Op. Br. 56. Guy's false argument that there wasn't "any evidence" Sanchez had any motive to lie, *id.* at 58, exploited his earlier

9

withholding of the critical *Brady* evidence about Sanchez's detention and bribery. Defense counsel could hardly be expected to object, since he didn't know of the *Brady* violation and thus of the falsity of Guy's comment. Guy's misconduct was not "garden variety."

Trial counsel did fail to object to many of the other comments, but he may well have done so out of a reasonable fear of drawing more attention to them. Appellate counsel, meanwhile, reasonably declined to spend precious pages on an unpreserved issue. Defendants don't dispute that there is no preservation or exhaustion requirement under § 1983. *See* Pl. Op. Br. 57. Failure to object is merely one factor in a multi-faceted constitutional analysis. It certainly does not, as a matter of law, invalidate a civil claim based on a prosecutor's carefully premeditated, highly prejudicial assault on a criminal defendant's fair trial rights. *See id.* at 56.

This was an exceedingly weak case, in which the prosecution's witnesses "crumbl[ed]," as Guy testified at his deposition in explaining why his summation was so important. A-3448–50. Bellamy is entitled to have a jury decide whether Guy's summation, which he planned with his supervisors, *see* Pl. Op. Br. 23, together with the *Brady* violations that it exploited, were a substantial cause of Bellamy's wrongful conviction and resulted from the D.A.'s policy of deliberate indifference to such misbehavior.

10

**B.**    ***Van de Kamp v. Goldstein* Does Not Overrule this Court's Firm Precedent that New York Municipalities May Be Held Liable for a D.A.'s Officewide Managerial Policies that Affect Prosecutions**

Bellamy claims, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that the D.A.'s (1) "Chinese Wall" policy prevented ADA Guy from knowing about or disclosing the promises his Office made to Sanchez, and (2) deliberate indifference to prosecutorial misconduct caused Guy to consciously avoid knowledge of this *Brady* material and to deliver his highly inflammatory, misleading summation.[5]  It is firmly established in this Circuit that a New York municipality may be held liable under *Monell* for a district attorney's managerial policy that causes a line prosecutor to violate a criminal defendant's constitutional rights.  *See* Pl. Op. Br. 48-50.  New York City therefore may be held liable for the Queens D.A.'s deliberate indifference to *Brady* violations, to false or misleading testimony and argument, and to summation misconduct, all of which is plausibly alleged in the Complaint and, for purposes of summary judgment, must be presumed true.

---

[5] Defendants don't address Plaintiff's claim that the Queens D.A. was deliberately indifferent to a long history not only of summation misconduct, but of *Brady* violations as well.  This claim is pled in the Complaint, *see* A-44, 79, 90 ¶¶ 54, 314-16, 367-69, and Plaintiff repeatedly notified the district court and Defendants that he was pursuing it, *see* Pl. Op. Br. 48 n.15.  If necessary, as in *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123-24 (2d Cir. 1991), Plaintiff should be permitted to amend his complaint to cure any deficiency in his *Monell* claim.

11

Defendants put great stock in *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988). But *Baez*, as this Court has made clear, merely holds that a municipality is not liable for a district attorney's decision to prosecute a specific case, for which he is deemed to represent the State. *See Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992); *Gentile v. Cty. of Suffolk*, 926 F.2d 142, 152 n.5 (2d Cir. 1991); Brief for Amici Curiae at 27 n.8. Since *Baez*, this Court repeatedly has held that a municipality may be held liable for a D.A.'s officewide managerial *policy* that *causes* a line prosecutor to inflict a constitutional injury, as the cases just cited and the amici make clear. These cases apply the familiar concept that a tortfeasor may be held liable for causing a third party to inflict an injury, including a party who is not liable himself. *See generally Zahrey v. Coffey*, 221 F.3d 342, 353-54 (2d Cir. 2000). Indeed, this is the premise of *Owen v. City of Independence*, 445 U.S. 622 (1980), which holds municipalities liable for unlawful policies even though the employees who carry out those policies may be immune.

In *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), this Court — following the municipal-liability road map laid out in *McMillian v. Monroe County*, 520 U.S. 781 (1997) — re-affirmed its holdings in *Walker* and *Gentile*. Carefully reviewing New York's constitution, statutes, and caselaw, the Court reiterated that "*Baez* was 'confined . . . to challenges to specific decision[s] of the District Attorney to prosecute,'" *Myers*, 157 F.3d at 77 (quoting *Walker*, 974 F.2d

12

at 301), and that *Baez* represents a "narrow exception to th[e] general rule" in New York that "DAs and ADAs are generally presumed to be local county officers, not state officers," including when they engage in the "'negligent hiring, supervision and retention' of ADA[s]," *id.* at 76-77 (quoting *Morris v. City of New York*, 198 A.D.2d 35, 36 (1993)).

Defendants purport to inform this Court that its caselaw is wrong. They dismiss as "a passing footnote" the *Gentile* panel's narrow construction of *Baez*, Defs. Br. 65, insultingly suggest that the unanimous *Walker* panel adopted that footnote without thought, and then, *totally ignoring Myers*, falsely represent that this Court has never analyzed New York law to determine whether D.A.s are state or local policymakers, *see id.* at 66-67. They also ignore that the New York Appellate Division, in *Ramos v. City of New York*, 285 A.D.2d 284, 303 (1st Dep't 2001), explicitly adopted, as "firmly grounded in New York law," *Walker*'s endorsement of municipal liability for prosecutors' *Brady* violations. As a state appellate decision construing New York's own law, *Ramos* must be given great deference. *See McMillian*, 520 U.S. at 786-87.

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), has no bearing upon this Circuit's long-standing precedent allowing *Monell* liability. Prosecutors enjoy individual immunity based upon the congressional intent underlying 42 U.S.C. § 1983 and as a matter of policy. *See Imbler v. Pachtman*, 424 U.S. 409 (1976).

13

*Van de Kamp* extends this reasoning to immunize supervisory prosecutors for administrative policies that are closely intertwined with prosecutorial functions. *See* 555 U.S. at 342-44. However, unlike individuals, "municipalities do not enjoy immunity from suit — either absolute or qualified — under § 1983." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *see Owen*, 445 U.S. at 650. *Van de Kamp* neither questions nor undercuts this settled law. Individual prosecutors have immunity for directly inflicting injury, but § 1983 also imposes liability on "persons" who "cause" such injury, and *Monell* recognizes that a municipality is such a "person." That the individual may not be sued says nothing about whether the municipality may be.[6]

Defendants misunderstand municipal-liability doctrine when they argue that D.A.s cannot expose municipalities to liability because they are "independent" of other city officials. Different branches or agencies of city government control different functions, which is why each *Monell* plaintiff must identify the final policymaker who had authority to bind the city with respect to the particular

---

[6] Defendants cite a couple of magistrate-judge opinions that contain little if any analysis of *Van de Kamp*'s interplay with municipal-liability doctrine, *see* Defs. Br. 68-69, and the one district court judge they cite actually supports Bellamy's position. While Judge Weinstein, in *Jones v. City of New York*, 988 F. Supp. 2d 305 (E.D.N.Y. 2013), questioned the *Walker* line of cases, he dismissed that *Monell* claim for factual reasons. Soon after, recognizing the continuing viability of the Second Circuit's caselaw, he upheld a *Monell* claim against the City because longstanding misconduct by a D.A.'s office should not be "swept under the rug." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 454 (E.D.N.Y. 2015); *see also, e.g.*, *Jovanovic v. City of New York*, No. 04 Civ. 8437, 2010 WL 8500283, at *16 n.12 (S.D.N.Y. Sept. 28, 2010) (Crotty, D.J.) (holding that *Van de Kamp* does not affect *Monell* liability).

function at issue. *See McMillian*, 520 U.S. at 784-85; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion); *see also, e.g.*, *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (finding that sheriff is county's final policymaker because he is an independently elected official who doesn't "answer" to the county manager or "any other entity in the management of his jail staff"). Any other rule would mean that no government entity has responsibility for policies that cause constitutional harm, which would defeat Congress's broad remedial purposes in enacting § 1983. *See Owen*, 445 U.S. at 635-36; *see also* Brief for Amici Curiae at 8-25.

Still citing *Baez*, Defendants assert that the State Attorney General may supersede a local D.A. in "any criminal proceeding," while the Governor can remove a D.A. from office. Defs. Br. 64. This Court, of course, was aware of these points, made in *Baez*, when it decided *Gentile*, *Walker*, and *Myers* — Defendants are merely repeating old, unsuccessful arguments.[7]

---

[7] The power to supersede is virtually never exercised, and has nothing to do with a D.A.'s personnel and prosecutorial policies, which govern the 99.9 percent of prosecutions that are not taken from him. New York City can exert far more influence through its control over 97 percent of the D.A.'s budget. *See* Council of the City of New York, *Report to the Committee on Finance and the Committee on Public Safety*, May 22, 2017, at 3, http://council.nyc.gov/budget/wp-content/uploads/sites/54/2017/03/901-906-DA-and-OSNP-exec-1.pdf (noting that, in 2018, the City would pay $359 million for the five D.A.s, while the state would pay $11 million). Meanwhile, the Governor's power to remove is merely a function of New York's "home rule" under which *all* local government officers derive their authority from the State Constitution and Legislature. *See, e.g.*, *Kelley v. McGee*, 57 N.Y.2d 522, 535-36 & n.12 (1982) (position of D.A., under home rule, is "local, or county, in nature"). Thus, the Governor may remove the chief executive officer (i.e., the mayor) and the police chief of every municipality, *see* N.Y. Pub. Off. Law § 33(2), but this power certainly doesn't convert them into "state" officials. D.A.s and

## POINT II

### DEFENDANTS CANNOT EVADE THE MANY ISSUES OF FACT REMAINING TO BE TRIED CONCERNING PLAINTIFF'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

**A.** **There Is Ample Evidence that Gillen Fabricated the Incriminating Statements Attributed to Bellamy**

Defendant Gillen told prosecutors that Bellamy made spontaneous, incriminating admissions in the patrol car following his arrest. Bellamy swears this isn't so. Under this Circuit's caselaw, a plaintiff's own testimony alone entitles him to a jury trial on an evidence fabrication claim. *See* Pl. Op. Br. 37-38. Defendants ignore this precedent; instead, they cite two cases in which there *also* was evidence corroborating the plaintiff's claim. *See* Defs. Br. 49. But neither of these cases holds or implies that corroborative evidence is *required*.

Defendants, like the district court below, also rely on *Jeffreys v. City of New York*, 426 F.3d 549, 553-55 (2d Cir. 2005), *see* Defs. Br. 47-48, but that case is inapplicable. In *Jeffreys*, the plaintiff claimed excessive force based almost

---

ADAs are city employees entitled to representation and indemnification, *see* N.Y. Gen. Mun. Law § 50-k; N.Y.C. Admin. Code § 7-110, and are covered by the City's life insurance, pension, and healthcare plans, *see* Queens D.A.'s Office, *Assistant District Attorneys*, http://www.queensda.org/ada.html (last visited Jan. 8, 2018). The State Constitution provides for local election of D.A.s, *see* N.Y. Const., Art. 13, § 13(a), whose jurisdiction is similarly local, *see* N.Y. County Law §§ 700, 927. State law frequently refers to the D.A. as a "county" or "local" officer. *See, e.g.*, N.Y. Const., Art. 13, § 13(c); N.Y. Pub. Off. Law §§ 2, 31(1)(e). *Myers*'s holding that D.A.s manage their offices on behalf of the localities that elect them and that they represent is clearly correct.

16

entirely on his own allegation that the defendant officers had thrown him from a third-story window.  But in prior proceedings, including his guilty plea, Jeffreys had repeatedly confessed that he jumped out the window.  *See Jeffreys*, 426 F.3d at 552.  He couldn't explain these "multiple admissions," and medical evidence further discredited his allegation against the officers.  *Id.* at 552-53, 555 n.2.  This Court upheld summary judgment because his claim was "so replete with inconsistencies and improbabilities" that no reasonable juror could credit it.  *Id.* at 555 (quoting district court).

Unlike in *Jeffreys*, Bellamy has consistently denied making the statements at issue.  Defendants have not pointed to any statement Bellamy has ever made that contradicts his claim.  And, as we have shown, his claim is supported by circumstantial evidence.  *See* Pl. Op. Br. 11-12, 38.

Defendants argue that the failure of Detectives Lane and Jenkins — who were in the police car when Bellamy allegedly shouted the statements, *see id.* at 12 — to testify about what happened should somehow count against *Plaintiff* because his counsel didn't question them about it at his criminal trial, *see* Defs. Br. 48.  This turns reality, as well as the rules for summary judgment, upside down.  No competent defense counsel would blindly ask such questions and risk unfavorable answers.  But the D.A.'s Office, which had full access to these police witnesses, would undoubtedly have elicited their testimony had it supported Gillen.  To this

day, these witnesses have not corroborated their former colleague on this critical matter. Especially on summary judgment, Bellamy, as the non-movant, is entitled to the reasonable inference that the failure of these officers to support Gillen's version means that his version is false.

Defendants assert, based on Gillen's word, that Gillen recorded the "mistaken identity" statement "right away" and disclosed it to an ADA the same night, Defs. Br. 48, but this is in dispute. The "recording" is nothing more than a single page of undated handwritten notes. *See* A-290, 2410–11. Defendants characterize Gillen's failure to make a DD5 report of the statements as an "oversight," Defs. Br. 8, but a jury could conclude otherwise from Gillen's preparation of a detailed DD5 recording what occurred during Bellamy's arrest and detention but omitting the alleged incriminating statement, *see* A-1738. Gillen's claim is further belied by his colleague's testimony that it is standard police practice to record a suspect's statements in a DD5, *see* A-3389–90, and by ADA Antignani's failure to disclose Bellamy's alleged statement at his arraignment, even though it was Antignani's practice to disclose *every* statement made by a defendant and he disclosed other, far more innocuous ones, *see* Pl. Op. Br. 11-12. A reasonable jury could infer, from these facts, that Gillen manufactured the statement later to bolster a weak case.

18

Defendants argue that, because Bellamy made outbursts during the pretrial hearing and the trial protesting being framed for a murder he denied committing, this Court should resolve this dispute against him. *See* Defs. Br. 47. But Defendants cite no rule under which such propensity or character evidence is admissible. Even if it were, it wouldn't compel the conclusion that Bellamy made the contested statements. For purposes of summary judgment (and in reality), Bellamy is innocent. That he was distraught at being falsely prosecuted for murder, and interrupted what he contended was false testimony, has nothing to do with whether he made an incriminating, wholly unsolicited statement before he was charged.

Defendants contend that some of Bellamy's words uttered at trial are inconsistent with his later statements during court proceedings, but there is no contradiction between Bellamy's outbursts and his claim that Gillen manufactured statements, and the immaterial contradictions Defendants allege are based on misstatements of the record.[8] Even if there were contradictions, the result would be a credibility issue requiring resolution by a jury.

---

[8] When Bellamy exclaimed at trial, "[h]e did not read me my rights," A-2392, he meant that Gillen had not *immediately* Mirandized him when they arrived at the precinct, as Gillen's testimony suggested. Contrary to Defendants' Brief at 47, this statement does not contradict Bellamy's later testimony that Gillen interrogated him for hours before belatedly reading him his *Miranda* rights. *See* A-1355–56, 1829. Likewise, Bellamy never denied making statements to Gillen that he later "admitt[ed]" he made. Defs. Br. 47. Bellamy's protest, at the suppression hearing, to Gillen's testimony that Bellamy had "stated that he was in C Town th[e] *morning* [of the murder]" and "knew [Abbott's] whole family," A-2396–97 (emphasis added), is consistent

19

Throughout his ordeal, this young man protested being framed for a murder he didn't commit.  Upon being convicted, Bellamy cried out 30 times, "I didn't do it!"  A-1031–37.  During the post-trial 440 proceedings, he even refused an *Alford* plea offer that would have let him walk out of prison immediately.  A-702–03, 3227–28.  It would be perverse, now that his conviction has been vacated based upon proof that satisfied a state judge of his likely innocence, if he were denied civil recovery because, in the courtroom, he refused to go silently like a lamb to his slaughter.

**B.     A Jury Could Reasonably Conclude that the Defendants' Fabrication of Veronica Walker's 'Identification' of Bellamy, Together with Their Withholding of Her Exculpatory Statements, Proximately Caused His Conviction**

**1.     The Fabrication Claim**

Defendants argue that, even if police fabricated a DD5 report claiming Veronica Walker had identified Bellamy as the perpetrator, this misconduct did not prejudice Bellamy because Walker never positively identified him at trial.  *See* Defs. Br. 44-46.  However, the prosecution used the false DD5 in several ways to suggest Bellamy's guilt, and thus a reasonable jury could find he was prejudiced.

---

with his deposition testimony that he told Gillen he went to C-Town at about *noon*, *see* A-1357, and didn't know Abbott's family, Dist. Ct. Dkt. No. 195-2 at 109–10; Dist. Ct. Dkt. No. 195-3 at 43–44.  Indeed, at Bellamy's trial, Gillen, correcting his false earlier testimony, claimed that Bellamy stated he was in the area of the murder "in the afternoon."  A-2456.

ADA Guy has acknowledged that he relied on the DD5 to elicit Walker's trial testimony that she "mention[ed]" the name "Kareem" to detectives. A-3453; *see* A-942–43. (According to Walker's deposition, Bellamy's name came up only when detectives showed her his photo and she told them he was an acquaintance and not the perpetrator. *See* Pl. Op. Br. 20-21.) Guy confronted Walker before the jury with the DD5 and tried to get her to admit she had identified Bellamy. *Id.* at 22. He then argued to the jury, consistent with the false DD5, that Walker really recognized him but was too scared to make an identification in court, and that her unspoken "identification" corroborated Carter and Sanchez. *Id.* at 59.

Guy's leading questions based on the fabricated DD5, combined with detectives' earlier threats that she could be imprisoned if she didn't cooperate, *see* A-3283–84, pressured Walker to accede, in part, to the prosecution's version of events. Asked, "did you tell Detective Solomeno that the [attacker] looked like Kareem," Walker testified she had told detectives it "could have been" Bellamy, A-944, even though she knew it had not been, *see* Pl. Op. Br. 22 & n.8. Defendants themselves contended below that, because Walker went "half-way" towards identifying Bellamy in court, Guy implied, and the jurors could rightly infer, that Walker would have made an in-court identification had Bellamy not

21

(allegedly) intimidated her.[9]  A-2084–85 ¶ 308.  Guy has testified that the DD5

(which he did not know was fabricated) gave Walker less "'wiggle' room" on the

stand and "proved most helpful" in convicting Bellamy.  A-1752, 3453–54.

Defendants incorrectly assume that the trial judge's instruction that

questions are not evidence cured any prejudice from Guy's questioning based upon

the false DD5.  *See* Defs. Br. 46.  But prejudicial questions alone can deny a

criminal defendant a fair trial.  *See Washington v. Schriver*, 255 F.3d 45, 61 (2d

Cir. 2001) ("the sting survives such instructions" (internal quotation marks

omitted)); *see also United States v. Meserve*, 271 F.3d 314, 326 (1st Cir. 2001)

("Even when a question elicits . . . an answer arguably favorable to the defense, the

question itself may nevertheless prejudice a defendant . . . .").  When Guy, holding

the DD5, asked Walker, "didn't you tell Detective Solomeno and Detective Gillen

that you recognized that [attacker] as Kareem," A-944, the jury was bound to

believe that his question was based upon his superior knowledge.

Defendants argue that Walker's testimony somehow favored Bellamy

because defense counsel, during his summation, made the best of things by arguing

that Walker's failure to positively identify Bellamy allowed for reasonable doubt.

But this argument *failed*.  The jury, after asking for two readbacks of Walker's

---

[9] The lie that Walker identified Bellamy even infected the decision denying Bellamy's habeas petition.  *See* A-613 (memorandum and order denying habeas petition) ("*Three* witnesses identified petitioner as present at [t]he scene of the murder." (emphasis added)).

testimony, *convicted* Bellamy. Pl. Op. Br. 23; *see Shabazz v. Kailer*, 201 F. Supp. 3d 386, 396 (S.D.N.Y. 2016) (reasonable to infer fabricated evidence influenced jury since they asked for the evidence during deliberations). Defendants cannot seriously contend that Bellamy suffered no prejudice from their fabrication of the DD5 and Guy's use of it.

Defendants' reliance on *Dufort v. City of New York*, 874 F.3d 338 (2d Cir. 2017), is misplaced. In *Dufort*, there was no prejudice from the police defendants' withholding that the eyewitness had identified the plaintiff based upon his red sweatshirt, not his face, because the witness at trial gave this testimony anyway. *See id.* at 355. In Bellamy's case, the jury never learned that Walker had told police Bellamy was not the perpetrator.

Finally, the question of whether the fabricated Walker identification caused jurors to convict is governed by the rule that "[i]ssues of causation . . . are questions of fact." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012). A jury should decide causation.

### 2. The *Brady* Claim

Defendants wrongly argue that Bellamy's *Brady* claim concerning Walker's statements is unpreserved. *See* Defs. Br. 54. Bellamy asserted the *Brady* claim in his complaint, *see* A-62, 64, 93–94 ¶¶ 188-89, 199, 379, 382, but Defendants' summary judgment motion didn't challenge this claim, *see* A-710–51, and the

23

district court dismissed the entire complaint without even addressing the merits of the claim (even though the facts underlying it appeared in Bellamy's opposition brief). The law is clear that under these circumstances dismissal is improper. *See Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (vacating dismissal where "the district court did not provide [plaintiff] with notice that it would consider grounds not raised in the defendants' brief"); *see also* Fed. R. Civ. P. 56(f)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

Defendants' additional contention that the *Brady* claim fails because "all relevant information was available to defense counsel," Defs. Br. 54, is absurd. The notes and DD5 that Defendants reference did not include Walker's exculpatory statement that Bellamy wasn't the perpetrator or her refusal to sign the DD5 under the detectives' improper pressure to do so. Bellamy's counsel was not at fault for not being omniscient. Moreover, had Defendants revealed the truth, the prosecution never would have called Walker. If anything, her exculpatory statements would have made her a *defense* witness.

**C. Contrary to Defendants' Claims, the Record Permits a Jury Finding that the Individual Defendants Violated *Brady* by Intentionally Suppressing Linda Sanchez's Statements**

Defendants portray as immaterial Sanchez's report to Gillen, on the day of the murder, that she "didn't see anything," because Sanchez purportedly didn't

24

know what detectives were investigating.[10]  Defs. Br. 51-52.  Yet Sanchez testified

at trial that she learned of the incident "when the cops came inside the C-Town to

ask questions *that same day*."  A-2560 (emphasis added).  During the 440 hearing,

she testified that when police came into the supermarket on the day of the incident,

"they said do you know anything.  I said no."  A-1096.  When questioned by the

court, she made clear she was referring to "James Abbott. . . .  I said no, I didn't

know nothing."  *Id.*  This testimony is corroborated by Gillen's admission that he

canvassed C-Town with a photo of Abbott and asked store employees (of whom

Sanchez was one) whether they had seen Abbott or knew him.  *See* A-2759, 3386–

87.

Next, Defendants dismiss as an insignificant error Sanchez's testimony that

she told police she saw Bellamy on a Sunday when the murder occurred on a

Saturday.  *See* Defs. Br. 52-53.  However, what lay behind this discrepancy was

not a trivial error, but her vivid account of an incident that could not possibly have

occurred on a Saturday.  According to Sanchez's later deposition testimony, she

told police the incident occurred on a day when Bellamy was trying to buy beer but

was told by an employee named "Goshe," "you can't buy beer before noon"

---

[10] Defendants note that Sanchez, at trial, denied speaking to detectives on the day of Abbott's murder.  *See* Defs. Br. 51.  But Sanchez has since confirmed repeatedly that she told canvassing detectives that morning, and Gillen specifically, she "didn't see anything."  *See* A-1639–40, 2773–75, 3296–97.

25

(because of Blue Laws then in effect that barred Sunday morning alcohol sales, *see* Pl. Op. Br. 10). This caused Bellamy to show displeasure through the "look on his face." A-1497–99.[11] Had police disclosed Sanchez's account of the beer incident, the defense could have dramatically impeached Sanchez's trial testimony that she had observed Bellamy and Abbott on the day of the murder.

Defendants also claim there is no evidence that Sanchez told Gillen and Solomeno about the Sunday beer incident at a "relevant time[] in 1994 [or] 1995," that is, before the trial. *See* Defs. Br. 52-53. However, Sanchez has testified she spoke to them before the lineup and her grand jury testimony, then didn't speak to them again. *See* A-1496, 1504.

Defendants question whether they were present when Sanchez was shown a photo and falsely identified Terrill Lee as the killer's accomplice. *See* Defs. Br. 53. However, Sanchez has testified that the photo identification occurred on the same occasion as the in-person lineup, *see* A-2785, which Gillen conducted, *see* A-826, 1614, before he spoke to Lee that same night, A-307, 1180. Sanchez's

---

[11] Defendants point out that Sanchez, during the same deposition, claimed she saw Bellamy on a Saturday. *See* Defs. Br. 52. But she made this claim only because her family insisted that she had seen Bellamy on a Saturday. *See* A-1518 ("[I s]poke to my family to refresh up my memory *because I told them it was Sunday*, they said no Linda, it wasn't Sunday it was Saturday." (emphasis added)). And she stood firm in her recollection that Bellamy had been unable to buy beer when she saw him in the store. *See* A-2227–28. She was likewise insistent at the 440 hearing that she had seen Bellamy on a Sunday, the only day C-Town could not sell beer before noon. *See* A-2773–74, 2781–82. In any case, what matters for *Brady* purposes is the undisputed fact that *she told the Individual Defendants* that she had seen Bellamy on what must have been a Sunday.

misidentification of Lee, combined with her day-of-murder denial that she had seen anything and later recollection she had seen Bellamy on a Sunday, clearly constitute *Brady* material.

Finally, Defendants argue that Bellamy cannot prove that Defendants withheld this information intentionally. But intent is a classic jury question. *See Redd*, 678 F.3d at 178. Furthermore, Gillen betrayed his intent when he told Bellamy after the lineups, "once I close the door, I close it for good." A-1368. A civil jury could also infer detectives acted in bad faith based on their pattern of misconduct, *see Manganiello v. City of New York*, 612 F.3d 149, 163-64 (2d Cir. 2010), and the obvious exculpatory value of Sanchez's statements.

**D.     There Is Strong Circumstantial Evidence from Which a Jury Could Infer that Gillen Manufactured Carter's Lineup 'Identification' of Bellamy**

Defendants argue there is no circumstantial evidence to support Bellamy's claim that Gillen improperly induced Carter, who had failed to identify Bellamy at a lineup, to positively identify Bellamy following a private, post-lineup meeting with Gillen. *See* Defs. Br. 41-43. However, a jury could reasonably infer that Gillen wheeled Carter into another room and spoke to him alone, without the ADA supervising the lineup, to pressure Carter into making an identification. *See* Pl. Op. Br. 13-14, 41.

27

The record suggests Gillen improperly induced Carter to attribute his failure to identify Bellamy to Bellamy's supposedly changed hair style. It was Gillen who had been conscious of Bellamy's braids at the lineup, having hidden them under a head covering, whereas Carter had never described the perpetrator's hair during previous interviews, A-1092–93, said nothing about hair during the lineup itself, A-1175–78, and at trial testified the killer had no braids, A-2632–33. A jury could infer that Gillen gave Carter a false explanation for Carter's inability to identify Bellamy, which Carter then repeated to the prosecutor.

Further supporting this inference is Veronica Walker's testimony that Gillen used improper suggestion about Bellamy's purported change in hair style to get her to falsely identify him. *See* Pl. Op. Br. 20. And Gillen committed similar misconduct in at least one other case where, according to sworn testimony, he improperly encouraged an eyewitness to identify suspect Emmett Wheaton at a lineup. *See* A-1555–62.[12] A jury could reasonably infer from these improprieties that Gillen committed similar misconduct with Carter. *See Ismail v. Cohen*, 899 F.2d 183, 188-189 (2d Cir. 1990) (similar subsequent complaint against defendant officer probative of officer's intent and pattern of behavior).

---

[12] After being acquitted, Wheaton filed a lawsuit based on Gillen's misconduct that settled for $120,000. *See* A-1749.

28

## CONCLUSION

The judgment should be vacated and the matter remanded to the district court for completion of *Monell* discovery and trial. In view of the district court's one-sided fact-finding that ignored contrary evidence and dispositive caselaw brought to its attention, and its extraordinary personal attacks on Bellamy's counsel, the matter should be remanded to a different judge.

Respectfully submitted,

/s/ Joel B. Rudin
JOEL B. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

Jonathan Hiles, Esq.
Sanford Heisler Sharp, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
(646) 768-7054
jhiles@sanfordheisler.com

Jacob Loup, Esq.
Joel B. Rudin, Esq.
Law Offices of Joel B. Rudin, P.C.

(On the Brief)

Dated:       New York, New York
             January 9, 2018

29

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

I certify that this brief was prepared using Microsoft Word 2016, using 14-point Times New Roman font.  According to that software, this brief contains 6,983 words, not including the cover, table of contents, table of authorities, caption, signature block, or this certificate.

/s/ Joel B. Rudin
JOEL B. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com